VIRGINIA: IN THE CIRCUIT COURT FOR THE CITY OF
CHARLOTTESVILLE

**Sequel Investors Limited Partnership**
**a Virginia limited partnership**

                    **Plaintiff,**

v.                                                      Case No. _CL 20 - 613_

**Big Lots Stores, Inc**
**an Ohio stock corporation**
**c/o Registered Agent .**
**Corporation Service Company**
**100 Shockoe Slip, Fl 2**
**Richmond VA, 23219-4100**

                    **Defendant**

## BILL OF COMPLAINT

Comes now the Plaintiff, Sequel Investors Limited Partnership, by counsel, and
for their Bill of Compliant herein respectively represents as follows:

1. Defendant, Big Lots Stores, Inc is successor in interest to Consolidated Stores
   Corporation, an Ohio corporation, d/b/a Big Lots, who entered into a Lease with
   Sequel Investors Limed Partnership dated October 25, 1999. (A copy is attached
   as Exhibit A)

2. The Leased Premises is located within the Seminole Square Shopping Center in
   the City of Charlottesville, Virginia.

3. Section 26 of the Lease states "Tenant will surrender the Premises broom-clean
   and in good condition and repair and that Tenant's obligation under this section of
   the Lease survive the expiration of the Lease"

4. A walkthrough inspection of the Premises was conducted on January 24, 2020.

5. Mr. Edgerton a regional manager for Big Lots participated in the walkthrough
   inspection on January 24, 2020.

6. On February 17, 2020, a letter was sent to Defendant to address issues found
   during the inspection of January 24, 2020 and to provide notice that the Premises



EXHIBIT

A

are not in an acceptable condition to Landlord and do not meet the requirements outlined in Section 26 of the Lease. (A copy of the letter without photos is attached as Exhibit B)

7.  On August 13, 2020, an additional letter was sent to Defendant requesting that Defendant provide a detailed schedule of plans to address the issues identified in the February 17, 2020 letter.

8.  The Lease provides that the Tenant shall make repairs, perform maintenance and make all replacements necessary in order to keep the Premises in good order and repair.

9.  The August 13, 2020 letter also provided notice to Big Lots that an inspection of the five rooftop HVAC units servicing the Premises revealed a severe lack of preventative maintenance by Big Lots during its tenure at Seminole Square, irrespective of normal wear and tear. (A copy of the letter without photos is attached as Exhibit C)

10. On September 25, 2020 a letter was sent to Defendant that quotes have been obtained to bring the Premises to broom clean condition as defined in the Lease and Big Lots needs to issue a check or provide a proposal that is acceptable to the Landlord to undertake the work necessary to resolve this matter. (A copy of the letter is attached as Exhibit D)

11. Under the terms of the Lease the Tenant has an obligation not to cause waste to Landlord's property.

12. Defendant's negligence by not properly maintaining the Premises resulted in an economic loss to the Plaintiff.

13. The Lease provides that Landlord has a right to recover attorney's fees.

14. Plaintiff requests the Court grant judgment against Defendant for $101,298.10, court costs and reasonable attorney's fees.

Sequel Investors Limited Partnership

By Counsel

John R. Walenten, Esquire VSB. No.28687
408 E. Market Street, Suite 203A
Charlottesville, Virginia 22902
(434) 293-4545 telephone
(434) 293-2816 facsimile
e-mail: jrwalenten@embarqmail.com
Counsel for Plaintiff

## CERTIFICATE

I certify that a true and correct copy of the foregoing Bill of Complaint was sent via first-class postage prepaid this ___ day of November 2020, to defendant, Big Lots Stores, Inc. an Ohio corporation, c/o Registered Agent, Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, VA 23219-4100

John R. Walenten

**EXHIBIT A**

## AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is made as of the 25 ½ day of
_____ 1999, by and between (i) SEQUEL INVESTORS LIMITED
PARTNERSHIP, a Virginia limited partnership, having its principal office at c/o Great
Eastern Management Company, P.O. Box 5526 (2619 Hydraulic Road), Charlottesville,
Virginia 22905-5526 (22901) ("Landlord"), and (ii) CONSOLIDATED STORES
CORPORATION, an Ohio corporation, d/b/a Big Lots, having offices at 300 Phillipi Road,
Department 10051, P.O. Box 28512, Columbus, Ohio 43228-0512 ("Tenant").

In consideration of the respective covenants contained herein and intending to be
legally bound hereby, Landlord and Tenant hereby covenant and agree as follows:

## ARTICLE I

The other Articles of this Lease and the Schedules included therein make reference to
the following items (individually, "Item"; collectively, "Items"):

1.     Premises: A portion of a building outlined by hatch on the plan attached to
and made a part hereof as Exhibit "A". The only purpose of the attached Exhibit "A" is to
show the approximate size and location of the Premises, and of the Shopping Center (as
defined in Paragraph 2 below) outlined in red, and no representation is made between the
parties hereto with respect to the size, location, occupancy or use of any other areas shown
upon said plan.

2.     Shopping Center:  That certain real property and improvements located thereon
in the Seminole Square Shopping Center situated in the City of Charlottesville,
Commonwealth of Virginia,  as described in the legal description attached hereto and made a
part hereof as Exhibit "A-1". For purposes of Common Areas as defined in Article II,
Paragraph 6 hereinafter, the Shopping Center may include the adjacent area known as the
"Giant Seminole portion of the Seminole Square Shopping Center" as outlined in green on
Exhibit A.

3.     Gross Leasable Area of the Premises: An area containing approximately
twenty-five thousand six hundred fifty six (25,656) square feet.

4.     Delivery of Possession: October 22, 1999, provided that Tenant has complied
with the provisions of Article II, Paragraph 7 hereinafter.  In the event Landlord shall not
deliver possession of the Premises to Tenant by such time, Tenant may terminate this Lease
by written notice to Landlord.

5.     Term: The term shall be for a period which commences on the
"Commencement Date" (as defined in Paragraph I(b) of Article II hereof) and which ends on
January 31, 2008 (the "Initial Term"), subject to the other provisions of this Lease. ~~In the
event Stop & Shop Companies, Inc., the Original Tenant as defined in Article II Paragraph
1(c) hereof elects not to renew the Overlease (as defined in Article II Paragraph 1(c)) when it
expires on November 20, 2006, Landlord agrees to recognize this Lease as primary and both~~

~~Landlord and Tenant agree that all terms and conditions of this Lease, including those relating to the Term, shall remain in full force and effect.~~ Tenant shall have the option to extend the Initial Term of this Lease for one (1) consecutive additional term of eight (8) years (the "Option Term") subject to the provisions of Paragraph 1 of Article III hereof and the other provisions of this Lease.

6.    Minimum Rent: Will be based on the applicable "Lease Year" (as defined in Paragraph 1(b) of Article II hereof) as follows:

Commencement Date to the end of the Initial Term: One Hundred Fifty One Thousand Three Hundred Seventy and 00/100 Dollars ($151,370.00) per Lease Year, which is equal to Twelve Thousand Six Hundred Fourteen and 20/100 Dollars ($12,614.20) per month, at the rate of Five and 90/100 Dollars ($5.90) per square foot of Gross Leasable Area in the Premises. *Twenty Six*

Lease Year(s) 1-4 of Option Term: One Hundred Seventy-Seven Thousand and 00/100 Dollars ($177,026.40) per Lease Year, which is equal to Fourteen Thousand Seven Hundred Fifty-Two and 20/100 Dollars ($14,752.20) per month, at the rate of Six and 90/100 Dollars (6.90) per square foot of Gross Leasable Area in the Premises.

Lease Year(s) 5-8 of Option Term: One Hundred Eighty-Nine Thousand Eight Hundred Fifty-Four and 40/100 Dollars ($189,854(00) per Lease Year, which is equal to Fifteen Thousand Eight Hundred Twenty-One and 20/100 Dollars ($15,821.20) per month at the rate of Seven and 40/100 Dollars ($7.40) per square foot of Gross Leasable Area in the Premises.  *.40*

7.    Percentage Rent: For each "Lease Year" (including Partial Lease Years as defined in Paragraph 1(b) of Article II) from the Commencement Date through January 31, 2005, the Percentage Rent shall be equal to the amount by which two and one-half percent (2 1/2%) of Tenant's "Gross Sales" (as defined in Paragraph 4 (c) of Article II hereof) for such Lease Year exceeds Minimum Rent for that Lease Year. For all Lease Years thereafter during the Term (including Partial Lease Years), Percentage Rent shall be equal to the amount resulting from multiplying two and one-half percent (2½%) by the positive difference, if any, of Tenant's Gross Sales for any such Lease Year minus the sum resulting from dividing Tenant's Minimum Rent for that year by three percent (3%).

8.    Subtenant's Pro-Rata Share or Pro Rata Share: A fraction, the numerator of which is the Gross Leasable Area of the Premises, and the denominator of which is the Gross Leasable Area of all buildings in the Shopping Center at the applicable time.

9.    Tenant's Permitted Use of the Premises:

(a)   Tenant shall have the right to use the Premises for the retail sales of general merchandise and furnishings which may include the sale of "odd lot" and "closeout" merchandise. The Premises shall be occupied and used only for the Permitted Uses and for no other purpose whatever unless Landlord, in its sole right, discretion or with the approval and consent of any other interested party who has a right, consents to a change in such uses.



Tenant acknowledges and agrees that the Permitted Uses of the Premises set forth herein are a critical element of the bargain of the parties hereto and that actual and substantial detriment will result to Landlord and the other tenants and occupants of the Shopping Center in the event that a change or deviation in such uses shall occur or be permitted without the express written consents herein required.  Except as otherwise provided therein in Article II Paragraph 15(d), Tenant agrees to keep the Premises open and diligently, actively and continuously operate the business conducted therein, using a sufficient number of adequately trained managers and personnel for efficient service, during the minimum hours and days and evenings of the week which are indicated on Exhibit C.  Tenant shall carry at all times in the Premises a full stock of merchandise of such quantity, character and quality as to maximize Gross Sales and shall operate 100% of the Premises.

(b)  Notwithstanding anything to the contrary contained in this Lease, Landlord warrants, covenants and agrees that there are no use restrictions in place in the Shopping Center, nor are there any exclusive rights in favor of other tenants (including replacements thereof)in the Shopping Center (other than those described in Exhibit L hereto) which will materially adversely affect Tenant's use and occupancy of the Premises.  Landlord shall indemnify, defend and hold harmless Tenant from any and all costs, liabilities claims and expenses related to a violation of the foregoing sentence.  The provisions of this paragraph (b) shall not apply if Tenant violates the use restriction described in Paragraph 2.4 of the Declaration of Restrictions ("Declaration") dated September 30, 1985, or if Tenant violates any other use restrictions which relate specifically to the "S&S Space" as defined in the Declaration.  Tenant acknowledges having received a copy of the Declaration.

10.   Broker: Landlord and Tenant each represents and warrants to the other that (i.e. the party making the subject representation and warranty) there is no real estate agent or broker entitled to a fee or commission in connection with this Lease.  Landlord and Tenant each agrees to defend, indemnify and save harmless the other from and against all loss, cost and expense (including attorneys' fees) incurred by such other by reason of a breach of such representation or warranty on the part of the former (i. e. on the part of the party who or which made the subject representation or warranty).

## Exhibits

| | |
|---|---|
| EXHIBIT A | The Premises and Shopping Center Site Plan |
| EXHIBIT A-1 | Legal Description of the Shopping Center |
| EXHIBIT B | Tenant Improvements/Criteria Manual |
| EXHIBIT B-1 | Initial Tenant Improvement Plans |
| EXHIBIT C | Operating Hours |
| EXHIBIT D | Sign Criteria |
| EXHIBIT E | Tenant Covenants Relating to IRB Financing |
| EXHIBIT F | Deleted |
| EXHIBIT G | Deleted |
| EXHIBIT H | Deleted |
| EXHIBIT I | Deleted |
| EXHIBIT J | Form of Attornment and Non Disturbance Agreement |
| EXHIBIT K | The One Lease ～ Deleted |
| EXHIBIT L | Exclusive Use Table |

## ARTICLE II

Of the Lease dated _October 25_____, 1999, by and between SEQUEL INVESTORS LIMITED PARTNERSHIP, as Landlord, and CONSOLIDATED STORES CORPORATION, as Tenant.

## TABLE OF CONTENTS

| Paragraph | Page |
|---|---|
| 1. | INTRODUCTORY PROVISIONS ..................... 6 |
| 2. | PAYMENT/"Rental" .............................. 8 |
| 3. | MINIMUM RENT ................................ 10 |
| 4. | PERCENTAGE RENT ........................... 10 |
| 5. | TAXES ....................................... 12 |
| 6. | COMMON AREAS; COMMON AREA CHARGES; TRASH DISPOSAL CHARGES ..................................... 12 |
| 7. | INSURANCE AND PREMIUMS ..................... 14 |
| 8. | UTILITIES .................................... 16 |
| 9. | [INTENTIONALLY DELETED] |
| 10. | [INTENTIONALLY DELETED] |
| 11. | REPAIRS, MAINTENANCE AND ALTERATIONS ....... 17 |
| 12. | INSURANCE - COMPLIANCE AND RATE ............. 20 |
| 13. | USE AND OPERATION .......................... 20 |
| 14. | ASSIGNMENT ................................. 21 |
| 15. | OPERATION OF BUSINESS/DARK STORE ........... 23 |
| 16. | SIGNS ...................................... 24 |
| 17. | [INTENTIONALLY DELETED] |

18.   [INTENTIONALLY DELETED]

19.   CASUALTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

20.   EASEMENT FOR PIPES . . . . . . . . . . . . . . . . . . . . . . . . . 26

21.   NON-LIABILITY OF SUBLANDLORD . . . . . . . . . . . . . . . 26

22.   INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

23.   RIGHT TO CURE DEFAULTS . . . . . . . . . . . . . . . . . . . . . 28

24.   DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

25.   BANKRUPTCY OR INSOLVENCY . . . . . . . . . . . . . . . . . . 30

26.   SURRENDER OF PREMISES . . . . . . . . . . . . . . . . . . . . . 33

27.   HOLDING OVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

28.   COVENANT AGAINST LIENS . . . . . . . . . . . . . . . . . . . . 33

29.   EFFECT OF UNAVOIDABLE DELAYS . . . . . . . . . . . . . . 34

30.   ESTOPPEL CERTIFICATES . . . . . . . . . . . . . . . . . . . . . . 35

31.   WAIVER OF TRIAL BY JURY . . . . . . . . . . . . . . . . . . . . 35

32.   WAIVER OF RIGHT OF REDEMPTION . . . . . . . . . . . . . 35

33.   QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 36

34.   RELATIONSHIP OF PARTIES . . . . . . . . . . . . . . . . . . . . 36

35.   BILLS AND NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . 36

36.   ACCESS TO PREMISES . . . . . . . . . . . . . . . . . . . . . . . . 36

37.   NON-WAIVER OF SUBLANDLORD . . . . . . . . . . . . . . . . 37

38.   RECORDING THIS SUBLEASE . . . . . . . . . . . . . . . . . . . 37

39.   ENTIRE AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . 38

40.   SOLE BROKER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

41.   RULES AND REGULATIONS . . . . . . . . . . . . . . . . . . . . 39

42.   PAYMENT OF INTEREST ............................ 39

43.   [INTENTIONALLY DELETED]

44.   SUBORDINATION TO MORTGAGES ................. 40

45.   CONDEMNATION ................................. 40

46.   RESTRICTIONS AND REQUIREMENTS .............. 41

47.   [INTENTIONALLY DELETED]

48.   ATTORNEYS FEES ............................... 43

49.   SUBLANDLORD-DEFAULTS ....................... 43

50.   GOVERNMENTAL REGULATIONS ................... 44

51.   HAZARDOUS MATERIAL ......................... 43

52.   CERTAIN DEFINITIONS ......................... 44

53.   GENERAL PROVISIONS .......................... 45

1.   INTRODUCTORY PROVISIONS

(a)   Leasing. The Landlord, for and in consideration of the rents, covenants, agreements, and conditions herein contained on the part of Tenant to be paid, kept, observed, and performed, does hereby lease to Tenant, and Tenant does hereby take from Landlord, that certain space (the "Premises") described in Item 1 of Article I above, outlined by hatch on the plan attached hereto as Exhibit "A" hereof, and located within the Shopping Center which is identified in Item 2 of Article I above, together with the non-exclusive right to use in common with Landlord and others the "Common Areas" (hereinafter defined) pursuant to the provisions of Paragraph 6 hereof. The "Gross Leasable Area" of the Premises shall be that set forth in Item 3 of Article I above. Landlord excepts and reserves the land under, and the exterior walls and roof of, the Premises. This Lease is made subject to ~~(i) all the terms and conditions set forth in the "Overlease" (as hereinafter defined),~~ (ii) all the terms and conditions set forth in this Lease, and (iii) all liens, encumbrances (as hereinafter defined), easements, restrictions, covenants, and zoning and other land use laws and regulations, now or hereafter affecting or governing the Premises or the Shopping Center which do not materially adversely affect the use of the Premises as contemplated herein. Notwithstanding the foregoing, the Shopping Center may contain only the Premises, or the Shopping Center may contain such additional other premises, stores and/or tenancies as Landlord may, from time to time, determine; subject, however, to the provisions of Paragraphs 13(b) and 13(c) hereof.



(b) Term. Commencement Date; Lease Year. Subject to the following provisions, the term of this Lease (the "Term") shall be for the period set forth in Item 4 of Article I above, commencing on the "Commencement Date" (as hereinafter defined), unless sooner terminated in accordance with the terms of this Lease. The word "Term" as used herein shall include any renewals or extensions of this Lease expressly provided by this Lease. The "Commencement Date" shall be the date which is the earlier of forty five (45) days after "Delivery of Possession" as defined in Item 4 of Article I or the date on which Tenant opens for business. A "Lease Year"shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period of time between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year".

~~(c) Overlease. Landlord, as lessor, and THE STOP & SHOP COMPANIES, INC. (the "Original Tenant") as lessee, entered into a certain lease dated as of October 10, 1995 (the "Overlease"), a memorandum of which was recorded among the City of Charlottesville, Virginia Land Records in Deed Book 472 at Page 789, with respect to certain premises (the "Overlease Premises") consisting of a building containing approximately 82,660 (sic) square feet of ground floor area, which is described in the Overlease, located in the Shopping Center. The Overlease has been amended by the following surviving instruments:~~

~~1.    Agreement dated April 24, 1986 between Landlord and Original Tenant.~~

~~2.    Letter agreement dated February 10, 1988 between Landlord and Original Tenant.~~

~~3.    Letter agreement dated September 1, 1988 between Landlord and Bradlees.~~

~~Original Tenant assigned all of its right, title, and interest in and to the Overlease to Bradlees Tidewater, Inc. ("Bradlees") by virtue of an Assignment of Lease dated June 7, 1988 (the "First Lease Assignment"). In addition, Original Tenant, assigned all of its right, title, and interest in and to certain "Related Agreements" to Bradlees by virtue of an Assignment and Assumption dated as of June 17, 1988 (the "Related Agreements Assignment").~~

4.    Landlord hereby warrants, represents, and covenants to Tenant that: (a) Landlord will defend the title of the Premises, and will indemnify Tenant against any damage and expense. which Tenant may suffer by reason of any defect in the title or description herein of the Premises; and (b) Landlord has full right and power to execute this Lease and to lease the Premises for the Term provided in this Lease. In case Landlord does not have the title and rights aforesaid, then in such event, in addition to any other rights of Tenant, this Lease shall, at the option of Tenant, become null and void, and no Rent for the remainder of the term of aforesaid shall become due to the Landlord, its legal representatives or assigns, and all advanced rents and other payments shall be returned by the Landlord to Tenant and Landlord will defend, indemnify, and protect the Tenant in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease. In order to effect this

option, Tenant must notify Landlord within thirty (30) days of becoming aware of such defect in the title or Landlord's not having the full right and power to execute this Lease.

~~Bradlees assigned all of its right, title and interest in and to the Overlease to Heshinger Company ("Heshinger") by virtue of an Assignment of Lease dated March 10, 1989 (the "Second Lease Assignment"). In addition, Bradlees assigned all of its right, title and interest in and to certain "Operation Documents" to Heshinger by virtue of an Assignment of Operation Documents dated as of March 10, 1989 (the "Operation Documents Assignment"). Heshinger, by virtue of a bankruptcy filing, has rejected its interest in the Overlease.~~

~~(d)    Incorporation by Reference.~~

~~(1) It is understood and agreed that this Lease is a sublease of a portion of the Overlease Premises. (That portion of the Building that is not being leased to Tenant pursuant to the terms of this Lease shall hereinafter be referred to as the "Other Premises".) During the Term of this Lease, Tenant shall perform and observe all of the obligations, terms, conditions and covenants set forth in the provisions of the Overlease which are to be performed or observed by the "Tenant" thereunder with respect to the Premises. This Lease is expressly made subject to the Overlease, including, without limitation, those provisions of the Overlease which are specifically referenced in this Lease. Any term or expression that is used both in this Sublease and in the Overlease and that is not defined in this Lease shall have the same definition herein as defined in the Overlease. Landlord shall have the right, from time to time, to enter into modifications and/or amendments of the Overlease without obtaining Tenant's consent. Despite the foregoing, in the event that any such amendment or modification would materially adversely affect Tenant's rights under this Lease, Landlord shall not enter into such amendment or modification without obtaining Tenant's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed. If the approval of Landlord shall be required with respect to the granting by Landlord of any easement, license or other agreement with respect to the Shopping Center, then Landlord shall have the right to grant or withhold such approval in the exercise of Landlord's sole and absolute discretion, without obtaining Tenant's consent.~~

~~(2) Tenant shall not do or permit to be done any act or thing which may constitute a breach or violation of any term, covenant or condition of the Overlease, whether or not such act or thing is permitted under the provisions of this Lease.~~

~~(3) Tenant will indemnify and save Landlord harmless from any loss or liability, including, but not limited to, claims, judgments, damages and awards by reason of any breach by Tenant of any of the terms or conditions of the Overlease with respect to the Shopping Center, and shall reimburse Landlord for all reasonable counsel fees, court costs and other reasonable expenses incurred in connection therewith. If any breach or default under said Overlease is caused by Tenant's failure to comply with the terms and conditions hereof, Landlord, at its option, shall have the right, but not the obligation, to immediately take all the necessary and reasonable steps to cure said default or breach, with the costs so incurred by Landlord to be paid to Landlord by Tenant as Additional Rent within fifteen (15) days after receipt by Tenant of a written statement setting forth the same, together with documentation substantiating such costs.~~

2.      PAYMENT

(a) Throughout the Term of this Lease, Tenant shall pay to Landlord the "Rental", which is hereby defined as the sum of the "Minimum Rent" and the "Percentage Rent", "Taxes", "Common Area Charges", "Premiums", and other "Additional Rent" (all as hereinafter defined), when and as the same shall be due and payable hereunder. All moneys payable by Tenant under the terms of this Lease, other than the Minimum Rent, shall be hereinafter referred to, individually and collectively (and whether or not so designated in this Lease), as "Additional Rent". Except as otherwise stated herein, Additional Rent shall be due and payable, in each instance, thirty (30) days after the date on which Tenant is given notice of the amount of the Additional Rent due. All Rental payable under this Lease shall be paid in lawful money of the United States of America by check, subject to collection, payable to Landlord at c/o Great Eastern Management Company, P.O. Box 5526 (2619 Hydraulic Road), Charlottesville, Virginia 22905-5526 (22901), or payable to, or mailed or delivered to, such other person or place as Landlord shall designate by written notice to Tenant hereunder. Except as may be expressly provided herein, all Rental payable under this Lease shall be paid in full by Tenant, without notice or demand and without deduction, abatement or setoff of any kind. Rental for any Partial Lease Year shall be prorated.

(b) If Tenant should fail to pay the Landlord when due any installment of Minimum Rent, Additional Rent or other sum to be paid hereunder, then upon the second (2nd) such late payment and on any late payments thereafter, Tenant will pay Landlord on demand a late charge of seven and one-half percent (7½%) thereof or One Hundred and No/100 Dollars ($100.00), whichever is greater. Failure to pay such late charge upon demand thereof shall be an event of default under this Lease. Provision for such late charge shall be in addition to all other rights and remedies available to Landlord hereunder or at law or in equity and shall not be construed as liquidated damages or limiting Landlord's remedies in any manner. In addition, any and all sums remaining unpaid shall accrue interest at the "Applicable Interest Rate" (as hereinafter defined in Paragraph 42(a) of Article II) and, as of the tenth (10th) of each and every calendar month that an installment of Minimum Rent, Additional Rent or other sum to be paid hereunder remains unpaid, such installment shall be subject to a late charge of one percent (1%) of the amount still due..

(c) If Tenant pays any installment of Minimum Rent or any other sum due under the Lease by check and such check is returned for insufficient funds or other reason not the fault of Landlord, then Tenant shall pay to Landlord on demand a minimum processing fee of One Hundred and No/100 Dollars ($100.00) per returned check. These fees shall be construed as Additional Rent and be collected in addition to any and all other fees and/or remedies available to Landlord under this Lease. Any Rental paid after the 15th of any month shall, at Landlord's option, be credited to the payment of Rental due on the first day of the following month, and will not affect this, or any other legal action instituted by Landlord to recover delinquent Rental and/or possession of the Premises.

(d) This is a net lease and the Minimum Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid without notice, demand, setoff, counterclaim, deduction, or defense and, except as otherwise expressly provided herein, without abatement or suspension. Except as otherwise expressly provided in this Lease, this Lease shall not

terminate, nor shall Tenant have any right to terminate this Lease.  It is the intention of the parties hereto that the obligations of Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.

3.        MINIMUM RENT

        The "Minimum Rent" shall be that amount set forth in Item 6 of Article I above. The Minimum Rent shall be payable in equal monthly installments, in advance, with the first monthly installment to be due and payable on the Commencement Date  and each subsequent monthly installment to be due and payable on the first day of each and every month thereafter during the Term of this Lease.

4.        PERCENTAGE RENT

        (a)  In addition to Minimum Rent and other Additional Rent, Tenant shall pay Landlord, annually throughout the Term of this Lease as hereinafter provided, a percentage rental (hereinafter referred to as the "Percentage Rent") in the amount set forth in Item 7 of Article I above.

        (b)  Within twenty (20) days following the end of each calendar month during the entire Term of this Lease, Tenant shall submit to Landlord a written statement of Tenant's Gross Sales for the previously ended month.  Within forty-five (45) days after the end of every Lease  Year or Partial Lease Year, during the Term of this Lease, Tenant shall submit to Landlord a written statement of Tenant's Gross Sales for said Lease Year. Such statement shall be certified as being true, correct and complete in all material respects by (i) Tenant, and (ii) if Tenant is a corporation, by an officer thereof.  However, if on more than one (1) occasion during the Term of this Lease, Landlord, through its designated agent, shall audit Tenant's records and such audit discloses an error in any such statement and such error represents an underpayment of Percentage Rent, in any instance, by three percent (3%) or more of the amount actually due, then and in that event all statements thereafter submitted by Tenant pursuant to this Paragraph 4(b) shall, without any further request or demand by Landlord, be audited statements, audited at Tenant's expense by an independent certified public accountant using generally accepted auditing principles ("GAAP").

        (c)  The term "Gross Sales"  as used herein, shall mean (1) the aggregate gross amount of all sales made in or from the Premises and (2) charges for all services rendered in or from the Premises.  Such sales, charges, and receipts shall include those of Tenant and Tenant's permitted sublessees. The following shall be deducted therefrom to the extent same are included in the above computation:  (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned to the Premises; (3) income from stamp machines; (4)  the amount of the discount on sales of merchandise to employees; (5) insurance proceeds; (6) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving

Landlord of the benefit of a sale which would otherwise be made at, in, or from the Premises; and (7) bad debts on credit sales and bad checks.

(d) Tenant shall record, at the time of sale, all receipts from sales and other transactions, whether cash or credit, in a cash register (s) (or automated sales recording - machine (s) which is either then generally recognized, approved and accepted in the retail industry for such recording purposes). Tenant's bookkeeping procedures shall be consistent with generally acceptable accounting practices. For a period of not less than two (2) years after the end of each Lease Year or Partial Lease Year to which they have reference, Tenant shall keep or cause to be kept on the Premises, or at Tenant's main office address as set forth on the first page hereof, full, true and accurate records of all such Gross Sales, credits, refunds and other operations. Landlord or Landlord's representative shall have access to said records upon five (5) days notice during regular business hours during said two (2) year period for the purpose of examining or auditing said records at Landlord's expense. Notwithstanding the foregoing, Landlord shall not be entitled to examine or audit Tenant's records more frequently than once per Lease Year or Partial Lease Year. When and as Landlord may reasonably require, Tenant shall also furnish to Landlord any and all statements, information, and copies of sales and personal property tax reports and returns which may separately show data evidencing such Gross Sales independently for the Premises. Without limiting the generality of the foregoing, Tenant agrees to keep, for at least two (2) years following the end of each Fiscal Year, the personal property, sales, use and occupation tax reports and returns with respect to that Fiscal Year and all pertinent original sales records. If any annual statement submitted by Tenant hereunder understates actual Gross Sales by three percent (3%) or more, and Percentage Rent is due for that Lease Year or Partial Lease Year or if Tenant submits any willfully inaccurate -statement of Gross Sales, then the reasonable costs of Landlord's audit or examination of Tenant's books (including, but not limited to, the reasonable fees, expenses and costs of any accountant retained by Landlord for such audit or examination) shall be paid by Tenant within ten (10) days after Landlord's demand therefor. The furnishing by Tenant of any willfully or materially inaccurate statement of Gross Sales may be deemed, at Landlord's sole option and discretion, an "Event of Default" (as hereinafter defined). In the event of any underpayment of Percentage Rent (whether or not by more than 3%), Tenant shall, within five (5) days after demand therefor, pay Landlord the Percentage Rent due, plus interest thereon at the Applicable Interest Rate from the date such Percentage Rent was originally due under Paragraph 4 (b) hereof until the date such payment is actually received by Landlord; such payment shall be in addition to, and it shall be made without limiting or waiving, any of Landlord's other rights and remedies at law or in equity on account of Tenant's original failure to pay the total amount of Percentage Rent when and as due pursuant to paragraph 4(b) hereof. If Tenant disputes Landlord's determination of Gross Sales after audit by Landlord, Tenant shall pay the amount claimed by Landlord into a mutually agreeable federally insured interest bearing escrow account for the benefit of Landlord and submit Tenant's claim to the American Arbitration Association in Washington, D.C., for determination in accordance with the procedures of said Association then in effect, which determination shall be final and binding upon both parties. The losing party shall pay the costs of such arbitration and the escrow account together with interest thereon shall be paid to the prevailing party.

(d)  Landlord agrees to keep any information obtained from Tenant under this Paragraph 4 as confidential, except that Landlord may disclose such information (i) to any prospective purchaser or mortgagee of the Premises (so long as each such person also agrees in writing to keep such information confidential), (ii) in connection with any litigation or arbitration proceedings between the parties or (iii) as may be required by any judicial or other legally constituted authority.

5.        TAXES

(a)  As used herein, the term "Taxes" shall mean all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center.

(b)  ~~Tenant shall pay Landlord, as provided in this Lease and as Additional Rent, Tenant's "Pro-Rata Share" (as defined in Item 8 of Article I hereof) of all Taxes paid by Landlord with respect to the Shopping Center.~~ For each tax year included in the Term of this Lease, Tenant shall pay to Landlord Tenant's Pro-Rata Share of Taxes. Landlord shall give Tenant a written statement of the actual amount of Tenant's Pro-Rata Share of Taxes, together with a copy of the actual tax bill or current assessment notice. For the tax years during which the Term of this Lease shall commence and terminate, Tenant's Pro-Rata Share of Taxes shall be adjusted and apportioned pro rata, on a per diem basis, between Landlord and Tenant as of the first day of the first month immediately following Commencement Date of this Lease and the expiration date of the Term of this Lease.

(c)  Starting with the Commencement Date and continuing throughout the Term of this Lease, Tenant shall pay Landlord, in advance together with Minimum Rent and as Additional Rent, one-twelfth (1/12th) of Tenant's Pro-Rata share of Taxes. These payments shall be reconciled annually in a statement from Landlord to Tenant and any underpayment shall be paid by Tenant to Landlord within ten (10) days from receipt of the reconciliation; any overpayment shall be paid by Landlord to Tenant together with the reconciliation.

6.        COMMON AREAS; COMMON AREA CHARGES; TRASH DISPOSAL CHARGES

(a)  As used herein, the term "Common Areas" shall mean the improved portion of the Shopping Center not occupied by building area as shown on Exhibit A (which may include the Giant Seminole portion of the Seminole Square Shopping Center), including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, facades, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center. Subject to the provisions of this Lease, Tenant, its employees, agents, customers, and invitees shall have the nonexclusive right, during the Term, to use the Common Areas for vehicular and pedestrian ingress, egress, and parking, in common with Landlord and the other tenants of the Shopping Center and their respective employees, agents, customers, invitees and licensees and in common with those persons and entities having similar rights to the Common Areas.   Landlord will not grant its approval to (i) any material change in the layout of the parking area designated Visibility Corridor on Exhibit A hereto or (ii) any reduction in the number of parking spaces within the Visibility Corridor, without, in

either instance, the prior written consent of Tenant, which consent shall not be unreasonably withheld, conditioned or delayed and shall be deemed automatically granted if Tenant fails to respond within twenty (20) days after a request for its consent. Notwithstanding the foregoing to the contrary, Tenant may withhold its consent to any change that would reduce the number of parking spaces within the Visibility Corridor by more than five percent (5%).

(b)   As used herein, the term "Common Area Charges" shall mean the costs and expenses of:

(i)   operating, maintaining, refurbishing, repairing, repainting, replacing, improving, and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)   operating, maintaining, refurbishing, repairing, repainting, replacing, improving, and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)   operating, maintaining, refurbishing, repairing, repainting, replacing, improving, and lighting appropriate parking area entrance, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)   providing security, lighting and policing if necessary, and on-site and off-site traffic control;

(v)   maintaining and resurfacing all paved surfaces in a level and smooth condition, free of potholes, with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)   cleaning, sweeping, snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance or materially adversely affect the parking areas.

In no event shall there be any duplication of any costs or expenses included in Common Area Charges. Excluded from such Common Area Charges shall be all capital expenditures (except for the amortization in accordance with GAAP of any capital items needed for the operation of the Common Areas) and any administrative, management or related fees exceeding six (6%).

(c)   No provision of this Lease shall be construed as a demise to Tenant  the parking or any other Common Areas.

(d)  Starting with the Commencement Date  and continuing throughout the Term of this Lease, Tenant shall pay Landlord, in advance as hereinafter described and as Additional Rent, Subtenant's estimated Pro-Rata Share of  Common Area Charges.

(e)  Within a reasonable time, but not to exceed nine (9) months after the end of each calendar year, Landlord shall forward to Tenant a reconciliation which shall contain Landlord's detailed costs and expenses of operating the Common Areas for the   previous calendar year and a statement of Tenant's Pro-Rata Share thereof. Landlord's failure to forward, or to timely forward, any such reconciliation shall not excuse Tenant from it. liability for Tenant's Pro-Rata Share of Common Area Charges.

(f)  Each month during the Term of this Lease, along with each monthly installment of Minimum Rent and as Additional Rent, beginning with the Commencement Date,  Tenant shall pay to Landlord, in advance, an amount equal to one-twelfth (1/12) of Tenant's Pro-Rata Share of estimated annual Common Area Charges  as set forth in the then latest reconciliation and estimates of Common Area Charges for the next calendar year.  Together with the annual reconciliation described in subparagraph (e) above, Landlord shall refund any overpayment by Tenant of Common Area Charges for the prior calendar year.  Tenant shall pay Landlord any under payment within ten (10) days from receipt of the reconciliation. If the Commencement Date is a day other than the first day of a calendar month, then the amount of Common Area Charges due for the first month and the last month of the Term shall be pro rated on the basis of a thirty (30)-day month.   Landlord grants to Tenant the right, at Tenant's sole cost and expense, to inspect ~~Overlandlord's~~ records of such Common Area Charges at Landlord's principal office at a mutually convenient time during normal business hours.

~~(g)  Notwithstanding anything to the contrary contained in this Lease, Tenant's Pro Rata share of Common Area Charges after the first full Lease Year of the Term of this Lease, shall not increase by more than the increase in the C.P.I. (as defined in Article II, Paragraph 25(a)(2)(iv)) exclusive of expenses relating to snow removal and the resurfacing of parking lots and roadways.~~ Deleted per 2nd Addendum dated 10/24/16

7.         INSURANCE AND PREMIUMS

(a) Tenant, at Tenant's sole cost and expense, shall obtain and maintain in effect at all times, starting with the date of Delivery of Possession and continuing throughout the Term of this Lease commercial liability insurance policies with respect to the Premises naming Landlord as an additional insured, which policies shall protect Landlord and Tenant against any liability for injury, death or property damage occurring upon, in or about any part of the Premises or any appurtenances thereto, with each such policy to afford protection with an initial combined single limit for bodily injury and property damage of not less than Two Million Dollars ($2,000,000.00) per occurrence, together with an umbrella liability policy in an initial amount of at least Five Million Dollars ($5,000,000.00). The foregoing minimum limits shall be increased from time to time based on the limits customarily required or recommended by institutional shopping center lenders in the area where the Shopping Center is located.

(b)     All insurance policies required to be procured by Tenant under this Lease shall:

(1)  .. be issued by responsible insurance companies licensed to do business in the state wherein the Shopping Center is located, and which have an A.M. Best rating of XII, A or better, and shall have such form and content as shall be approved by Landlord, which approval shall not be unreasonably withheld or delayed beyond ten (10) business days; and

(2)     be written as primary coverage and not contributing with, or in excess of, any coverage which Landlord may carry; and,

(3)     with respect to the insurance carried under Paragraph 7 (a) hereof, name Landlord as an additional insured; and,

(4)     contain an agreement by the insurer that such insurance will not be cancelled or not renewed or the coverage reduced except after thirty (30) days prior written notice to Landlord.

All insurance policies to be provided by Tenant pursuant to Paragraph 7 (a) hereof shall contain an express waiver of any right of subrogation by the insurance company against Landlord, its agents and employees. Neither the issuance of any insurance policy required under this Lease nor the minimum limits specified herein shall be deemed to limit or restrict in any way Tenant's liability arising under or out of this Lease.

(c) On or before the date of Delivery of Possession, and at least thirty (30) days before the expiration date of each policy carried hereunder, Tenant shall deliver to Landlord a certificate of insurance evidencing the existence of the policy Tenant is required to obtain under Section 7(a), Any insurance required to be carried hereunder may be carried under a blanket policy covering the Premises and other locations of Tenant, provided that the coverage with respect to the Premises (i) identifies with specificity the particular address of the Premises as being covered under the blanket policy, (ii) provides the minimum guaranteed coverage amounts per occurrence for the Premises as specified in this Paragraph 7, and (iii) expressly waives any pro-rata distribution requirement contained in Tenant's blanket policy covering the Premises.   Each and every insurance policy required to be carried hereunder by Tenant shall provide that such insurance policy shall not be canceled unless Landlord shall have been given thirty (30) days' prior written notice of cancellation. In the event that Tenant shall, prior to the thirtieth (30th) day before any such insurance policy will lapse or terminate, or. is required to be made effective, fail to furnish the aforementioned evidence of any insurance coverage herein required to be procured by Tenant, then Landlord, at its sole option, shall have the right to obtain said coverage and pay the premiums therefor for a period not exceeding one year in each instance, and the premiums so paid by Landlord shall be payable by Tenant to Landlord, on demand, as Additional Rent, as provided in Paragraph 23 hereof.

(d)     Landlord shall at all times carry insurance covering  all improvements located in the Shopping Center, including the Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "all risk" insurance, in an

amount not less than 80% of the full replacement value of all the improvements located in the Shopping Center, including the Premises.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit.

     (e)    Tenant will pay to Landlord monthly, as Additional Rent, Tenant's estimated Pro Rata Share of premiums for the insurance Landlord is required to carry pursuant to Section 7(d), to the extent not otherwise included in Common Area Charges (the "Premiums").

Landlord shall furnish Tenant with an annual reconciliation detailing Tenant's Pro Rata Share thereof. Tenant shall promptly pay for any deficiency within ten (10) days from receipt of the reconciliation, and Landlord shall promptly refund or give credit for any over payment.

8.         UTILITIES

     (a) For the period from the date of Delivery of Possession through the Term of this Lease, Tenant shall pay, as and when the same become due and payable and as hereinafter provided, all water rents, rates and charges, all sewer rents, and all consumption charges with respect to all electricity, natural gas (if any) and other utilities serving exclusively the Premises (collectively, the "Utility Consumption Charges") . Landlord cause the Premises to be separately metered or submetered for, electricity and, if available, natural gas.  On or before the date of Delivery of Possession, Tenant shall change the name the account with each utility company having a meter serving  the Premises separately, such that Tenant is the one liable for all Utility consumption Charges and meters for the Premises for such utility for the period from the date of Delivery of Possession until the end of the Term of this Lease. Tenant shall pay all metered Utility Consumption Charges and metering costs to said utility company, and its share of any submetered costs to Landlord when and as such charges and costs become due. 

     (b) Except with respect to the Utility Consumption charges for water, which is addressed in Paragraph 8(c) below, the Utility Consumption Charges with respect to those utilities, if, which are not metered separately for just the Premises but service the Premises shall be shared by Tenant as provided in this Paragraph 8(b). For the period from the date of the Delivery of Possession until the expiration of the Term of this Lease, Tenant shall pay to Landlord, as Additional Rent, for each meter (excluding any water meters) , if any, serving both the Premises and other premises within the Shopping Center, Tenant's  "Utility Share" (as hereinafter defined) of one hundred percent (100%) of the Utility Consumption Charges measured by such. Subtenant's "Utility Share" shall be a fraction, the numerator of which shall be the Gross Leasable Area of the Premises and the denominator of which shall be the total Gross Leasable Area of all premises (including the Premises) which are served by the subject meter and open for business at any time during the period covered by the subject Utility Consumption Charges. After Landlord's receipt of a statement, from the applicable governmental agency or public utility company, of Utility Consumption Charges for such a non-separately metered utility, Landlord shall forward to Tenant a bill showing the amount

payable by Tenant hereunder with respect thereto. Said amount shall be due from Subtenant, in full, within ten (10) days after Landlord forwards the respective bill therefore to Tenant hereunder. Notwithstanding the foregoing and in addition thereto, Landlord may estimate future Utility Consumption Charges for such non-separately metered utilities and bill Tenant therefor in advance based upon estimates, at the same times and in the same manner as Common Area Charges are billed hereunder, except that Tenant's liability hereunder with respect such non-separately metered Utility Consumption Charges commences as of the date of the Delivery of Possession.

(c) Prior to the date that Tenant opens its store for business with the general public, Landlord, at Landlord's sole cost and expense, shall install, or cause to be installed, a meter or submeter to measure the consumption of water in the Premises (the "Water Submeter"). For the period from the date of Delivery of Possession until the expiration of the Term of this Lease, Tenant shall pay to Landlord, as Additional Rent, one hundred percent (100%) of the Utility Consumption Charges measured by the water meter or meters serving the Premises. After Landlord's receipt of a statement, from the applicable governmental agency or public utility company, of Utility Consumption Charges for water, Landlord shall forward to Tenant a bill showing the amount payable by Tenant hereunder with respect thereto. Said amount shall be due from Tenant, in full, within ten (10) days after Landlord forwards the respective bill therefor to Tenant hereunder. Notwithstanding the foregoing and in addition thereto, Landlord may estimate future Utility Consumption Charges for water, and bill Tenant therefor in advance based upon estimates, at the same times and in the same manner as Common Area Charges are billed hereunder, except that Tenant's liability hereunder with respect to water shall commence as of the date of Delivery of Possession.

9.     [INTENTIONALLY DELETED]

10.    [INTENTIONALLY DELETED]

11.    REPAIRS, MAINTENANCE AND ALTERATIONS

(a) Landlord shall, at its expense, within fifteen (15) days (or such longer period of time as may reasonably be required by Landlord after written notice from Tenant with respect thereto), make necessary structural repairs to the Premises and the building of which it is a part, and shall keep in good order, condition and repair the foundations, floor slab, downspouts, gutters, exterior walls (except for repairing [nonstructural] and repainting which shall be Common Area expenses) and roof of the Premises and the portion of any utility system located outside the building in which the Premises are located (it being understood and agreed that Landlord's obligations exclude the exterior and interior of all windows, doors, plate glass, storefronts (i.e., glass and frames (s)) and signs, and repairs required by any casualty except as otherwise covered by Paragraphs 19 and 46 below). Tenant shall, upon demand, reimburse Landlord for one hundred ten percent (110%) of the costs (such costs to include Landlord's out-of-pocket expenses and the compensation of Landlord's employees with the additional ten percent (10%) being to reimburse Landlord for its overhead with respect thereto) of making any such repairs or replacements caused by the willful misconduct or negligence of Tenant, any tenant or concessionaire of Tenant, or their respective employees, agents, invitees, licensees or contractors.

(b) Except for the repairs that Landlord is specifically obligated to make under Paragraph 11 (a) above, Tenant, at its expense, shall promptly make all other repairs, perform all maintenance, perform all custodial services, and make all replacements in and to the interior, non-structural portions of the Premises that are necessary in Landlord's reasonable opinion in order to keep the Premises in good order and repair and in a safe and tenantable condition, ordinary wear and tear excepted (subject, however, to Tenant's replacement obligation hereunder) and subject to Paragraph 19 hereof, or that are required subsequent to the date of this Lease by law or governmental authority, any insurance carrier underwriting either the Landlord's insurance or the Tenant's Insurance, or any Mortgagee.  Without limiting the generality of the foregoing, Tenant, at its expense, is specifically required to make promptly all repairs, or promptly notify the respective utility company to make all repairs within its exclusive control, as the case may be, to (i) any pipes, water and waste lines, ducts, wires or conduits beneath or in the Premises or within the ceiling of the Premises, in each case servicing exclusively the Premises; (ii) the glass windows and plate glass doors included within the Premises; (iii) Tenant's sign(s); (iv) any electrical, natural gas (if any), plumbing, sprinkler, HVAC System, and other systems, equipment, fixtures and other items installed in and exclusively servicing the Premises; (v) the floors (other than the floor slab), ceilings, and interior walls of the Premises; and (vi) the Shopping Center (including the Premises) and/or the Common Areas which may be required as a result of repairs, alterations and other improvements or installations made by Tenant or any permitted subtenant, licensee or concessionaire of Tenant or the agents of any of them; and (vii) any portion of the Premises or the rest of the Shopping Center damaged by any intentional misconduct or negligence of Tenant, any of its subtenants or concessionaires, or any of its or their respective employees, agents, licensees or contractors.  Tenant shall also, promptly and at its own expense, keep any sidewalks and curbs adjacent to the Premises clean and free from snow, ice, dirt and rubbish.

(c) Except for maintenance, repairs, and replacements Tenant is obligated to perform under the terms of this Lease, and except for the alterations Tenant will perform in order to initially open for business from the Premises in accordance with Exhibit B-1 hereto which Landlord hereby approves (any such future alterations to be subject to Exhibit B and to Landlord's prior written approval, which approval shall not be unreasonably withheld), Tenant shall not make any alterations, improvements or additions (collectively, "Tenant's Alterations") to the Premises or any part thereof without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld for any non-structural Tenant's Alterations provided a licensed, reputable, independent architect certifies to Landlord that such Tenant's Alterations will not impair the structural integrity of the Premises in any manner whatsoever and will cost less than Fifty Thousand Dollars ($50,000.00). Notwithstanding the foregoing to the contrary, an approved or permitted assignee or subtenant of Tenant, other than an Affiliate of Tenant, may, in connection with its initial occupancy of the Premises or a portion thereof, make initial non-structural alterations costing in excess of Fifty Thousand Dollars ($50,000.00), but such alterations shall be subject to the reasonable approval of Landlord. Furthermore, if any particular repair, replacement, or Tenant's Alteration (whether or not Tenant is obligated to perform the same under any provision of this Lease) is reasonably expected to cost in excess of Fifty Thousand Dollars ($50,000.00), the same shall not be commenced until complete plans and specifications therefor (including working drawings), prepared and sealed by a licensed, reputable independent architect, have

been submitted to, and approved by, Landlord. Landlord may, as a condition of granting its consent or approval hereunder, require Tenant to post such performance bonds as Landlord deems reasonable protecting Landlord and the Premises. Immediately upon the completion of any Tenant's Alteration, repair or replacement costing in excess of Fifty Thousand Dollars ($50,000.00), Tenant shall deliver to Landlord a certification from the aforesaid architect stating that the same have been constructed in accordance with the approved plans. In making any repair, replacement or Tenant's Alteration, Tenant shall use materials equal or exceeding in quality and kind to the original construction. All repairs replacements, and Tenant's Alterations made by Tenant shall comply with the provisions of Exhibit B and be performed (i) in a good and workmanlike manner, (ii) in accordance with all applicable legal requirements and insurance requirements, (iii) in those instances in which Landlord's approval is required hereunder, in accordance with such plans and specifications as have been approved by Landlord, and (iv) only after receipt by Tenant and presentation to Landlord of all necessary permits and licenses. All Tenant's Alterations made by Tenant shall be subject to Landlord's inspection and approval during and after completion to determine whether the same comply with the requirements set forth in this Lease. Tenant shall pay, when and as due, all costs of the maintenance, repairs, replacements, and Tenant's Alterations made by Tenant hereunder.

(d)    Landlord reserves the right to correct, remove, and/or perform any maintenance, repairs, or replacements to be performed by Tenant, and any Tenant's Alterations, provided that (i) such maintenance, repairs, or replacements or the lack thereof, or such Tenant's Alterations, fail, in Landlord's reasonable judgment, to comply with the terms of this Lease, (ii) Landlord gives Tenant written notice of the specific problem, and (iii) Tenant fails to undertake or diligently pursue such correction, removal or performance within fifteen (15) days thereafter, or, in the event of an emergency, such earlier period of time as the exigencies of the situation may require. Landlord also reserves the right to perform any maintenance, repairs or replacements to or of the heating, ventilation and air conditioning system within the Premises which Tenant fails to properly perform or diligently pursue within fifteen (15) days after written notice of the need for such maintenance, repair, or replacement is given to Tenant by Landlord. In any instance in which Landlord exercises its rights under this Paragraph 11, Landlord may, at its option, enter the Premises and proceed forthwith to make, or have made, such correction, removal, performance, maintenance, repairs, or replacements and to pay the costs thereof for Tenant's account. No such action by Landlord shall be deemed to waive or release any default by Tenant hereunder. If Landlord undertakes any correction, removal, performance, maintenance, repairs, replacements or Tenant's Alterations pursuant to this Paragraph 11(d), then and in any such event Tenant shall pay Landlord, promptly on demand and as Additional Rent, any and all expenses incurred by Landlord in so doing. Such expenses include Landlord's reasonable out-of-pocket expenses, and all employee wages, salaries and fringe benefits allocable to work performed in the Premises in correcting any such maintenance, repairs, replacements or Tenant's Alterations, plus ten percent (10%) of all of the foregoing for Landlord's overhead.

(e) Except as may be provided in Paragraph 11 above and Paragraphs 19 and 45 below, Landlord and Tenant understand and agree that no defect in the Premises, no failure by Landlord to fulfill any of its duties under this Paragraph 11, and no action taken by Tenant

or Landlord under this Paragraph 11 shall entitle Tenant to any abatement or diminution of Rental or setoff against the Rental due during the Term of this Lease.

12.        INSURANCE - COMPLIANCE AND RATE

Tenant shall, at its own cost and expense, comply with all requirements of Tenant's insurance carriers and with all of the orders, rules and regulations of the applicable insurance rating organizations having jurisdiction and any similar bodies; Tenant shall not do or permit to be done any act or thing upon the Premises that will invalidate or be in conflict with any fire insurance or other policies or coverage referred to in this Lease. If as a result of any failure by Tenant to comply with the provisions of the foregoing sentence, any act of omission or commission by Tenant, its employees, agents, contractors or licensees, or the specific use to which the Premises are put (whether or not such specific use may be for the purposes hereinbefore permitted or may have been consented to by Landlord), the fire, extended coverage, or other insurance rate(s) applicable to the Premises, the building in which same are located, any other portion of the Shopping Center, any adjacent property owned or controlled by Landlord or an "Affiliate" (as hereinafter defined) of Landlord, or the contents in any or all of the aforesaid properties, shall be higher than that which would otherwise be applicable, then, in addition to all other remedies Landlord has under the terms of this Lease, Tenant shall pay to Landlord, on demand and as Additional Rent, such portion of the premiums as shall be attributable to such higher rate(s). If Tenant installs any electrical equipment that overloads any line in the Premises or the building in which the Premises are located, Tenant shall, at its own cost and expense, promptly make whatever changes are necessary to remedy such condition and to comply with all requirements of the Landlord and the Board of Fire Insurance Underwriters, any similar body, and any governmental authority having jurisdiction thereof. For the purposes of this Paragraph, any finding or Exhibit of the applicable insurance rating organization having jurisdiction shall be deemed to be conclusive.

13.        USE AND OPERATION

(a) The Premises may be used by the Tenant solely for the purposes set forth in Item 9 of Article I above and for no other purpose, subject, however to the provisions of Paragraph 15 hereinbelow. However, notwithstanding the foregoing, Tenant shall not use the Premises in any manner or for any purpose which violates (i) subject to the provisions of Article I, Paragraph 9, any covenant, declaration or restriction of record which encumbers the Premises as of the date hereof, (ii) any rule, regulation, law, ordinance, or requirement of any governmental agency (iii) any other provision of this Lease, (iv) any provision of the Overlease, (v) any use exclusives heretofore granted or permitted to be granted by Landlord to other tenants and/or occupants of the Shopping Center to the extent such use exclusives are binding on Landlord and/or the Shopping Center under the Overlease, or (vi) any use exclusives heretofore or hereafter granted by Landlord to other tenants and/or occupants of the balance of the Shopping Center provided such use exclusives shall have been granted prior to Tenant's proposed use of the Premises for such purposes.  With respect to the foregoing (v) and (vi), a list of such exclusives is attached hereto as Exhibit L.

(b) To safeguard the other party's interest in a clean, quiet and odor-free environment and in having adequate parking for its customers, Tenant covenants that no portion of the

Premises, and Landlord covenants that no portion of the balance of the Shopping Center, will be used for any of the following purposes: bingo parlor; massage parlor; the business of the sale of so-called "adult" material such as, without limitation, "adult" magazines, books, movies and/or photographs; flea market; penny arcade or game room (including, but not limited to, any pinball, electronic game, or other coin-operated amusement); sale of alcoholic beverages for on-premises consumption, except that any "sit down" type restaurant otherwise permitted to be located within the Shopping Center may sell and serve alcoholic beverages for on premises consumption as an incidental part of the sale and service of food for on-premises consumption; any automobile, truck or recreational vehicle sales, storage, service, fuel, washing or repair operation (to exclude tire and repair stores).

(c)  So long as Tenant is operating 100% of the Premises as provided in this Lease, and further provided that Tenant is not in default, nor with the passage of time or the giving of notice would be in default hereunder, except for tenants open and operating for business in the Shopping Center as of the date of this Lease or any replacements thereof, no other general closeout or liquidation store operation substantially similar to Tenant and operating in more than 10,000 square feet of space ("Competing Business") may be permitted in the Shopping Center during the Term of this Lease. In the event a Competing Business, as defined herein, is operated in the Shopping Center, Tenant shall pay in lieu of Minimum Rent, (which shall abate during the period that any such Competing Business is operated in the Shopping Center), monthly Minimum Rent equal to three and one-half percent (3.5%) of Gross Sales for such month, such amount to be payable within ten (10) days after the month for which it is due. At such time that the Competing Business ceases to operate in the Shopping Center, all abatements hereunder shall cease and Tenant shall resume paying Minimum Rent due hereunder.

14.        ASSIGNMENT

(a) Tenant may not assign, mortgage or encumber this Lease, nor sublet, nor suffer or permit the Premises or any part thereof to be used or managed by others, without the prior written consent of Landlord in each instance, which shall not be unreasonably withheld.  The Landlord has retained the prior right of consent to proposed assignment or sublease for several substantial business and equity reasons which were considerations for this Lease, including, without limitation, the fact that the success and continuation thereof of the Shopping Center is directly related to the use and operation of each particular store in the concept of the overall and integrated merchandising scheme of the Shopping Center; the obligations of Landlord owed to mortgagees, major tenants, other nearby shopping centers and the public; the direct economic benefits to be derived to Landlord in the form of Percentage Rent based upon Gross Sales; and the reputation and expertise of Tenant.  In evaluating and determining whether or not to consent to a requested assignment or sublease of the Premises by Tenant, Landlord must be satisfied in its sole reasonable determination that the criteria elements set forth above must continue to be satisfied and the Landlord must receive adequate assurance of (i) the financial condition and stability of the proposed assignee, sublessee or subtenant ("assignee"); (ii) the reputation and expertise of the assignee; (iii) the ability and likelihood of payment by assignee of all rents and other amounts due hereunder; (iv) assignee's ability including the expectation of Percentage Rent in amounts no less than that previously received from Tenant

and expected to be received in the future based upon increased reasonable sales projection, and such other reasonable assurances as Landlord requires.

(b) Notwithstanding the provisions of Paragraph 14(a) above, Tenant shall have the free right, without obtaining Landlord's consent, to sublet the Premises or assign this Lease if all of the following conditions are satisfied: (i) (A) the sublessee or assignee is an Affiliate or an entity which may, as a result of a reorganization, merger or consolidation, succeed to all or substantially all of the assets of Tenant; or (B) the assignment or subletting is part of a chain-wide assignment or sale of at least seventy-five percent (75%) of all of Tenant's stores in the standard metropolitan statistic area (as defined in the United States Bureau of Labor Statistics) (11SMSA11) wherein the Premises is located, and the proposed sublessee or assignee has at least three (3) stores in Virginia, Maryland and/or North Carolina; and (C) the assignee or sublessee has management experience in the particular type of business conducted on the Premises and such experience is at least equal to that of Tenant as of the date hereof, and the assignee or sublessee, in Landlord's sole discretion, has a net worth sufficient to operate a business of such nature; and (ii) the assignment or subletting consists of all of Tenant's leasehold interest or of the entire Premises, as the case may be, and in the case of an assignment, shall transfer to the assignee all of Tenant's rights in, and interest under, this Lease, including but not limited to, the security, if any, deposited hereunder; and at the time of such assignment or subletting, this Lease is in full force and effect without any breach or default thereunder on the part of the Tenant beyond applicable cure periods; and (iv) the assignee or sublessee shall (1) assume, by written recordable instrument, in form and content satisfactory to Landlord, the due performance of all of Tenant's obligations under the Lease, including any accrued obligations as of the time of the assignment or subletting, and (2) agree to perform and observe all of Tenant's representations, warranties, and duties under this Lease; and (3) a copy of the assignment or sublease and the original assumption agreement, both in form and content satisfactory to Landlord and fully executed and acknowledged by the assignee or sublessee, and, in the event the assignee or sublessee is a corporation, a certified copy of a properly executed corporate resolution authorizing such assumption agreement, shall have been delivered to Landlord within ten (10) days prior to the effective date of such assignment or subletting; and (vi) such assignment or subletting shall be upon and subject to all the provisions, terms, covenants and conditions of this Lease.

However, no such assignment or subletting shall serve to release Tenant of or from any liability for the performance or observance of all of Tenant's obligations theretofore or thereafter accruing under this Lease. Rather, Tenant and any and all prior assignees and sublessees shall continue to be and remain liable for the full performance of Tenant's obligations under this Lease. Further, it is acknowledged and agreed by Tenant that any monies collected by Tenant from any assignee or sublessee hereunder, shall be deemed to have been collected in a "constructive trust" for the benefit of Landlord. This provision shall be applicable to any subsequent assignees or sublessees.

(c) Notwithstanding anything contained in this Lease to the contrary and notwithstanding any consent by Landlord to any assignment or sublease of the Premises, no assignee or subtenant shall assign this Lease or its sublease, nor further sublease the Premises, without satisfying each of the conditions and/or requirements set forth in subparagraphs (a), (b) and/or (c) as applicable, hereinabove in each instance.

(d) In connection with any assignment of this Lease or subletting of the Premises where Tenant must first obtain Landlord's consent to such assignment or subletting under the terms of this Paragraph 14, Tenant shall give Landlord twenty (20) business days' prior written notice of such assignment or subletting (which notice shall include a copy of the entire proposed assignment and assumption agreement or sublease, conditioned upon Landlord's consent, during which period Landlord may review the assignment or subletting;

(e) Tenant's failure to comply with all of the provisions and conditions of this Paragraph 14 shall, at Landlord's option, render any purported assignment or subletting null and void, and of no force and effect and, in addition, constitute an Event of Default.

(f) If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, 11 U.S.C. §101, et se . (the "Bankruptcy Code"), any and all monies and other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord, and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code. Any and all monies and other consideration constituting Landlord's property under the preceding sentence, but not paid or delivered to Landlord, shall be held in trust for the benefit of Landlord and be promptly paid or delivered to Landlord.

(g) In the event Tenant shall assign this Lease or sublease the Premises or any part thereof for Rental or other consideration in excess of the Rental payable hereunder, Landlord shall receive all such excess Rental or other consideration as Additional Rent hereunder. The assignee or sublessee shall be required to make all payments due to Landlord and Landlord shall thereafter, in a prompt manner, remit to Tenant any amounts that may be due Tenant. The Tenant shall pay Landlord a minimum administrative fee of Five Hundred and No/100 Dollars ($500.00) plus reasonable attorney's fees for each proposed sublease or assignment of this Lease.

(h) If there shall occur any change in the ownership of, or the power to vote, the majority of the outstanding capital stock or partnership interests of Tenant without the prior written consent of Landlord, or if there shall occur a sale of substantially all of the merchandise in the Premises to an unrelated purchaser, then such change or sale shall constitute an assignment of this Lease and, as such, shall be subject to the foregoing provisions of this Paragraph 14.

15.       OPERATION OF BUSINESS/DARK STORE

(a) Tenant shall initially open the Premises as a Big Lots  store and shall open such business to the public within one hundred fifty (150) days, subject to extension pursuant to the provisions of Paragraph 29(a) hereof, from the date of Delivery of Possession, at which time the Premises shall be fixtured, stocked and staffed with adequately trained personnel so as to allow Tenant to conduct its normal business operation(s) within 100% of the entire Premises during the hours specified in Exhibit C.  As long as Tenant has the obligation to remain open as provided herein, Tenant shall also operate the Premises at all times fully stocked with merchandise and with an adequate number of employees to maximize Gross Sales, and continually and at all times maintain the Premises in a clean, neat and attractive

condition. It is expressly understood that, notwithstanding anything to the contrary contained herein, Tenant shall have the right to close the Premises and "go dark" on written notice to Landlord given between January 1 and January 31, 2003, if Tenant shall have failed to generate at least Three Million Two Hundred Fifty Thousand Dollars ($3,250,000) in Gross Sales ("Go Dark Base Sales") for any twelve (12) consecutive months from the date Tenant opens for business until December 31, 2002. Subsequent to the calendar year ending December 31, 2002, Tenant shall have the same ability to go dark as provided herein on written notice to Landlord given between January 1 and January 31 of each third year thereafter if sales within any twelve (12) consecutive months during such subsequent three (3) years are not at least equal to the Go Dark Base Sales. Tenant's ability to go dark shall in no way affect Tenant's other obligations under this Lease. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Premises within sixty (60) days thereafter (except for casualty or Landlord approved renovation), Landlord may terminate this Lease at any time thereafter upon sixty (60) days' notice to Tenant, in which event Tenant shall be released from all further liability hereunder.

(b)   If, at any time during the term of this Lease, twenty-five percent (25%) or more of that portion of the Premises devoted to sales is, for a period of at least sixty (60) days, closed to the public for business, Landlord shall have the right, at its option, at any time thereafter, to give written notice to Tenant to terminate this Lease. The termination of this Lease pursuant to this Paragraph 15(b) shall be effective sixty (60) days after Tenant's receipt of the aforesaid notice. If this Lease is terminated pursuant to this Paragraph 15 (b), Tenant shall surrender the entire Premises to Landlord on the date of such termination, and the parties hereto shall have no further rights or obligations under this Lease with respect to the entire Premises, except for liabilities which accrued on or before the effective date of termination.

(c) Notwithstanding anything in Paragraph 15(b) to the contrary, the Premises or any portion thereof shall not be deemed closed to the public for business for purposes of Paragraph 15(b) if such closing is occasioned by (i) any default by Landlord (beyond applicable grace periods) of its obligations under this Lease, (ii) the making of repairs, alterations, or renovations due to damage or destruction of the Premises or as permitted pursuant to the provisions of Paragraph 11 hereof, (iii) eminent domain, (iv) preparation for reopening in connection with the assignment of this Lease or subletting of all or any portion of the Premises in accordance with the provisions hereof, or (v) the matters or events described in Paragraph 29(a).

16.        SIGNS

(a) To the extent permitted by any applicable governmental laws and regulations (including any based upon the size and frontage of the Premises), Tenant, at its sole cost and expense, shall have the right to and shall erect a single storefront sign on the Premises in conformity with Exhibit D attached hereto and made part hereof (which Exhibit D is hereby approved by Landlord). Tenant, at its sole cost and expense shall, maintain in good condition and repair at all times any such sign and/or any other advertising matter of any kind which has been approved by Landlord for use by Tenant.   Tenant shall install no other sign of any type on the exterior of the Premises, on the exterior plate glass of the Premises, or on the sidewalks or Common Areas, except in those instances, if any, where Landlord grants its

prior, express, written approval. Landlord hereby agrees that, in the event Tenant elects to do business under a name other than "Big Lots," Landlord shall provide its approval if such new signs comply with the provisions of this Section 16(a). Without limiting the foregoing, it is understood and agreed that (i) no sign of a flashing or blinking nature will be permitted nor will any rotating sign be permitted, and (ii) Tenant shall not place any paper sign on any exterior door or window of the Premises. Tenant shall obtain and pay for all permits and licenses required in connection with each of its signs permitted hereunder. Copies of all such permits and licenses shall be delivered to Landlord within a reasonable time after they are issued and prior to installation of the respective sign. Tenant shall not place any other sign or advertisement or any type of structure or obstruction on the roof or facade of the Premises. As and to the extent requested in writing by Tenant, Landlord shall cooperate, at Tenant's cost and expense, with Tenant's efforts to obtain such governmental permits and licenses for Tenant to erect the aforesaid storefront sign. It is expressly understood and agreed that Tenant may seek a variance for the erection of the aforesaid storefront sign, but only to the extent such variance would not reduce or otherwise diminish the amount of signage that would otherwise be legally available to tenants and/or occupants of the balance of the Overlease Premises. Tenant shall not operate any loudspeaker or other device which can be heard outside of the Premises. If any sign is exhibited without Landlord's prior written approval (if required hereunder), Landlord shall have, in addition to all of its other rights and remedies under this Lease, the right to immediately remove the sign at any time without notice to Tenant, and Tenant shall pay Landlord, as Additional Rent, upon demand, any and all costs and expenses incurred by Landlord in making said removal and restoring the Premises to its previous condition, plus the greater of fifteen percent (15%) of the costs of said removal and restoration or Two Hundred Fifty Dollars ($250.00) for Landlord's time and effort.

(b)    To the extent permitted by governmental laws and regulations, Landlord agrees that Tenant may erect, at Tenant's sole cost and expense, a "Coming Soon" sign on the Premises.

17.    [INTENTIONALLY DELETED]

18.    [INTENTIONALLY DELETED]

19.    CASUALTY

(a)    If the Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Minimum Rent, Percentage Rent and Additional Rent herein provided for in this Lease shall abate entirely only in case the whole Premises are untenantable or if Tenant determines in good faith it cannot economically conduct business from the undamaged portion of the Premises. In the event of a casualty which damages only a portion of the Premises and Tenant continues to

F:\DOCS\WP\SEQUEL\BIGLOTS\LEASE.CLN
October 8, 1999 (4:19pm)

operate in the remaining portion of the Premises, Rent, Percentage Rent and Additional Rent shall be reduced based on the square footage of the Premises which is not used by Tenant. Said abatement shall cease when the Premises are restored to tenantable condition.

(b)    In the event the Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within one (1) year from the date of such casualty.  Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord, such notice to be given within thirty (30) days following such one (1) year time period, and thereupon Tenant shall be released from all future liability and obligations under this Lease.

(c)    If the Premises are damaged or destroyed during the last year of the Term or any options or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty.

20.        EASEMENT FOR PIPES

Tenant shall permit Landlord and Landlord's designees to install, use, maintain, repair, and replace pipes, cables, conduits, plumbing, vents, wires and other equipment in, to, through and under the Premises, as and to the extent that Landlord may now or hereafter deem to be necessary or appropriate for the proper operation and maintenance of the building in which the Premises are located and/or any other present or future portion of the Shopping Center. All such work shall be done in such manner as to avoid any material interference with Tenant's use of the Premises and, to the extent commercially reasonable and permitted by applicable laws and governmental regulations, shall not be in that portion of the Premises devoted to sales. Landlord shall give Tenant seven (7) days' written notice (except in the event of an emergency) of any work required to be performed under this Paragraph 20 after the Commencement Date.

21.        NON-LIABILITY OF LANDLORD

(a) Except as otherwise expressly provided in this Lease or unless  caused by the negligence or intentional misconduct of Landlord or Landlord's employees, agents, and contractors while acting within the scope of their employment, Landlord shall not be responsible or liable to Tenant for any loss or damage to persons or property, or any interference or interruption of Tenant's use of the Premises, that may be occasioned by (i) the acts or omissions of persons occupying any space adjacent to or adjoining the Premises or any other occupants of the Shopping Center, their employees, agents, subtenants, licensees, or concessionaires, or any visitors to, or customers of, the Shopping Center; (ii) water, gas, steam, wind, or the bursting, stoppage, or leaking of any pipes, sewer or water lines, or other conduits, fixtures, or equipment, or the interruption of any utility services to the Premises; (iii) any repairs, alterations, maintenance or additions to the Premises or any other portion of the Shopping Center; or (iv) any casualty or condemnation or deed in lieu of condemnation.

(b)    Subject to the express provisions of Paragraph 13 (b) and Paragraph 13(c) of this Lease, Landlord makes no representation or warranty as to the number or type of other tenants in the  Shopping Center or that any of the other leases for premises within the Shopping Center will continue for any period of time.  Further, subject to the express provisions of Paragraph 13(b) and Paragraph 13(c) of this Lease, Tenant has neither any right against Landlord, nor any right to an abatement or diminution of Rental, by reason of any act or omission by Landlord with respect to any leases for other premises within the Shopping Center or by reason of any failure of Landlord to enforce any provision of said other leases or any rules or regulations applicable to the Shopping Center pursuant to the terms of the Overlease.

(c) No provision of this Lease shall be deemed to confer any rights unto any persons or entities other than the parties to this Lease, permitted successors and assigns and as otherwise provided under the terms of this Lease.

(d) The term "Landlord" as used in this Lease means the lessee of the ground lease covering the Shopping Center under the Overlease or, in the absence thereof, the fee owner of the Shopping Center.  In the event of a termination of the Overlease, an assignment or transfer by a Landlord of its rights or interests as lessor under the Overlease, or any assignment or transfer or transfer of ownership of the Premises,  the Shopping Center or the improvements included within the Shopping Center by a Landlord who is the fee owner thereof, then and in any such event the Landlord who is the lessee when such Overlease is so terminated, or who makes the assignment or transfer, as the case may be, shall thereupon automatically be entirely freed and relieved of all obligations under this Lease and  it shall be deemed, without further agreement, that the person or entity thereby acquiring the right of possession of the Premises has assumed and agreed to observe and perform all obligations of Landlord under this Lease; provided, however, that this provision shall not relieve Landlord of any obligations hereunder which may have accrued prior to any such termination, assignment or transfer.

(e) Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed that  there shall be absolutely no personal liability on the part of Landlord or any of its successors-in-interest with respect to any of the terms, covenants and conditions of this Lease, it being understood that  Tenant shall look solely to the equity of the Landlord or such successor-in-interest in the Premises and Shopping Center, or the leasehold estate of Landlord or of such successor in the Premises, as the case may be, for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord or by such successor-in-interest of any of the terms, covenants and conditions of this Lease to be performed by Landlord. Such exculpation of personal liability is absolute and without any exception whatsoever.

22.        INDEMNIFICATION

(a) Tenant agrees to indemnify and save Landlord  harmless from and against any and all claims, demands, costs and expenses (including, but not limited to, reasonable attorneys' fees) for, or in connection with, any accident, injury or damage whatsoever to any person or property (a) arising, directly or indirectly, out of Tenant's use or occupation of the Premises,

F:\DOCS\WP\SEQUEL\BIGLOTS\LEASE.CLN

or tenant

(b) occurring in, on or about the Premises or any part thereof or on the sidewalks adjoining the same, or (c) arising directly or indirectly from any act or omission of Tenant or any concessionaire, or Tenant of Tenant or any of its or their respective licensees, servants, agents, employees or contractors. The foregoing indemnity shall not apply to any such claim or demand caused by the negligence or intentional misconduct of Landlord, a particular mortgagee, or its or their respective employees, agents, and contractors.

(b) Landlord agrees to indemnify and save Tenant harmless from and against any and all claims, demands, costs and expenses (including, but not limited to, reasonable attorneys' fees) for, or in connection with, any accident, injury or damage whatsoever to any person or property arising, directly or indirectly, from any act or omission constituting negligence or intentional misconduct on the part of Landlord or Landlord's employees, agents and contractors. The foregoing indemnity shall not apply to any such claim or demand caused by the negligence or intentional misconduct of Tenant, or Tenant's employees, agents, concessionaires and contractors.

(c) Mutual Waiver of Subrogation. Notwithstanding anything to the contrary contained in this Lease: (i) Landlord shall not be liable for any damage to fixtures, merchandise or property of Tenant and Tenant hereby releases Landlord from the same; and (ii) Tenant shall not be liable for any damage to the Premises, building of which it is a part or other improvements in the Shopping Center and Landlord hereby releases Tenant from the same.

23.        RIGHT TO CURE DEFAULTS

(a) If an "Event of Default" (hereinafter defined) shall occur, then, in addition to Landlord's other rights and remedies under this Lease and at law and in equity, Landlord shall have the right, but not the duty, to cure such Event of Default at Tenant's expense. Tenant agrees to reimburse Landlord, within thirty (30) calendar days after Landlord submits a statement of the amount due and as Additional Rent, for all costs and expenses incurred by Landlord as a result of any efforts made by Landlord to cure any such breach, plus ten percent (10%) thereof for Landlord's overhead.

(b) If Landlord is in default of any of its obligations under this Lease for more than thirty (30) consecutive days, plus such additional time (if any) as permitted under Paragraph 29 hereof or reasonably required to perform any such obligation, after written notice given to Landlord and to all mortgagees by Tenant hereunder specifically and correctly describing such default, then and in that event, but not before, and in addition to Tenant's other rights and remedies under this Lease, Tenant shall have the right, but not the duty, to cure such default at Landlord's expense. Landlord agrees to reimburse Tenant, within thirty (30) calendar days after Tenant submits a statement of the amount due, for all reasonable costs and expenses incurred by Tenant to cure any such breach, plus ten percent (10%) thereof for Tenant's overhead. Notwithstanding the foregoing, Tenant's rights and remedies shall be subject to the provisions of Paragraphs 21 and 49 hereof.

24.　　　　DEFAULT

(a)  In the event that (i) Tenant shall default in the payment, when and as due
hereunder, of any of the Rental reserved herein and such default shall continue for more than
ten (10) days after Landlord gives Tenant written notice of such default, (ii) Tenant shall
default in the observance or performance, when and as due hereunder, of any of the other
terms, covenants and conditions of this Lease and, except with respect to defaults under
Paragraphs 26 or 27 hereof, such default shall continue for more than thirty (30) days after
Landlord gives Tenant written notice of such default (or, in the event such default cannot
reasonably be cured within said thirty (30)-day period, Tenant shall fail to commence such
cure within said thirty (30)day period and thereafter diligently prosecute its efforts to cure
such default), (iii) this Lease shall be assigned or passed to or devolved upon one other than
Tenant, or the Premises shall be occupied by someone other than Tenant, except as permitted
under Paragraph 14 hereof, (iv) Tenant shall make any assignment for the benefit of creditors
or file a voluntary petition in bankruptcy or insolvency or be by any court adjudicated a
bankrupt or insolvent, (v) Tenant shall be dissolved, voluntarily or involuntarily, (vi) a
receiver or trustee of Tenant or any of its property shall be appointed in any proceedings and
such appointment shall not be vacated within fifteen (15) days after it has been made, or (vii)
Tenant shall fail to move into or take possession of the Premises as provided in this Lease,
then and in any of the foregoing events (an "Event of Default") this Sublease and the Term
hereof shall (upon the date specified by Landlord in a subsequent notice to Tenant, which date
shall be not less than three (3) days after the giving of such notice hereunder by Landlord to
Tenant) either (A) reenter the Premises without terminating this Lease, or (B) terminate this
Lease in which event the term of this Lease shall wholly cease and expire, with the same
force and effect as though the date so specified were the date hereinabove first set forth as the
date of expiration of the Term, except that Tenant shall remain liable to Landlord as
hereinafter provided. Upon such expiration, or at any time thereafter, Landlord may reenter
the Premises either by force or otherwise and have the possession of the same as of its former
estate, or may recover possession thereof in the manner prescribed by the statute relating to
summary proceedings or similar statutes, and in either such event Tenant shall remain liable
to Landlord as hereinafter provided. No demand for the rent or for reentry for condition
broken, no notice to quit possession or any other notice prescribed by statute, shall be
necessary to enable Landlord to recover such possession; rather, all right to any such demand
or notice, and all other statutory notices and prerequisites, are hereby expressly waived by
Tenant.

(b)  In case of any such Event of Default, reentry, expiration or dispossession by
summary proceedings or otherwise:(i) the Rental shall continue to be due monthly thereupon
and payable by Tenant up to the time of reentry, expiration, or dispossession, together with
such expenses as Landlord may incur for legal expenses, attorneys' fees, brokerage fees or
commissions, putting the Premises in good order, and otherwise preparing the same for re-
rental; (ii) Landlord may relet the Premises or any part or parts thereof, either in the name of
the Landlord or otherwise, for a term or terms which may, at Landlord's option, be less than
or exceed the period which would otherwise have constituted the balance of the Term and
may grant concessions such as free rent, and any sums so received shall be credited against
amounts due and owing pursuant to the terms of this Lease from Tenant; and (iii) Tenant or
the legal representatives of Tenant shall also pay Landlord, as damages for the failure of

Tenant to observe and perform said Tenant's covenants herein contained, any deficiency between the Rental reserved or covenanted to be paid under the terms of this Lease, and the net amount, if any, of the rents collected on account of any lease or leases of the Premises for each month of the period which would otherwise have constituted the balance of the Term. In addition to the foregoing, Tenant or Tenant's representative shall also pay Landlord the total amount of such expenses as Landlord may incur in connection with any efforts made by or on behalf of Landlord to re-enter and/or relet the Premises, such as legal expenses, attorneys' fees, brokerage fees and commissions, and the costs of keeping the Premises in good order or preparing the same for reletting. The foregoing damages shall be paid in monthly installments by Tenant on the rent day specified in this lease and any suit brought to collect the amount of the deficiency for any month shall not prejudice in any way the rights of Landlord to collect the deficiency for any subsequent month by a similar proceeding. No reletting of the Premises by Landlord, whether or not the term of such reletting extends beyond the Term of this Lease, shall (i) be deemed an acceptance by Landlord of an offered surrender of the Premises, or (ii) release Tenant from any of its liability under this Lease.

(c) Landlord, at Landlord's option, may make such alterations, repairs, replacements or decorations in the Premises as Landlord, in Landlord's sole judgment, considers advisable and necessary for the purpose of reletting the Premises; and the making of such alterations or decorations shall not operate or be construed (i) as an acceptance by Landlord of an offered surrender of the Premises, or (ii) to release Tenant from any of its liability under this Lease.

(d) Neither shall Landlord be liable, nor shall Tenant be entitled to any credit or offset, with respect to any failure on the part of Landlord to relet the Premises, or in the event that the Premises are relet, for any failure on the part of Landlord to collect the rent due or payable under such reletting.

(e)    In the event of a breach or a threatened breach by Tenant of any of the covenants or provisions of this Lease, Landlord shall have the right of injunction and the right to invoke any remedy allowed at law or in equity as if reentry, summary proceedings and other remedies were not herein provided. Mention in this Lease of any particular remedy shall not preclude Landlord from any other remedy in law or in equity.

(f) No receipt of Rental by Landlord from Tenant after the termination of this Lease, nor after Landlord's having given tenant notice of such termination hereunder, shall reinstate, continue or extend the Term or affect any notice theretofore given hereunder. No receipt of Rental after the commencement of suit, or after final judgment for possession of the Premises, shall reinstate, continue or extend the Term or otherwise affect said suit or judgment.

(g) Any and all unpaid Rental hereunder shall bear interest from the due date until paid at the "Applicable Interest, Rate" (as hereinafter defined) and shall be subject to late fees as provided in Article II, Paragraph 2 (b) herein.

25.    BANKRUPTCY OR INSOLVENCY

(a)    In the event Tenant is the subject of a proceeding under Section 365 of the Federal Bankruptcy Code, the following terms shall have the following respective meanings:

A trustee in Bankruptcy or a debtor-in-possession under the Bankruptcy Code shall be deemed to have provided "adequate assurance that the trustee will promptly cure (then pending] default(s]" within the meaning of Section 365 (b) (1) (A) of the Bankruptcy code if and only if

(1) the trustee or the debtor-in-possession shall, at all times, have sufficient unencumbered assets or net cash flow after payment of all administrative expenses connected with the Bankruptcy proceeding and secured obligations and after curing all pre-petition defaults under this Sublease as hereinafter provided to continue to operate the Premises and otherwise fulfill all of its obligations under this Lease; and

(2) the Bankruptcy Court shall have entered an order (x) requiring the trustee or the debtor- in-possession to cure all then pending monetary defaults under this Lease within fifteen (15) days from the subject assumption of this Lease, and to cure all non-monetary defaults under this Lease within thirty (30) days from the date of the subject assumption, and (y) segregating a sufficient amount of the foregoing unencumbered assets to enable the trustee or the debtor-in-possession to cure such defaults as aforesaid.

(ii) A trustee in Bankruptcy or a debtor-in-possession under the Bankruptcy Code shall be deemed to have provided "adequate assurance that the trustee will promptly compensate Landlord for any actual pecuniary loss to Landlord resulting from such default" within the meaning of Section 3 65 (b) (1) (B) of the Bankruptcy Code if and only if the trustee or the debtor-in-possession shall have sufficient unencumbered assets or net cash flow after payment of all administrative expenses connected with the Bankruptcy proceeding and secured obligations, after curing all pre-petition defaults under this Lease as hereinabove provided, and without impairing the trustee's or the debtor-in-possession's ability to continue to operate the Premises as provided above to pay, within sixty (60) days from the date of the subject assumption of this Sublease, such pecuniary losses.

(iii) A trustee or debtor- in-possession shall be deemed to have provided "adequate assurance of the source of rent and other consideration due" under this Lease within the meaning of Section 365(b) (3) (A) of the Bankruptcy Code if the trustee or the debtor- in-possession delivers to Landlord, at the time of the subject assumption or assignment of this Lease and as additional security under this Lease, an amount equal to two (2) months of the Minimum Rent and the Additional Rent then accruing under this Lease,  with any unused portion of such additional security to be returned to the trustee or the debtor-in-possession upon the earlier to occur of (x) thirty (30) days after the expiration of this Lease, or (y) ninety (90) days after the closing of the subject Bankruptcy proceeding.

(iv) In determining whether "financial condition and operating performance" are "similar" within the meaning of Section 365(b)(3)(A) of the Bankruptcy Code, there shall be taken into account (a) in judging financial condition, any changes in the United States Bureau of Labor Statistics, Consumer Price Index for Urban Wage Earners and Clerical Workers, all Items for of the Standard Metropolitan statistical Area wherein the Shopping Center is located ("CPI"), and (b) in judging operating performance, business experience in the same particular type of business as that being operated on the Premises.

(v) Percentage Rent shall be deemed to "decline substantially" within the meaning of Section 365(b)(3)(B) of the Bankruptcy Code if and only if the Percentage Rent for any Fiscal Year is less than ninety percent (90%) of the Percentage Rent which was payable under this Lease for any of the three (3) previous Lease Years.

(vi) A trustee or debtor- in-possession shall be deemed to have provided "adequate assurance that any percentage rent due under such lease will not decline substantially" within the meaning of Section 365(b)(3)(B) of the Bankruptcy Code if and only if (x) the trustee, the debtor-in-possession, or the assignee presents, and the Bankruptcy Court approves, a detailed, written business plan for achieving such Percentage Rent as is not a "substantial decline" within the meaning of clause (v) above, and (y) the trustee, the debtor-in-possession, or the assignee shall have sufficient unencumbered assets to implement that plan. In the case of a trustee or debtor-in-possession, such assets shall be only those remaining after the payment of all administrative expenses connected with the Bankruptcy proceeding and secured obligations, curing all pre-petition and pending defaults under this Lease, operating the Premises in accordance with the provisions of the Lease (including paying all amounts when and as the same become due under the Lease), paying any other pecuniary losses, and establishing the additional security set forth herein, and otherwise providing the requisite assurances under the Bankruptcy Code, all as provided above.

(vii) A disruption of "any tenant mix or balance" in the Shopping Center within the meaning of Section 365(b) (3) (D) of the Bankruptcy Code shall include any disruption in the Landlord's attempt to provide a specific variety of retail stores in the Shopping Center which, in the Landlord's judgment, would be most beneficial to all tenants of the Shopping Center and which would enhance the image, reputation and profitability of the Shopping Center.

(b) Neither Tenant's interest in this Lease, nor any lesser interest of Tenant herein, nor any estate of Tenant hereby created, shall pass to any trustee, receiver, assignee for the benefit of creditors, or any other person or entity, or otherwise by operation of law under the laws of any state or locality having jurisdiction of the person or property of Tenant (collectively, "State Creditors Law") . No acceptance by Landlord of Rental or any other payments from any such trustee, receiver, assignee, person or other entity shall be deemed to have waived Landlord's right to terminate this Lease for any transfer of Tenant's interest under this Lease without such consent.

(c) In the event the estate of Tenant created hereby shall be taken in execution or by other process of law, Tenant or any guarantor of Tenant's obligations hereunder shall be adjudicated insolvent pursuant to the provisions of any present or future State Creditors Law, any proceedings are filed by or against any guarantor of this Lease under the Bankruptcy Code or any similar provisions of any future Federal bankruptcy law, a receiver or trustee of the property of Tenant or a guarantor of this Lease shall be applied for under any State Creditors Law by reason of Tenant's or such guarantor's insolvency or inability to pay its debts as they become due or otherwise, or any assignment shall be made of Tenant's or a guarantor's property for the benefit of creditors under any State Creditors Law, then and in any such event, unless within ten (10) days after such event Tenant shall have obtained a stay, or discharged or bonded against such execution, filing application or assignment, Landlord may, at its option, terminate this Lease and all rights of Tenant hereunder by giving Tenant

written notice of Landlord's election to so terminate. Such termination shall be effective as of the date such notice is given or as soon thereafter as is permitted by law.

26.        SURRENDER OF PREMISES

On the last day or sooner termination of the Term, Tenant shall quit and surrender the Premises broom-clean, in good condition and repair (reasonable wear and tear excepted, and subject to the provisions of Paragraphs 19 and 45 hereof), together with all alterations, additions and improvements which may be in, on or to the Premises, except furniture, equipment (other than building equipment), or unattached movable trade fixtures put in at the sole expense of Tenant.  Tenant shall, on or before the end of the Term, remove from the Premises all its property, together with any non-structural and structural alterations, additions and improvements made without Landlord's prior written approval, the removal of which is requested by Landlord, and any or all of such property not so removed shall, at Landlord's option, become the exclusive property of Landlord or be disposed of by Landlord, at Tenant's cost and expense, without further notice to, or demand upon, Tenant.  If the Premises are not surrendered as and when aforesaid, Tenant shall indemnify Sublandlord against any and all loss and liability resulting from the delay by Tenant in so surrendering the Premises, including, without limitation, any claims made by any succeeding occupant found on such delay. Tenant's obligations under this Paragraph 26 shall survive the expiration or earlier termination of the Term.

27.        HOLDING OVER.

        If Tenant shall hold possession of the Premises after the end of the Term or other termination of this Lease, Subtenant shall be deemed to be occupying the Premises as a Tenant from month to month, at one hundred fifty percent (150%) of the Minimum Rent then in effect, and subject to all the other conditions, provisions and obligations of this Lease insofar as the same are applicable, or as the same shall be adjusted, to a month-to-month tenancy; provided, however, Tenant shall be liable for any and all damages and expenses that Landlord may sustain by virtue of Tenant's holding over, including, but not limited to, any amount for which Landlord may be liable under, or as a result of, any other lease entered into by Landlord for a term beginning at or after the expiration of the Term of this Lease. Nothing contained in this Lease shall be construed as a consent by Landlord to any occupancy or possession of the Premises by Tenant after the expiration of the Term of this Lease. Rather, at the end of the Term of this Lease, Landlord shall be entitled to the benefit of all public general or public local laws and ordinances now or hereafter in effect with respect to the recovery of the possession of lands and tenements held over by tenants; and Landlord may proceed under such laws or ordinances without notice to Tenant, all statutory notice requirements being hereby expressly waived by Tenant.

28.        COVENANT AGAINST LIENS

        If  because of any act or omission (or alleged act or omission) of Tenant, of Tenant's permitted subtenants, concessionaires, or licensees, or of its or their employees, agents or contractors any mechanic's or other lien, claim for a lien, or order for the payment of money or any other encumbrance or claim for an encumbrance shall be filed against Landlord,  any

mortgagee, the Premises, or any other portion of the Shopping Center (whether or not such lien, claim, order or encumbrance is valid or enforceable as such), Tenant shall (at its own cost and expense) cause same to be discharged of record or bonded within ten (10) days after notice to Tenant of the filing thereof. Tenant shall indemnify and save harmless Landlord and all mortgagees against and from all liabilities, suits, penalties, claims, demands, reasonable costs and expenses (including, but not limited to, reasonable attorneys' fees) resulting therefrom. If Tenant fails to comply with the foregoing provisions, Landlord shall, in addition to all its other rights and remedies under this Lease, have the option of discharging or bonding any such lien, claim, order or encumbrance without inquiring into the validity thereof. Tenant agrees to reimburse Landlord, promptly upon demand, for all sums so advanced by Landlord, all costs and expenses (including, but not limited to, reasonable attorneys' fees) incurred by Landlord in connection therewith, and interest (at the Applicable Interest Rate) on all such amounts from the date incurred or advanced until paid to Landlord, as Additional Rent. Tenant shall provide all materialmen, contractors, artisans, mechanics, laborers and other persons now or hereafter contracting with Tenant, with any subtenant, concessionaire, or licensee, or with anyone acting by, through, or on behalf of, the Tenant or such other parties, with notice that they must look exclusively to Tenant and/or such contracting persons alone and personally for payment. Such materialmen, etc. may not look to the Landlord, the Premises or any other portion of the Shopping Center with respect to such payment.

29.        EFFECT OF UNAVOIDABLE DELAYS

(a) The provisions of this Paragraph 29 shall be applicable if there shall occur during or prior to the Term any: (i) strike, lockout, or labor dispute; (ii) inability to obtain labor or materials or reasonable substitutes therefor in the market generally; (iii) act of God, governmental delay, restriction, regulation or control, enemy or hostile governmental action, war (whether declared or undeclared) , civil commotion, insurrection, revolution, sabotage, fire or other casualty, or act or failure to act by the other party hereto; or (iv) any other condition similar to those enumerated in the foregoing beyond the reasonable control of the party claiming such unavoidable delay. If Landlord shall, as the result of any such event, fail to punctually perform any of its obligations under this Lease, then such obligations shall be punctually performed as soon as practicable after such event shall abate, and Tenant shall not be entitled to any damages or abatement or diminution of payments of Rental on account of such delay. If Tenant shall, as the result of any such event, fail to punctually perform any of its obligations under this Lease other than the payment of any Rental or other amounts reserved herein, then such obligations shall be punctually performed as soon as practicable after such event shall abate, and Landlord shall not be entitled to any damages on account of such delay. If Landlord or Tenant, as the case may be, shall, as the result of any such event, be unable to exercise any right or option within any time limit provided therefor in this Lease, such time limit shall be deemed extended for a period equal to the duration of such event. Nothing in this Paragraph 29 shall be construed to extend, diminish or negate the Tenant's obligation to pay Rental or other amounts when and as due hereunder, and the foregoing provisions of this paragraph 29 shall not apply to a lack of funds.

(b)        Notwithstanding the provisions of Paragraph 29(a) hereof, if Tenant shall, as the result of any of the aforesaid events, fail for more than sixty (60) consecutive days, to

comply with one or more of the provisions of Paragraph 15 hereinabove, then Landlord shall have the right, upon giving written notice to Tenant, to terminate this Lease.

(c)     In order to claim the benefits of this Paragraph 29, the party claiming any such excuse for its performance hereunder must have given the other party written notice of the cause and anticipated duration of such failure of performance within five (5) days of the occurrence of said cause.

30.        ESTOPPEL CERTIFICATES

Tenant and Landlord shall each, at any time and from time to time, within fifteen (15) days after written request therefor by the other party, certify, in a written instrument or certificate duly executed and acknowledged, to a proposed purchaser, mortgagee, investment banker, attorney, accountant or any other person, firm or corporation specified in such request: (a) as to whether this Lease has been supplemented or amended and, if so, the substance and manner of such supplement or amendment; (b) as to the validity and force and effect of this Lease in accordance with its terms as then constituted; (c) as to the existence of any Event of Default; (d) as to the existence of any counterclaims or defenses on the part of Tenant; (e) as to the Commencement Date and the expiration date of the Term of this Lease; (f) as to the existence of any defects in the Premises; (g) as to the amounts and status of Rental or other amounts payable hereunder; and (h) as to any other matters as may reasonably be so requested. Matters referred to in clauses (c) , (d) and (f) of this Paragraph 30 may be stated to the best knowledge of the certifying party. Any such certificate may be relied upon by the requesting party and any other person, firm or corporation to whom the same may be addressed and delivered; and the contents of such certificate, as stated therein, shall be binding. Failure of Tenant to execute and deliver the requested instrument or certificate shall constitute an Event of Default and Tenant agrees to pay to Landlord as liquidated damages (and in addition to all remedies available to Landlord under this Lease, at law or in equity), the sum of $500.00 per day for each day Tenant fails to so deliver such instrument or certificate to Landlord after the expiration of the fifteen (15) day limit together with all costs (including reasonable attorneys' fees), loss and damages suffered by Landlord.

31.        WAIVER OF TRIAL BY JURY

The parties hereto shall, and they hereby do, waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, or any claim for injury or damage in connection with this Lease, the Premises, or the rest of the Shopping Center.

32.        WAIVER OF RIGHT OF REDEMPTION

Tenant hereby waives any and all rights of redemption or restoration of the operation of this Lease conferred by any present law, statute or otherwise upon the expiration or sooner termination of the Term, the entry of any judgment for recovery of possession through any action or proceeding, or Landlords obtaining possession of the Premises under the provisions of this Lease.

F:\DOCS\WP\SEQUEL\BIGLOTS\LEASE.CLN
October 8, 1999 (4:19pm)

33.        QUIET ENJOYMENT

Subject to all of the other provisions of this Lease, Landlord warrants, covenants and agrees with Tenant that prior to an Event of Default, Tenant shall peaceably and quietly use and enjoy the Premises free from any interference.

34.        RELATIONSHIP OF PARTIES

Nothing contained in this Lease shall be construed to create the relationship of principal and agent, partnership, joint venture or any other relationship between the parties hereto, other than the relationship of landlord and tenant.

35.        BILLS AND NOTICES

Except as otherwise in this Lease provided, a bill, statement, notice or communication which Landlord may desire or be required to give to Tenant shall be deemed sufficiently given or rendered if in writing and (a) hand delivered, (b) deposited with the U.S. Postal Service (with first-class postage prepaid and sent by certified or registered mail, return receipt requested), or (c) deposited with an overnight commercial carrier service and addressed to Tenant at the address first hereinabove given or at such other address as Tenant may designate by written notice to Landlord hereunder. The time of the rendition of such bill or statement and of the giving of such notice or communication shall be deemed to be the time received or refused. Copies of any notice or other communication to Tenant shall be sent to Consolidated Stores Corporation 300 Phillipi Road, P.O. Box 28512, Dept. 10051, Columbus, Ohio 43228-0512. Any notice by Tenant to Landlord must be served in a similar manner, addressed to Landlord at the address first hereinabove given, or at such other address as Landlord may designate by written notice to Tenant hereunder, with copies sent to Charles Rotgin, Jr. c/o the address of Landlord, and to Lucius H. Bracey, Jr., Esq., c/o McGuire, Woods, Battle and Boothe, LLP, P.O. Box 1288 (Court Square Building-310 4th Street, N.E.), Charlottesville, Virginia, 22902-1288 (22902). However, in the event of an emergency, any notice under this Lease may be delivered by facsimile, or delivered by hand to the other party at the address set forth in the first paragraph of this Lease as the exigencies of the particular situation may require. [13]

36.        ACCESS TO PREMISES

(a)        Landlord and its designees shall have the right to enter upon the Premises (i) at all times in the event of an emergency, (ii) during Tenant's normal business hours following two (2) days' prior notice, to inspect the premises, (iii) subject to clause (i) hereinabove, at all reasonable hours following two days' prior written notice, to make repairs, additions or alterations to the Premises or the building in which the same are located or to any other property owned or controlled by Landlord as required or permitted by this Lease, and (iv) as otherwise required or permitted under this Lease upon such prior written or oral notice, if any, as shall be reasonable under the then applicable circumstances;

(b)        Without limiting the foregoing, Landlord and the other occupants of the Overlease Premises, from time to time, upon such written or oral notice, if any, as shall be

reasonable under the then applicable circumstances, each shall have access to any portion of the Premises as contains any portion of the heating, ventilating and air conditioning systems and/or any utilities equipment, meters and conduits which serve other occupants of the Overlease Premises for the purpose of operating, maintaining, replacing or repairing the same (but nothing contained in this subparagraph shall obligate Landlord to perform any such maintenance, replacements or repairs); provided, however, Landlord and any other occupants of the Overlease Premises shall use commercially reasonable efforts not to disrupt Tenant's business operation.

(c)     For a period commencing four (4) months prior to the end of the Term, Landlord may have access to the Premises upon one (1) days' prior notice for the purposes of exhibiting the same to prospective tenants and posting not more than two (2) for rent or lease signs upon the Premises. Tenant shall not cover, alter, remove, or disturb any such signs.

37.        NON-WAIVER OF LANDLORD

(a) No failure by Landlord to insist upon the strict performance of any term, covenant, agreement, provision, condition or limitation (collectively, all or any "provision") of this Lease to be kept, observed, or performed by Tenant, failure by Landlord to exercise any right or remedy consequent upon a breach of any such provision of this Lease, or acceptance by Landlord of full or partial Rental or any other amounts due under the Lease during the continuance of any such breach by Tenant, shall constitute a waiver of any such breach or of any such provision. No provision of this Lease shall be deemed altered or modified, or breach deemed waived, except by a written instrument executed by both Landlord and Tenant. No waiver of any breach of this Lease shall affect or alter this Lease; rather each and every provision of this Lease shall continue in full force and effect with respect to (i) any subsequent occurrence of the same type of breach, and (ii) any other then existing or subsequent breach. No employee or agent of Landlord shall have any authority to accept any keys to the Premises prior to termination of this Lease; the delivery of any keys to any employee or agent of Landlord shall not operate as a termination of this Lease or a surrender by Tenant of the Premises.

(b) No payment by Tenant, or receipt by Landlord, of a lesser amount than the total amount of Rental or any other amounts due under the provisions of this Lease shall be deemed to be other than a payment of a portion of the full Rental due under this Lease. No endorsement or statement on any check or any letter or other instrument accompanying any check or payment for Rental shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of the Rental due or to pursue any other right or remedy provided in this Lease.

38.        RECORDING THIS LEASE

(a)     Tenant may not record either this Lease nor a memorandum thereof among or in any public records. Notwithstanding the foregoing to the contrary, at Tenant's written request, Landlord will execute a memorandum of this Lease, provided that the content of such memorandum shall include and be limited to (i) the names and addresses of the parties hereto, (ii) a description of the Premises, (iii) the term of this Lease, (iv) the following provision in

its entirety: "Upon the expiration or earlier termination of the Lease, Landlord shall have the unconditional and absolute right to require Tenant to execute and record a termination and release of this memorandum of lease.", and (v) such other provisions as may be requested by Landlord. Any person or entity dealing in any transaction whatsoever with Landlord or any of Landlord's successors or assigns shall be entitled to rely fully on any such termination and release of this memorandum of lease without the need for further investigation or inquiry.

(b)     In no event shall any monetary or economic provisions of this Lease be disclosed in the memorandum of lease. Any and all federal, district, state, county and city documentary stamps and transfer taxes and any and all similar forms of taxes at any time imposed on or by virtue of this Lease, without regard to the recordation of this Lease or any memorandum thereof, shall be paid by Tenant. Notwithstanding the foregoing to the contrary, should any such taxes be imposed on or by virtue of the recording of the memorandum of this Lease, such taxes shall be paid by the party requesting and recording such memorandum.

(c)     Within ten (10) days after the expiration or sooner termination of this Lease, Tenant, at Tenant's sole cost and expense, shall execute and deliver to Landlord a complete and unconditional termination and release of the memorandum of this Lease (if any) (the "Release"), which Release shall be in form and substance acceptable to Landlord in the exercise of its sole discretion and which also shall be in recordable form.

(d)     Notwithstanding anything herein to the contrary, Tenant's execution and delivery of the Release shall be, at Landlord's election, a condition precedent to the effectiveness of the exercise by Tenant of any right Tenant has in, or under, this Lease to terminate this Lease prior to the natural expiration date of this Lease.

39.       ENTIRE AGREEMENT

This Lease, including all the Articles hereof and all the Exhibits attached hereto and incorporated herein, contains the final and entire agreement between the parties hereto. The parties hereto shall not be bound by any terms, statements, conditions or representations, oral or written, express or implied, not specifically set forth in this Lease. Any agreement hereafter made shall not operate to change, modify, waive, terminate, discharge or effect an abandonment of this Lease, in whole or in part, unless such agreement is in writing and signed by all parties hereto. Landlord and Tenant each hereby agrees that it is not relying on any representations or agreements other than those specifically contained in this Lease. Without limiting the generality of the foregoing, Tenant agrees that Landlord has not made any representation, express or implied, with respect to any federal, state, or municipal law, ordinance, or regulation applicable to the Premises, or the rest of Shopping Center, or any use or proposed use to be conducted therein (including, without limitation, laws or ordinances relating to zoning or fire walls). In the event the Premises cannot be used by the Tenant, in whole or in part, for any purpose for which Tenant intends to use same, Tenant shall not have any right to terminate this Lease, except as permitted pursuant to the provisions of Paragraph 1(c) (4) hereof, nor shall Tenant be entitled to any abatement of, or off-set against, Rental payable hereunder or any claim for damages or otherwise.

40.        SOLE BROKER

Each party hereto covenants, warrants and represents that it has not dealt with any broker or real estate agent or finder entitled to a fee or commission in connection with this Lease, or had any conversation or negotiation with any such broker or real estate agent or finder concerning the renting of the Premises. Landlord and Tenant each hereby agrees to defend and hold harmless the other party against any and all claims for brokerage commission arising out of any conversations or negotiations had by the indemnifying party with. any broker or real estate agent or finder.

41.        RULES AND REGULATIONS

Tenant agrees to comply with and observe such rules and regulations as are promulgated from time to time by Landlord including designated locations for employee parking, provided they are reasonable and uniformly enforced against all tenants of the Shopping Center and are consistent with the terms of this Lease. Tenant recognizes that Landlord has the right to make reasonable amendments to said Rules and Regulations from time to time for the operation and maintenance of the Shopping Center, provided that the same are of general applicability and effect and are not inconsistent with the provisions of this Lease, and that a copy of those amendments is sent to Tenant at least thirty (30) days before Landlord seeks to enforce them against Tenant. Tenant shall cause its employees, agents, contractors, customers and invitees to comply with and observe such Rules and Regulations as amended from time to time. Landlord hereby agrees to use reasonable efforts to uniformly enforce such Rules and Regulations, as amended, against all tenants and. occupants of the Shopping Center; Landlord, however, shall not be liable to Tenant for any violation of said Rules and Regulations by any other tenant or occupant or its or their employees, agents, contractors, customers, or invitees.

42.        PAYMENT OF INTEREST

(a) Whenever either party hereto is required to pay the other party interest under the terms of this Lease, such interest rate (the "Applicable Interest Rate") shall be the lesser of (i) the highest applicable lawful rate of interest permitted in the jurisdiction in which the Shopping Center is located, or (ii) the greater of (1) eighteen percent (18%) per annum, or (2) the sum of two percent (2%) per annum plus the "Prime Rate" (as hereinafter defined), which such sum shall fluctuate in accordance with changes in the Prime Rate as hereinafter provided.

(b)        Anything to the contrary in this Lease notwithstanding, no interest, or other fee or charge which would be classified as interest, shall be due or payable under this Lease if and to the extent such amount would exceed the highest applicable lawful rate permitted in the jurisdiction in which the Shopping Center is located. In the event any interest, fee or charge paid under this Lease exceeds the rate permitted by law, such interest, fees and charges shall be recalculated and any excess paid over the interest rate permitted by law, plus legal interest on such excess, shall be paid to the party entitled thereto forthwith. It is the intent of the parties hereto that, under no circumstances, shall either party be required to pay interest in excess of the lawful rate.

(c) The "Prime Rate", as said term is used herein, means the variable rate of interest announced as being the "prime rate" from time to time by Citibank, N.A. (or its successor), at its main office in New York, New York, as such rate changes from time to time.

(d) The Prime Rate shall be determined as of the date the corresponding Rental is due and shall thereafter be determined as of 12:01 a.m. of the first business day of each succeeding week thereafter so long as the Rental is unpaid. The Prime Rate so determined shall remain in effect from said time and date until the time and date of the next succeeding determination of the Prime Rate hereunder. All interest hereunder shall be calculated on a per-diem basis based upon a three hundred sixty (360) day year.

43.        [INTENTIONALLY DELETED]

44.        SUBORDINATION TO MORTGAGES

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Premises or Shopping Center; provided, that as a condition to Tenant's obligations under this Lease, Tenant and the holder of any mortgage lien ("mortgagee") shall enter into a non-disturbance, subordination and attornment agreement satisfactory to the mortgagee which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. In the event Tenant does not execute and return such non-disturbance, subordination and attornment agreement to Landlord or the mortgagee within fifteen (15) (20) days after Landlord or the mortgagee requests the same of Tenant, then such failure shall be deemed to be an Event of Default. Tenant shall not be required to execute any such agreement which shall diminish or materially adversely change any of Tenant's rights under this Lease or which shall modify the provisions of this Lease as to the amount of Minimum Rent, the obligation on Tenant's part to make payments of Taxes and Common Area Charges, the size of the Premises, or the duration of the Term. Failure of Tenant to execute and deliver the requested non-disturbance, subordination and attornment agreement shall constitute an Event of Default and Tenant agrees to pay to Landlord as liquidated damages (and in addition to all remedies available to Landlord under this Lease, at law or in equity) the sum of $500.00 per day for each day Tenant fails to so deliver such non-disturbance, subordination and attornment agreement to Landlord after the expiration of the fifteen (15) day limit together with all costs (including reasonable attorneys' fees), loss and damages suffered by Landlord.

*[margin note: twenty]*

*[margin note: twenty (20)]*

45.        CONDEMNATION.

(a) In the event all of the Premises hereby leased are taken in condemnation proceedings, Tenant may terminate this Lease. In the event any part of the Premises or any part of the buildings of the Shopping Center, or Common Areas, or rights-of-way adjoining, or approaches to the Shopping Center are taken in condemnation proceedings and Landlord is unable to repair or replace same such that Tenant is materially adversely affected, and in the reasonable judgment of Tenant the Premises remaining would be unsatisfactory for Tenant's business operation, Tenant may cancel this Lease, or at its option, retain the Premises, in which event Landlord will restore the entire remaining Shopping Center to proper tenantable

condition forthwith. Until the Premises and the Shopping Center are restored to proper tenantable condition, Rental shall be reduced in proportion to the number of square feet of the Premises that Tenant is unable to use. For the purpose of this paragraph, the term "condemnation proceedings" shall include conveyances and grants made in anticipation or in lieu of condemnation proceedings.

(b) All compensation awarded or paid upon such a total or partial taking of the Premises, upon a total or partial taking of the Common Areas or upon any taking of the Shopping Center, shall belong to and be the property of Landlord without any participation by Tenant; provided, however, that nothing contained herein shall be construed to preclude Tenant from prosecuting any claim directly against the condemning authority for loss of business and depreciation to, damage to, cost of removal of, and value of, Tenant's stock and trade, fixtures, furniture and other personal property so long as no such claim by Subtenant shall diminish or otherwise adversely affect Landlord's award or the awards otherwise available to the Overlandlord.

46.      RESTRICTIONS AND REQUIREMENTS

Tenant agrees, at its own cost and expense:  (a) to take no action which would create any work stoppage, picketing, labor disruption or dispute, or any interference with the business of Landlord or any tenant or occupant of the Shopping Center or with the rights and privileges of any customer or other person lawfully in and upon the Shopping Center; (b) to comply with all laws, ordinances, rules and regulations of governmental authorities (including zoning laws and building codes) and insurance underwriters, and any other organization exercising similar functions, affecting the Premises, except that this clause shall not be construed to require Tenant to remove or be responsible for any hazardous substances that might be existing in or on the Premises as of the date of Delivery of Possession or were not caused by Tenant and shall not be construed to require Tenant (except as provided in Article 4, Paragraph 50 hereinafter) to comply with any such laws, ordinances, rules or regulations to the extent the same require structural changes in or to the Premises or the building in which the Premises are located; (c) to keep the display windows in the Premises electrically lit during the periods prescribed by Landlord unless the interior of the Premises is visible through such display windows, and to keep the Premises, including, but not limited to, all windows, doors and glass, in a neat, orderly and clean condition; (d) to store in the Premises only such merchandise as Tenant shall thereafter place on retail sale at the Premises, and to use for office or other non-selling purposes only such space in the Premises as is reasonably required for the conduct of Tenant's sales activities thereon; (e) not to conduct or permit any fire, auction, going out of business or bankruptcy sale in the Premises; (f) not to use, or permit to be used, the sidewalks or other space outside the Premises for any display, sale or other purpose, except pedestrian ingress and egress to the Premises; provided, however, that Tenant may use the sidewalk directly adjacent to and in front of the Premises for seasonal sales and/or: display purposes so long as such use does not impede pedestrian use or traffic and does not encompass more than one third (1/3) of the width of the sidewalk measuring from the exterior wall of the Premises; (g) not to use or permit to be used any device which may be heard outside the Premises; (h) subject to the provisions of Paragraph 15(a) hereof, to operate its business in the Premises with functional, neat and attractive equipment and trade fixtures; (i) (intentionally deleted); (j) to pay promptly, and when due, all taxes, fees, licenses,

assessments and other charges levied or imposed upon the business of the Tenant or upon any trade fixtures, furnishings or equipment or other personal property owned by Tenant in the Premises; (k) not to use the plumbing facilities for any purpose injurious to the same; dispose of any garbage or any other foreign substance therein; place a load on any floor in the Premises exceeding the floor load per square foot which such floor was designed to carry; install, operate or maintain in the Premises any heavy equipment except in a location approved by Landlord; or install, operate or maintain in the Premises any electrical equipment which will overload the electrical system therein, or any part thereof, beyond its capacity for proper and safe operation (as determined by the Landlord) or which does not bear underwriter's approval; (1) not to permit exterior or roof maintenance for the Premises to be performed by any individual not approved by Landlord; (m) not to operate on the Premises any vending machine or similar device for the sale of any merchandise, including, but not limited to, lockers, toilets, scales, amusement devices or devices for the sale of other commodities, unless the revenues from such vending machines or similar devices are included in "Gross Sales" and such machines and devices are only an incidental part of Tenant's retail operation within the Premises, with an exception for such vending machines for the sale of beverages, food, candies or cigarettes as are exclusively for the convenience of Tenant's employees and located in a nonsales area of the Premises; (n) to keep the Premises (including, without limitation, exterior and interior portions of all windows, doors and all other glass) in a neat, clean and sanitary condition, free of all insects, rodents, vermin and pests of every type and kind; (o) not to use the Premises for any purpose or activity which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors; (p) except as may be expressly required or permitted by this Lease, not to (directly or by sufferance) place any materials or debris on the roof of the Premises, or cut, drive nails into, or otherwise mutilate such roof; and (q) not to perform or permit any loading or unloading of merchandise into or from the front of the Premises at any time between the hours of 9:00 a.m. and 9:00 p.m., unless such loading or unloading is limited to a total of thirty (30) minutes in duration in each instance and uses only a single lined parking space.

Tenant shall not place any lien or encumbrance of any sort (including, without limitation, any chattel mortgage or security interest) against the Premises, the Shopping Center or any of Tenant's non-trade fixtures or any building equipment or improvements (such as the heating, ventilating and air-conditioning equipment, lighting systems, sprinkler system and the like) .

Tenant shall have the right to finance its own trade fixtures, merchandise, furniture and equipment; provided, however, nothing contained in this paragraph shall require Landlord to waive any of its statutory rights, liens or potential liens to any such financing and, provided further, in the event of insolvency or a bankruptcy filing as described in Article I, Paragraph 25 hereinbefore, such lien(s) shall becme a contractual lien securing Tenant's performance hereunder. Landlord shall at all times retain a contractual lien therein.

47.        [INTENTIONALLY DELETED]

48.     ATTORNEYS FEES

Each party hereto shall, within ten (10) days after demand therefor by the other party, reimburse such other party for any and all attorneys fees, expert advice, and expert witness fees and charges incurred by such other party in connection with any suit or other legal proceeding instituted by the first party against such other party,   in which the judgment or other final decision rendered is generally in favor of such other party.

49.     LANDLORD DEFAULTS

If Landlord is in default of any of its obligations under this Lease for more than thirty (30) consecutive days, plus such additional time (if any) as is permitted under Paragraph 29 hereof or reasonably required to perform any such obligation, after written notice given to Landlord and to all Mortgagees (provided the address(es) of Mortgagee(s) have been given to Tenant) by Tenant hereunder specifically and correctly describing such default, then and in that event, but not before, Landlord shall be deemed to be in default with respect to this Lease and Tenant shall have such rights at law or in equity to which it may be entitled. Tenant may elect to cure any such default of Landlord and withhold payment of up to a maximum of twenty five percent (25%) of the Minimum Rent due hereunder against the reasonable costs incurred by Tenant in curing such default,   only if Tenant first pays such Withheld Minimum Rent into a mutually acceptable federally insured escrow account with interest payable to the party ultimately determined to be entitled to receive it.  Tenant shall, within ten (10) days after depositing the Withheld Minimum Rent into escrow, initiate a lawsuit against Landlord to determine the party entitled to such Withheld Minimum Rent. The Withheld Minimum Rent and interest thereon shall be paid to the prevailing party in such lawsuit, together with attorney fees payable under Paragraph 48 above.  Except as expressly provided in this paragraph, Tenant shall have no right to seek a diminution of, or set-off against, any rent or Rental, and Tenant's rights and remedies shall be subject to the provisions of Paragraph 21 hereof.

50.     GOVERNMENTAL REGULATIONS:

Landlord acknowledges to the best of its knowledge and belief that  the Premises conforms to all requirements by authorities having jurisdiction which are applicable as of the date of this Lease.  Any changes to the Premises required to comply with changes to existing laws, rules or regulations or enactment of future laws, rules or regulations shall be the responsibility of Tenant; provided, however, that Landlord shall be responsible for the first Fifty Thousand Dollars ($50,000.00) of costs on a cumulative basis during the Term (including the Option Term and further renewals or extensions thereof) for any such changes.

51.     HAZARDOUS MATERIAL:

Landlord represents and warrants to the best of its knowledge and belief that the Premises do not presently contain any Hazardous Materials. "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos) which, now is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which

is regulated by any governmental authority. Upon discovery of any Hazardous Material in, on, under or around the Premises at any time during the term of this Lease or any options or extensions thereof, which Hazardous Material is determined to have been in existence on the Premises prior to the Delivery of Possession date, Landlord shall promptly, at Landlord's sole cost and expense, remove and dispose of such Hazardous Material in compliance with all governmental laws and regulations and Landlord shall indemnify Tenant with respect to all costs and expenses related to such Hazardous Materials.

Throughout the term of this Lease or any options or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials on, under, in, above, to, or from the Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence of Landlord, Landlord's agents, contractors, or employees, from any release of Hazardous Materials from the Premises directly caused by Tenant while in possession, or elsewhere if directly caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Lease Term.

52.        CERTAIN DEFINITIONS

(a) "Affiliate" means any person, firm or corporation which controls or is controlled by the party in question, or is controlled by the same persons or entities as the party in question. The term "control" with respect to a corporation means the ownership of, and the right to exercise, more than fifty percent (50%) of the total combined voting power of all classes of stock of the controlled corporation issued, outstanding and entitled to vote for the election of directors, whether such ownership be direct or indirect through control of another corporation(s) or firm(s).

(b) "Days" means calendar days, except where otherwise specifically stated.

(c) "Gross Leasable Area" with regard to any other store within the Shopping Center means the actual number of square feet of floor space within such other store, measured to the exterior faces of exterior walls and to the center lines of interior walls dividing tenants' premises, but excludes (i) any mezzanine space and (ii) any corridor along the rear of such premises. "Gross Leasable Area" with regard to the Shopping Center means the actual number of square feet of floor space on all floors of the buildings then in existence including the Premises, measured to the exterior faces of exterior walls, as computed by Landlord's architect. Gross Leasable Area with respect to the Premises shall be as set forth in Paragraph 3 of Article I hereunder.

(d) "Including" means "including but not limited to".

(e) "Reenter" and "reentry" as used herein shall not be restricted to their technical legal meaning.

53.        GENERAL PROVISIONS

(a)        Benefit and Burden. Subject to the provisions of Paragraph 14 hereof, the provisions of this Lease shall be binding upon, and inure to the benefit of, the parties hereto and their respective heirs, personal representatives, successors and assigns.

(b)        Governing Law/Venue. It is the intention of the parties hereto that this Lease (and each provision hereof) shall be construed and enforced in accordance with the laws of the state in which the Shopping Center is located, without reference to any choice of laws rules of that state. Unless otherwise agreed by the parties hereto, any action for enforcement of this Lease shall be brought in the State Courts within the City of Charlottesville or County of Albemarle, Virginia, or in the Federal Court for the Western District of Virginia located in Charlottesville, Virginia.

(c)        Table of Contents and Captions. The table of contents and the captions throughout this Lease are for convenience of reference only. The words contained therein shall in no way be held or deemed to define, limit, describe, explain, modify, amplify or add to the interpretation, construction or meaning of any provision of this Lease, nor in any way affect this Lease.

(d)        Plurality and Gender. Wherever appropriate herein, the singular includes the plural and the plural includes the singular. All feminine, masculine and neuter terms contained herein are used interchangeably wherever appropriate.

(e)        Counterparts. This Lease may be executed in several counterparts, in either original typed instruments or reproductions thereof, but all counterparts shall constitute one and the same instrument.

(f)        Invalid or Unenforceable Provision. If any provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby. Each provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

(g)        Time of the Essence. Landlord's and Tenant's respective responsibilities, obligations and liabilities under this Lease shall be construed in accordance with the principle that time is of the essence.

(h)        The person(s) executing this Lease on behalf of the Tenant hereby covenant and warrant that: (i) the Tenant is a duly constituted corporation qualified to do business in the state in which the Shopping Center is located; (ii) all Tenant's franchise and corporate taxes have been paid to date; (iii) all future forms, reports, fees and other documents necessary for Tenant to comply with applicable laws will be filed by Tenant when due; and (iv) such persons are duly authorized by the governing body of such corporation to execute and deliver this Lease on behalf of the corporation.

~~(i)     Notwithstanding anything to the contrary in this Lease, it is the express understanding, agreement and intention of the parties hereto that neither the Original Tenant or Bradlees shall be liable for any obligations created by this Lease to the extent any such obligations are greater than or in addition to the obligations of Tenant under the Overlease prior to the effectiveness of this Lease and any amendments and/or modifications to the Lease made herein.~~

## ARTICLE III

Of the Lease dated October ___, 1999, by and between SEQUEL INVESTORS LIMITED PARTNERSHIP, as Landlord, and CONSOLIDATED STORES CORPORATION, as Tenant.

Notwithstanding any other provision of this Lease, the following special provisions shall apply. In the event of any inconsistency between any of the following special provisions, and any other provision of this Lease, the provisions of this Article III shall control:

-1.        Option Term(s) .

(a)     Provided this Lease is then in full force and effect and Tenant is not then in default beyond any applicable notice and cure periods of the terms of this Lease, nor with the passage of time or the giving of notice would there be a default hereunder, and further provided that Tenant is operating one hundred percent (100%) of the Premises, Tenant shall have the option to extend this Lease for one (1) additional period of eight (8) years commencing on the expiration of the initial term of this Lease (the "Option" or "Option Term") Said option shall expire and be of no force or effect unless exercised by Tenant giving written notice thereof to ~~Sub~~landlord not earlier than eighteen (18) months or later than twelve (12) months prior to the expiration of the initial term of this Lease. All of the terms, conditions and provisions of this Lease shall remain in full force and effect during the Extension Term, except as otherwise set forth herein.

(b) Neither the foregoing Option granted to Tenant to extend this Lease, nor the exercise thereof by Tenant, shall prevent Landlord from exercising any right granted or reserved to Landlord in this Lease or which Landlord may have by virtue of any law to terminate this Lease, either during the Initial Term or during the Option Term. Any valid termination of this Lease shall serve to terminate the Option Term whether or not Tenant shall have exercised same. Any right on the part of Landlord to terminate this Lease shall continue during the Option Term, and the foregoing option granted to Tenant to extend this Lease shall not be deemed to give Tenant any further option to extend this Lease.

OCT 25 '99 13:04 F███████LIDATED STORES  8042935197   P.11/11

IN WITNESS WHEREOF, the parties hereto have signed, sealed and delivered this Lease as of the day and year first above written.

ATTEST:

Donald P. Pillott
10/25/99  Secretary

[CORPORATE SEAL]

LANDLORD:

SEQUEL INVESTORS LIMITED
PARTNERSHIP, a Virginia limited partnership

BY:  Great Eastern Management Company,
                                    General Partner

By: _____
    ITS:  V. Pres
    DATE: oct 25, 1999

TENANT:

ATTEST:

James J. Harris
Assistant Secretary

.[CORPORATE SEAL]

CONSOLIDATED STORES CORPORATION,
an Ohio corporation

BY: _____
    ITS: Kathleen Hipper, Vice President
DATE: _____

~~The Stop & Shop Companies, Inc. unites herein to evidence its agreement with the terms and conditions of this Lease.~~

ATTEST:

_____
            Secretary

[CORPORATE SEAL]

STOP & SHOP COMPANIES, INC.

BY: _____
    ITS: _____
DATE: _____

AB

47

** TOTAL PAGE.04 **



Exhibit A

having an arc length of 575.00 feet a distance of 305.30 feet
to a point, thence in a northwesterly direction along a curve
having an arc length of 394.64 feet a distance of 162.68 feet
to a point, thence N46°07'50"W 185.91 feet to a point, thence
N43°51'49"E 190.00 feet to a point, thence N46°07'50"W 340.00
feet to a point, thence N43°51'49"E 215.61 feet to a point,
thence N60°46'48"E 105.19 feet to a point, thence N40°49'29"E
8.76 feet to the point of beginning, being all of Block C as
shown on the above-described plat, containing 8.299 acres, more
or less.

# EXHIBIT B

# Tenant Design Criteria Manual

0595

Developers/Owners

Great Eastern Management Company, Agent, P.O. Box 5526, Charlottesville, VA 22905-5526
Telephone   (804) 296-0131   Fax   (804) 293-5197

Architects/Design

Shank & Gray Architects, 510 E. Main Street, Charlottesville, VA  22901
Telephone   (804) 295-0131   Fax   (804) 295-0338

Architects/Inspection

Shank & Gray Architects, 510 East Main Street, Charlottesville, VA  22901
Telephone   (804) 295-0131   Fax   (804) 295-0338

General Contractors & Approved Contractors for Tenant Improvements

Coleman-Adams Construction, In., Route 221 South, P.O. Box 368, Forest, VA 24551
Joe Coleman                    Telephone   (804) 525-4700

R.E. Lee and Son, Inc., 1460 Hydraulic Road, P.O. Box 7226, Charlottesville, VA  22906
Tom Lynch                      Telephone   (804) 973-1321

Great Eastern Management Company, P.O. Box 5526, Charlottesville, VA  22905-5526
E. Stephen Hopkins, Jr.        Telephone   (804) 296-4141

Note:  The architects and contractors listed on this page are approved for the project.
Tenants desiring to use another contractor or architect for interior construction
must obtain prior written consent of the Landlord.  We recommend Great Eastern
Management Company for interior improvements as it will be doing the majority
of the interior finishes and is familiar with the provisions of this Manual.

Leasing

Great Eastern Management Company, P.O. Box 5526, Charlottesville, VA  22905-5526
Andrew Boninti                 Telephone   (804) 974-7377

Management

Great Eastern Management Company, P.O. Box 5526, Charlottesville, VA  22905-5526
E. Stephen Hopkins, Jr.        Telephone   (804) 296-4141

Promotional Fund

Great Eastern Management Company, P.O. Box 5526, Charlottesville, VA  22905-5526
Kristin P. Peura               Telephone   (804) 296-4141

3

Exhibit B

1.  Landlord's Work

    The current space is being leased in an "as is" condition.

2.  Tenant's Work

    Subject to Landlord's prior written approval as outlined herein and in the Lease Tenant may, at its expense, construct within the Premises or furnish for the Premises:

    a.  entrance doors with similiar design and color as existing doors. Existing front doors are to be given to Landlord. Existing storefront opening is to be enclosed by Tenant using similar materials.

    b.  deviations from standard storefront provided by Landlord.

    c.  demising wall (both sides finished).

    d.  material, other than that provided by Landlord.

    e.  wall material, other than that provided by Landlord.

    f.  paint and interior decoration of store space.

    g.  additional partitions.

    h.  enclosing of columns.

    i.  installation of all floor covering (no asbestos containing material is permitted).

    j.  the penetration and flashing of all roof openings, which work shall be performed by the Landlord's contractor at Tenant's expense.

    k.  lighting fixtures, including lamps not provided by Landlord. Surface mounted or suspended fluorescent lights are not permitted in sales area.

    l.  all signs, including such marquee, canopy, door signs or other signs as may be required by Landlord and in accordance with criteria as set forth in this Manual.

    m.  such fire extinguishers as required by Code and approved by the fire prevention official having jurisdiction.

    n.  all of Tenant's Work shall be in accordance with all applicable building fire codes based on actual use of the Premises.

3.  Store Architects and Designers

    Within ten (10) days after the date the Lease is fully executed by all parties, Tenant shall identify to Landlord the licensed architect or interior designer engaged by the Tenant to prepare its plans for the construction in the demised Premises by Tenant (herein "Tenant's Work").

4.  The Tenant and its contractor are responsible for compliance with all local, state and federal building codes and all other applicable laws. It is strongly recommended that the Tenant's architect, designer and/or contractor consult with local building officials.

4

5.     Contractor

Before entering into a contract for construction, Tenant must become familiar with the requirements of this Manual, all applicable local ordinances, the statewide building code, and all applicable federal regulations included but not limited to ADA, OSHA, and environmental requirements. Prior to commencement of construction, Tenant must notify Landlord of the identity of the contractor(s) engaged for construction in the Premises. Contractors employed by Tenant will not be permitted to start construction until all approvals required by this Manual are obtained and document submittals are

complete. Contracts for construction are solely between Tenant and its contractor(s). The Landlord shall in no way be held liable for errors, omissions or performance by either Tenant or its contractor(s).

6.     Drawing Submission Requirements

The following deadlines apply to the submission of Tenant space design and construction drawings. The time sequence shall begin as of the date the Lease is fully executed by all parties.

a.     within 15 days - name, address, telephone number of the architect or interior designer.

b.     within 20 days - two (2) complete sets of preliminary plans outlining specifications with Tenant's approval affixed.

c.     within 10 days of obtaining Landlord's written approval of plans (as outlined in 6. b. above) - four (4) complete sets of working drawings and specifications; two (2) sets with Tenant's approval affixed. If either preliminary drawings or working drawings are disapproved upon initial submission, Tenant shall resubmit the modified drawings and specifications within ten (10) days of each disapproval until drawings are approved. When submitted, working drawings and specifications shall include:

i.     detailed drawings and specifications of all work, including plumbing and electrical installations (which shall be connected by Tenant to utility systems furnished by Landlord).

ii.     complete detail of all parts which will affect the appearance of the Premises and its architectural, mechanical and electrical components.

iii.     reflected ceiling plan, if changed or different from that provided by Landlord.

iv.     all plans, sections and elevations drawn to appropriate scale.

v.     all dimensions, material, color, texture and specifications (color chips shall also be included).

vi.     a stamp by an architect that has been approved by Landlord.

vii.     NOTE: SUPERIMPOSED LOADS, EITHER PLACED UPON OR HUNG FROM THE ROOF STRUCTURE ARE NOT PERMITTED!

7.     Additional Documentation Requirements

Prior to commencement of construction, Tenant shall furnish to Landlord copies of the following documents:

a.     A certificate signed and sealed by an architect registered in the State of Virginia and approved by Landlord providing:

5

i.    that all Tenant's Work shown on the final working plans and specifications is in conformance with all applicable laws and codes.

ii.    the total connected demand electrical load.

iii.    that nothing in the Tenant's Work will adversely affect the structural integrity of the building.

iv.    that the HVAC design as provided by the Landlord or to be constructed by the Tenant is sufficient to effectively heat and cool the Premises considering all aspects of the space design and that the HVAC design does not develop a negative pressure within the Premises.

v.    that the design of the Tenant space has been completed in accordance with this Tenant Design Criteria Manual and the Lease.

b.    A performance bond and labor and material payment bond or such other surety as may be acceptable to Landlord naming the Tenant and Landlord as dual obligees. Said bond shall be in the form of A.I.A. Document A-311 (latest edition) or such other form as may be acceptable to Landlord and shall be in an amount equal to 100% of the value of Tenant's Work..

c.    Workers compensation coverage in accordance with local requirements.

d.    Builder's risk insurance in the amount of the estimated cost of Tenant's improvements naming the Landlord as an additional insured party.

e.    Public liability insurance coverage naming the Landlord as an additional insured with minimum limits as set forth in the Lease.

f.    Plans and specifications approved by Landlord and all other agencies having jurisdiction.

g.    A building permit issued by the locality in which the construction is to occur and any other permits required by local authorities, which shall be obtained at Tenant's expense.

h.    A business license for the contractor as required by the locality in which the construction is to occur and/or the State of Virginia.

i.    The Landlord will issue a letter to Tenant authorizing the commencement of construction within 10 days from receipt of all of the above.

8.    **Tenant's Construction Procedures**

a.    Tenant will not commence construction until written authority has been obtained from Landlord.

b.    Storage of materials and/or equipment is to be confined within the walls of the Premises.

c.    All work shall be done in a first class and workmanlike manner, in accordance with all governing regulations and codes, and none of the same shall damage or weaken the building of which the Premises are a part.

d.    Tenant and Tenant's contractor shall be responsible for removal of all trash, rubbish and surplus material as frequently as necessary to keep the Premises free of debris. If either fails to observe this requirement, Landlord may remove same and charge Tenant for the cost of removal.

e.    Tenant's contractors must coordinate their work with that of the Landlord's contractors and make certain that such work shall not interfere or conflict with Landlord's contractors in completion of the overall development.

f.   Landlord's general contractor shall have the right, but not the obligation, to establish reasonable rules and regulations governing Tenant and Tenant's contractors during construction period in order to insure that construction proceeds in a safe and orderly manner and is in accordance with all governing rules and codes.

g.   In the event that Tenant's Work is performed subsequent to the opening of any anchor tenant(s) within the Shopping Center, Tenant shall cause its contractors to:

   i.   perform that portion of the construction which is noisy or may otherwise disturb in any way the operation of the Shopping Center or its tenants before 10:00 am or after 8:00 pm.

   ii.   enclose the Premises so that the interior is not visible from the front of the shopping center.

   iii.   receive delivery of all material through the rear of the Premises unless otherwise approved by Landlord.

h.   Tenant shall fully comply with all environmental laws and guidelines at all times, and assumes express liability therefore.

9.   Documents to be Submitted upon Completion of Construction Prior to Occupancy and/or Commencement of Business.

a.   A certificate of occupancy issued by the locality in which the Premises is located.

b.   an architect's affidavit that Tenant's Work has been completed to Tenant's satisfaction and in strict accordance with the working drawings and Tenant's construction requirements.

c.   a General Contractor's affidavit that it has fully completed Tenant's Work in accordance with the working plans and that all subcontractors, laborers and materials for such work have been paid in full.

d.   a fully executed lease commencement agreement in the form provided by Landlord.

10.   Sign Criteria

a.   The content of all signs shall be limited to white (acrylite 048) letters designating the store name only and shall contain no advertising devices, slogans, symbols or marks other than logos crests or corporate shields universally used by national or regional tenants on all signs. Logos, crests or corporate shield designs must by submitted to Landlord for approval, which approval shall not be unreasonably withheld provided that the proposed sign or symbol is compatible with the design intent of the Shopping Center.

b.   The location, character, design, color and layout off all signs shall be subject to Landlord's written approval and no sign will be place in final position without such approval.

c.   All signs must be professionally made, carry a U.L. approved label and be constructed of individual neon lighted letters.  The maximum letter height shall be 30" unless a written exception is granted by Landlord.  Each letter shall be fabricated from 22 gauge point grip steel with spot welded construction, be 4" deep and mounted on an 8" x 8" raceway and use 15 mm neon with 30 hertz normal power factor 120 volt transformers.

d.   The provisions in Exhibit D shall further govern signage.

11. **UTILITIES**

All utilities (including but not limited to on-line computer service, telephone, electricity, gas, cable, water and sewer) shall be in Tenant's name if such utility exclusively serves the Premises leased by Tenant, and Tenant shall make

the necessary arrangements with the utility company to establish service. In any circumstance in which the cost for a utility is determined by the reading of a common meter which measures usage for both Tenant's Premises and other areas, Landlord shall make the arrangements to establish service, and Tenant shall pay to Landlord, as provided in the Lease, Tenant's pro rata share of the cost of the utility which cost may include a service fee paid to Landlord.

F:\DOCS\WP\SEQUEL\BIGLOTS\EXHIBITB

8

## EXHIBIT C

### OPERATING HOURS

Tenant agrees to keep the Premises open as specified in Section 5 paragraph (b) of the Lease from 10 o'clock a.m. to 7 o'clock p.m., Monday through Thursday; from 10 o'clock a.m. to 9 o'clock p.m. Friday and Saturday; and from 12 o'clock noon to 6 o'clock p.m. on Sunday. Such minimum hours of operation are subject to change from time to time by Landlord so long as any such change is applicable to substantially all tenants of the Shopping Center.



03:11   FAX 6144610620   ALL STAR SIGN CO   ☐02

# EXHIBIT D

## SIGN CRITERIA

A.  The advertising content of all signs shall be limited to individual letters designating the store name only and shall contain no advertising devices, slogans, symbols or marks other than logos, crests, or corporate seals universally used by national or regional tenants on all signs. Logos, crests or corporate shield designs must be submitted to Landlord for approval, which approval shall not be unreasonably withheld provided that the proposed sign or symbol is compatible with the design intent of the shopping center.

B.  The location, character, design, color and layout of all signs shall be subject to Landlord's written approval and no sign will be placed in final position without same.

C.  All signs must be professionally made, carry a U.L. approved label and be constructed of individual neon lit letters. The maximum letter height shall be 30" unless written exception is granted by Landlord. Each letter shall be fabricated from 22 gauge point grip steel with spot welded construction, be 4" deep and mounted on an 8" by 8" raceway and use 15 mm neon with 30 hertz normal power factor 120 volt transformers. Distance between tube and sign face shall be no less than 1/2 the distance between the rows of neon. Plastic faces shall be 3/16" acrylic plastic. Exterior and interior of all letters shall be painted __white__; returns shall be baked enamel (__bronze__). The raceway shall be painted to match the color of the building. The following four letter styles will be acceptable.
1.  Helvetica medium
2.  Script
3.  Optima semi-bold
4.  Goudy

D.  Drawings submitted for approval by Landlord shall include:
1.  dimensions of the sign as a whole and of each letter or symbol.
2.  type of illumination. All signs shall be lit from the interior unless specific exception is granted by Landlord.
3.  necessary electrical requirements. All sign circuits shall be tied into a clock-timer controlled from inside the premises to facilitate lighting of signs at night until the time specified by Landlord.
4.  the name and/or stamp of the sign contractor or sign company which shall not be exposed to view.

E.  The following are expressly prohibited:
1.  Animation, moving signs or moving lights.
2.  Temporary signs, irrespective of the composition of the sign or material used.
3.  Box or cabinet type signs or signs with formed plastic letters.
4.  Painted on or luminous letters.
5.  Back-lit signs or letters.
6.  Rooftop signs or banners or projection signs.
7.  Free standing signs or sandwich board signs.
8.  Noise making devices, boxes, cabinets or frames.
9.  Wooden backed signs or letters.
10.  Signs above the roof line or on the roof.
11.  Pop rivet construction of signs.

F.  One sign is allowed per store-front unless there are two or more angled faces, such as a corner store-front, in which case a second sign may be allowed, subject to Landlord's approval.

G.  There will be no unauthorized suspended signs under the canopy. All Tenants will be required to install a flush-mounted sign over the store entry with letters 1" high. Design, location and letter type shall be approved by Landlord.

H.  In addition, Tenant shall purchase one sign from High Tech Signs at Rio Hill Shopping Center for each store (call Randy Smith at Hightech Signs at 974-7900 to order signs or with any questions).
1.  Each sign shall be oval shaped 8 inches high by 40 inches long, made from Dupont Lucite, Color BR 241B (a medium brown).
2.  The store name, which shall be the "trading as" name in the Lease, (letters and numerals as appropriate) shall be written in Times Bold, using 2 m.m. Arlon Cast #68 Beige (a beige color to match the drive of the fascias).
3.  Each side of each sign shall carry a reproduction of the shopping center logo, located centrally along the length of the sign and rising vertically from the lower edge of the sign to a height of 1.5 inches. The logo shall be Arlon Vinyl Cal-Plus #11 Green.
4.  The sign shall have an oval border, one-half inch thick and of the same beige vinyl as the store name.
5.  All sign requests and specifications shall be presented to the Landlord in writing for approval prior to the installation of any sign.
6.  All work (including the manufacturing of the sign and the installation thereof) shall be done by Hightech signs.
7.  In order to protect the beauty of the Shopping Center, no variations from these guidelines will be permitted.

EXHIBIT E

## TENANT'S COVENANTS RELATING TO INDUSTRIAL DEVELOPMENT BOND FINANCING

If Tenant is deemed to be a "principal user" of _____
Shopping Center with respect to the hereinafter described Bonds, as the term "principal user" is defined in Section 103 of the Internal Revenue Code of 1954, as amended, Paragraph 1 hereof is incorporated herein. If Tenant is not deemed to be a "principal user" of such Bonds for the purposes hereof, Paragraph 2 hereof is incorporated herein.

~~Paragraph 1: Tenant acknowledges that Landlord is financing or may in the future finance the shopping center (the demised Premises being a part thereof) through the use of industrial development bonds (including refunding bonds) (the "Bonds") to be issued by the local industrial Development Authority of the City/County of _____ (the Authority). Tenant agrees that it shall, promptly upon a request from Landlord, submit and file all certificates, representations and reports as may be, from time to time, required by Landlord, the Authority, any letter of credit institution, or any purchaser of underwriter of the Bonds. All quoted terms in this Section shall have the same meaning as set forth in Section 103 of the Internal Revenue Code of 1954, as amended, and in the regulations, rulings and pronouncements of the Internal Revenue Service issued from time to time pursuant thereto (the "Code").~~

~~a.    Tenant agrees that at no time within three years from the date of the issuance by the Authority of the Bonds will Tenant or any "related person" of Tenant pay or incur, or consent to the paying or incurring by others of "capital expenditures" with respect to the leased premises or any other facilities within City/County of _____ _____, "principal user" of which is Tenant or any "related person" of Tenant, or with respect to any facilities which are "contiguous to" or "integrated with" any facilities so located (hereinafter collectively referred to as the "Restricted Facilities"), if the aggregate amount of such "capital expenditures" during a period beginning three years before the date of issuance of the Bonds and ending three years after the date of issuance of the Bonds (the "Restricted Period") will be in excess of a total of _____~~

~~b.    Tenant represents that other than the Bonds, there are, on the date of the execution of this Lease, no outstanding issues of obligations of any State, Territory or possession of the United States, or any political subdivision of the foregoing, or of the District of Columbia, the proceeds of which have been or will be used primarily with respect to facilities:~~
~~i.    a "principal user" of which is or will be Tenant or a "related person" of Tenant, and;~~
~~ii.    which~~
~~(1)    are located in the City/County of _____ or~~
~~(2)    are "contiguous or integrated" facilities located on both sides of the border between the City of Charlottesville and any adjoining political jurisdiction (hereinafter collectively referred to as the "Restricted Area");~~

~~c.    Tenant further agrees that it shall file~~
~~i.    with the income tax return of Tenant for the current taxable year, a copy of the Authority's election required pursuant to Section 103 (b) (6) (D) of the Code, and~~
~~ii.    annually for three years following the date of the issuance of the Bonds, with the office of the Internal Revenue Service where Tenant's income tax return is required to be filed, on the date required for such filing (without regard to any extension of time), a supplemental statement showing all "capital expenditures" paid or incurred by Tenant with respect to any Restricted facilities (including any such "capital expenditures" by each "related person" of Tenant) during the preceding fiscal year of Tenant.~~

~~d.    Neither Tenant nor any Related Person of Tenant, within three years after the later of the date the project is placed in service or the date of issuance of the Bonds (the "Extended Restricted Period"), will become an owner (in whole or in part) or~~

1



Principal User of any facility ("new facility"), wherever located, financed (whether or not by or for the benefit of Tenant) in whole or in part by tax-exempt industrial development bonds unless Tenant's becoming such an owner or Principal User will not cause interest on the Bonds to become taxable because the inclusion of the "aggregate face amount" of all tax-exempt industrial development bonds allocated to Tenant and outstanding on the date of issuance of the Bonds in the calculation provided for in Section 103-(b)-(15) (A) of the Code would not cause the authorized face amount of the Bonds to exceed $40,000,000.

e.   In connection with the issuance of the Bonds, Tenant agrees to provide Landlord, promptly upon a request, a list of all "capital expenditures" paid or incurred by Tenant or any "related person" of Tenant with respect to any "Restricted Facilities within a period beginning three years before the date of the issuance of the Bonds and ending on the date of the issuance of the Bonds, such list to be broken down by date and amount of each such "capital expenditure."

f.   Tenant agrees to provide Landlord with such information as may be necessary in order to make timely and proper filing of the Authority's election required pursuant to Section 103(b) (6) (D) of the Code. If required by Bond Counsel in order to determine the tax-exempt status of the Bonds, Tenant also agrees to provide landlord information with respect to the aggregate outstanding amount of tax-exempt industrial development bonds allocated to Tenant as beneficiary.

g.   If Tenant shall for any reason fail to file the information required in paragraphs C and E above, or if Tenant's "capital expenditures" during the Restricted Period of the Extended Restricted Period (including any such capital expenditures by each "related person" of Tenant) shall exceed the amount specified in paragraphs A or D above, then Tenant shall, without further notice, immediately be in default of this lease and Landlord shall have the right, but not the obligation, in addition to all of its other rights and remedies, to terminate this lease. It is the understanding of the parties that the foregoing covenants by Tenant are a material part of the consideration given to induce Landlord to execute this lease and that any breach thereof shall entitle Landlord to a claim for damages in addition to those set forth in the Lease Agreement including

   I.   any prepayment of redemption penalty or premium;
   II.  any increased interest expense to be incurred by Landlord in the refinancing of all or portion of the outstanding Bonds (calculated as an amount equal to the difference between the interest on the Bonds which would have been paid by Landlord on the Bonds and the interest to be paid by Landlord at the per annum interest rate at which Landlord is able to refinance the outstanding principal balance of the Bonds), which shall be computed based on the principal balance and remaining term of the Bonds outstanding at the time of the refinancing and
   III. all other costs of refinancing, including reasonable attorneys' fees.

Paragraph 2:  Tenant acknowledges that Landlord is financing or may in the future finance the shopping center (the Demised Premised being a part thereof) through the use of industrial development bonds (including refunding bonds) (the "Bonds") to be issued by the Industrial Development Authority of the City of Charlottesville (the "Authority"). Tenant agrees that it shall, promptly upon request from Landlord, submit and file all certificates, representations and reports as may be, from time to time, required by Landlord, the Authority, any letter of credit institution, or any purchaser or underwriter of the Bonds. All quoted terms in this Section shall have the same meaning as set forth in Section 103 of the Internal Revenue Code of 1954, as amended, and in the regulations, rulings and pronouncements of the Internal Revenue Service issued from time to time pursuant thereto (the "Code").

   a.   Tenant Agrees that at no time within three years from the date of the issuance by the Authority of the bonds (the "Restricted Period") will Tenant or any "related person" of Tenant pay or incur, or consent to the paying or incurring by others of "capital expenditures" for improvements for which are deemed to be fixtures under Virginia law and which are made with respect tot he Demised Premises without the prior written consent which shall be at the sole discretion of Landlord.

   b.   Tenant further agrees that it shall provide to Landlord, annually, for three years

2

following the date of issuance of the Bonds, a statement showing all "capital expenditures" paid or incurred by Tenant with respect to the Demised Premises during the preceding fiscal year of Tenant, such statement to be provided to Landlord within thirty days after the end of such fiscal year.

c.   Tenant agrees to provide Landlord with such information as may be necessary in order to make timely and proper filing of the Authority's election required pursuant to Section 103(b) (6) (D) of the Code.   If required by Bond Counsel in order to determine the tax-exempt status of the bonds, Tenant also agrees to provide Landlord information with respect to the aggregate outstanding amount of tax-exempt industrial development bonds allocated to Tenant as beneficiary.

d.   If Tenant shall for any reason fail to provide Landlord with the information required in paragraphs B and C above, or if Tenant or any related person incurs "capital expenditures" with respect to the Demised Premises during the Restricted Period in violation of paragraph A above, then Tenant shall be in default of this Lease and Landlord shall have the right, but not the obligation; in addition to all of its other rights and remedies, to terminate this Lease.   It is the understanding of the parties that the foregoing covenants by Tenant are a material part of this consideration given to induce Landlord to execute this lease and that any breach thereof shall entitle Landlord to a claim for damages in addition to those set forth in the Lease Agreement including

   i.    any prepayment or redemption penalty or premium;
   ii.   any increased interest expense to be incurred by Landlord in the refinancing of all or portion of the outstanding Bonds (calculated as an amount equal to the difference between the interest on the Bonds which would have been paid by Landlord at the per annum interest rate at which Landlord is able to refinance the outstanding principal balance of the Bonds), which shall be computed based on the time of the refinancing and
   iii.  all other costs of refinancing, including reasonable attorney's fees.

e.   If at any time during the term of this lease (including any renewals), the interest payable by Landlord on the Bonds increases as a result of changes in the Federal or State income tax laws, the Minimum Rent payable under Section 3 of the lease shall increase with Tenant responsible for a pro-rata amount of such increase determined by dividing Tenant's leasable space by the total amount of leasable space in the Shopping Center that is being financed with the Bonds.   Landlord may elect to bill this increased rent on a quarterly or annual basis or estimate an amount to be payable by Tenant monthly in the same manner as taxes, insurance and common area maintenance, subject to year end adjustment.

## SUBORDINATION, ATTORNMENT AND NON-DISTURBANCE AGREEMENT

THIS AGREEMENT is made and entered into as of the ____ day of _____, 19__, by and among (i) Wachovia Bank, N.A. ("Mortgagee"), (ii) Sequel Investors Limited Partnership, a Virginia limited partnership ("Landlord"), and (iii) Consolidated Stores Corporation, an Ohio corporation ("Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a Lease dated as of September __, 1999 (the "Lease") demising unto Tenant certain premises (the "Premises") located within the improvements located on that certain real property more particularly described in Exhibit A attached hereto (the "Property").

WHEREAS, the Property is encumbered by a Deed of Trust and Security Agreement recorded among the Land Records  located in the Clerk's Office of the Circuit Court of Charlottesville, Virginia, and by various recorded and unrecorded instruments which may have been executed in connection therewith for the benefit of Mortgagee (collectively, the "Mortgage").

WHEREAS, Mortgagee represents that Mortgagee is the sole and exclusive beneficiary of the Mortgage and holder of the note and the other loan documents secured thereby.

WHEREAS, Tenant has requested Landlord and Mortgagee to enter into this Agreement.

NOW, THEREFORE, in consideration of the respective declarations and covenants contained herein, the parties hereto do hereby declare, covenant and agree as follows:

1.      Mortgagee hereby consents to the Lease.  Subject to the provisions of this Agreement, Tenant agrees that the Lease and all of the terms, covenants and provisions thereof and all rights, remedies and options of Tenant thereunder are and shall at all times continue to be subject and subordinate in all respects to the Mortgage and to the lien thereof, including without limitation all renewals, increases, modifications, spreaders, consolidations, replacements and extensions thereof and to all sums secured thereby.

2.      In the event any foreclosure or other suit, sale or proceeding is brought under the Mortgage or in the event of a deed in lieu of foreclosure or other transfer of the Property or any part thereof under the Mortgage, then and in any such event Mortgagee hereby covenants that, so long as Tenant is not in default under the Lease beyond the applicable period given Tenant to cure such default:

a.      Tenant's possession of the Premises and its rights under the Lease shall not be interfered with by Mortgagee or by any purchaser or assignee at foreclosure, pursuant to a sale in lieu of foreclosure or otherwise; and

b.      Unless Tenant is determined to be an indispensable party, Tenant shall not be made a party to any foreclosure or other suit, sale or proceeding under the Mortgage and the same shall not affect any of Tenant's rights under the Lease.

3.      Upon Mortgagee's taking possession of the Property under the Mortgage or upon any foreclosure and sale under the Mortgage or deed in lieu of foreclosure, then, insofar as the Lease relates to the Property (a) Tenant shall attorn to the Mortgagee, purchaser and/or grantee, as the case may be, and recognize such Mortgagee, purchaser and/or grantee as the Landlord under the Lease, said attornment to be effective and self-operative (without the execution of any other instrument on the part of any party hereto) immediately upon such Mortgagee's, purchaser's and/or grantee's succeeding to the interests of Landlord under the Lease and notifying Tenant in writing of such succession, and (b) notwithstanding any rule of law or statute to the contrary, the Lease shall continue, in accordance with its terms, between Tenant, as tenant thereunder, and Mortgagee, and/or such purchaser or grantee, as landlord thereunder; provided, however, that Mortgagee shall not be (i) liable (1) for Landlord's failure to perform any of its obligations under the Lease which have accrued prior to the date on which Mortgagee shall become owner of the Property or (2) for any act or omission of Landlord prior to such foreclosure or sale, (ii) bound by any payment of rents, additional rents or other sums which Tenant may have paid more than one (1) month in advance to any prior Landlord, unless (1) such sums are actually received by Mortgagee or (2) such prepayment shall have been expressly approved of by Mortgagee, or (iii) bound by any agreement materially amending, materially modifying or terminating the Lease made without Mortgagee's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned prior to the time Mortgagee succeeded to Landlord's interest.

4.      In the event of any inconsistency between the provisions of or rights under the Mortgage and the provisions of or rights under the Lease, whether before, during or after any foreclosure or transfer in lieu thereof, then the Lease shall be deemed to control vis a vis the rights and obligations of Tenant, and the Mortgagee shall not take any actions which materially adversely affect said rights or obligations of Tenant.  Tenant shall not be liable, directly or indirectly, for any of the obligations under the Mortgage.

5.      The term "Mortgagee," as used in this Agreement, means only the beneficiary of the Mortgage and holder of the note and other loan documents secured thereby for the time being, so that, in the event of any transfer of said Mortgage or note, the transferring Mortgagee shall thereupon become entirely freed and relieved of all covenants and obligations of the Mortgagee hereunder, except with respect to any breaches of this Agreement as shall have theretofore occurred.  This Agreement, however, shall bind any subsequent beneficiary of the Mortgage and holder of said note, their successors or assigns.  Except as aforesaid, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.      Tenant shall provide Mortgagee with copies of all written notices sent to Landlord pursuant to the Lease simultaneously with the transmission of such notices to the Landlord. Tenant shall notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to cancel the Lease or to an abatement of the rents, additional rents or other sums payable thereunder and agrees that any such cancellation or abatement shall be effective only if Mortgagee

shall have failed within (30) days after delivery of such notice to cure such default, or if such default cannot be cured within thirty (30) days, shall have failed within thirty (30) days after delivery of such notice to commence and thereafter diligently pursue any action necessary to cure such default. Notice to Mortgagee shall be deemed delivered when mailed by United States mail, sent via recognized overnight courier, or hand delivered or as otherwise provided in the notice provisions contained herein and in the Lease.

7.     All notices, demands, requests, consents, approvals and other instruments required or permitted to be given pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been properly given upon receipt if hand delivered or, if sent by registered or certified mail, postage prepaid, return receipt required, or by recognized overnight courier addressed to Tenant at Tenant's address, Landlord at Landlord's address, or Mortgagee at Mortgagee's address, as the case may be, such notice so mailed or sent shall be deemed to have been properly given on the second business day following deposit in the mails, or on the next business day after being sent by overnight courier. Mortgagee, Landlord and Tenant shall each have the right from time to time to specify as its address for the purposes of this Agreement any other addresses in the United States of America upon three days' notice thereof, similarly given, to the other party.

If to Mortgagee, to Mortgagee at:     WACHOVIA BANK, N.A.
Attn: Charles E. Barco, III
Senior Vice-President
547 Old Lynchburg Road
P.O. Box 711
MC:VA-21031
Charlottesville, VA 22902

If to Tenant, to Tenant at:     CONSOLIDATED STORES CORPORATION
300 Phillipi Road, Department 10051
P.O. Box 28512
Columbus, Ohio 43228-0512

If to Landlord, to Landlord at:     SEQUEL INVESTORS LIMITED PARTNERSHIP
c/o Great Eastern Management Company
2619 Hydraulic Road (P.O. Box 5526)
Charlottesville, VA 22901 (22905-5526)
Facsimile: 804/293-5197
Attn: Charles Rotgin, Jr.

With a copy to:     Lucius H. Bracey, Jr., Esq.
McGuire Woods Battle & Boothe
Court Square Building
310 4th Street, NE (P.O. Box 1288)
Charlottesville, VA 22902
Facsimile: 804/980-2222

Any party and its respective successors in interest taking the benefit of this Agreement may designate, by notice in writing hereunder, a new or other address to which such notices and demands shall thereafter be addressed.

8.     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.     This Agreement shall be governed by and construed in accordance with the laws of the State where the Property is located.

10.     This Agreement may not be modified orally or in any other manner than by an agreement in writing signed by the parties hereto or their respective successors in interest.

IN WITNESS WHEREOF, the parties hereto have signed, sealed and delivered this Agreement as of the date and year first written above.

MORTGAGEE:

WACHOVIA BANK, N.A.

By:_____

Name: _____
Title: _____
Date: _____


TENANT:

CONSOLIDATED STORES CORPORATION

By:_____

Name: _____
Title: _____
Date: _____

The Landlord unites herein to evidence its acknowledgement of this Agreement.

LANDLORD:

SEQUEL INVESTORS LIMITED PARTNERSHIP

By:    Great Eastern Management Company,
                              General Partner

By:     _____
Title:  _____
Date:  _____


State of Virginia,
City/County of _____, to-wit:

On  this  the  ____  day  of  _____,  19__,  before  me,
_____,  the  undersigned  officer,  personally  appeared
_____, whose name is signed to the foregoing Instrument, and who
acknowledged  himself/herself  to  be  the  _____  of
_____, a _____ corporation, and that (s)he, as
such _____, being authorized so to do, executed the foregoing
Instrument bearing date the ____ day of _____, 19____, for the purposes therein
contained,  by  signing  the  name  of  the  corporation  by  himself/herself  as
_____.

In witness whereof, I hereunto set my hand and official seal.


                              _____
                              Notary Public

[Notarial Seal]

                              My Commission Expires:_____

State of _____,
City/County of _____, to-wit:

On this the ____ day of _____, 19__, before me,
_____, the undersigned officer, personally appeared
_____, whose name is signed to the foregoing Instrument, and who
acknowledged himself/herself to be the _____ of
_____, a _____ corporation, and that (s)he, as
such _____, being authorized so to do, executed the foregoing
Instrument bearing date the ____ day of _____, 19___, for the purposes therein
contained, by signing the name of the corporation by himself/herself as
_____.

In witness whereof, I hereunto set my hand and official seal.

[Notarial Seal]

_____
Notary Public

My Commission Expires:_____

State of Virginia,
City/County of _____, to-wit:

On this the ____ day of _____, 19__, before me,
_____, the undersigned officer, personally appeared
_____, whose name is signed to the foregoing Instrument, and who
acknowledged himself/herself to be the _____ of
_____, a _____ corporation and General Partner
of Landlord, and that (s)he, as such _____, being authorized so
to do, executed the foregoing Instrument bearing date the ____ day of _____,
19___, for the purposes therein contained, by signing the name of the corporation by
himself/herself as _____ on behalf of Landlord.

In witness whereof, I hereunto set my hand and official seal.

[Notarial Seal]

_____
Notary Public

My Commission Expires:_____

F:\DOCS\WP\SEQUEL\BIGLOTS\SANDAGR1.CLN
September 28, 1999 (6:40pm)

6

## EXHIBIT A

## LEGAL DESCRIPTION

All those certain tracts or parcel of land situated in the City of Charlottesville, Virginia, southeast of U.S. Route 29, also known as Emmet Street, designated as Block C, containing 8.299 acres, more or less, and Block D-1 (which includes Parcel G-1), containing 11.9415 acres, more or less, as shown and further described on a plat of subdivision dated December 3, 1984, last revised October 17, 1985, by William S. Roudabush, Inc., of record in the City of Charlottesville, Virginia, in Deed Book 470, page 807, less and except Lot 2, Block C, containing 1.472 acres, more or less, as shown on subdivision plat by Roudabush, Gale & Assoc., Inc., dated February 27, 1987, and recorded in the aforesaid Clerk's Office in Deed Book 539, page 209.



GREAT EASTERN MANAGEMENT COMPANY

DEVELOPMENT   ■   CONSTRUCTION   ■   LEASING   ■   MANAGEMENT

**Facsimile Transmittal Letter**

TO:    Name: *Andrew Boninti*
       Firm/Company:
       City/State:
       Facsimile Number:

FROM:  Name: *D. Morris*
       Street Address: Great Eastern Management Company
                       2619 Hydraulic Road
                       Charlottesville, Virginia 22901

There are **8** total pages in this transmission, including this cover letter.  If you do not receive all the pages, call (804) 296-4141.  This document WILL/WILL NOT be followed by a hard copy.

N O T E S :

*Andy,*
*Following is a form SAND agreement*
*for you to send to Consolidated. Please let*
*us know if you want us to e-mail the*
*document.      Thanks.*
                            *Di*

The information contained in this facsimile message may be protected by the Attorney-Client and/or the Attorney-Work Product privileges.  It is intended only for the use of the individual named above.  The privileges are not waived by virtue of this having been sent by facsimile.  If the person actually receiving this facsimile is not the named recipient or the employee or agent responsible to deliver to the named recipient, any use, dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the address above via U.S. Postal Service.  We will reimburse you for any postage and telephone expenses incurred. Thank you.

Sent:   **9/28/99**          **8:45pm**          *dm*
        Date                   Time              Operator

P.O. Box 5526 ■ Charlottesville, Virginia 22905-5526

# CONFIRMATION REPORT

09-28-99  09:02P    ID: 8042935197          NAME: GREAT EASTERN

TYPE : TRANSMISSION

| NO. | TIME | DIAL NO. | REMOTE STATION | PAGES | JOB NO. | RESULT |
|-----|------|----------|----------------|-------|---------|--------|
| 01 | 08:55P | 02 | ANDREW BONINTI | 8/ 8 | 935 | OK |



**GREAT EASTERN MANAGEMENT COMPANY**

DEVELOPMENT ■ CONSTRUCTION ■ FINANCE ■ MANAGEMENT

### Facsimile Transmittal Letter

TO:    Name: _Andrew Boninti_
        Firm/Company: _____
        City/State: _____
        Facsimile Number: _____

FROM:    Name: _D. Morris_
        Street Address: Great Eastern Management Company
               2619 Hydraulic Road
               Charlottesville, Virginia 22901

There are _8_ total pages in this transmission, including this cover letter.  If you do not receive all the pages, call (804) 296-4141.  This document WILL/WILL NOT be followed by a hard copy.

### N O T E S :

Andy,

Following is a form SAND agreement for you to send to Consolidated. Please let us know if you want us to e-mail the document. Thanks.

               Di

The information contained in this facsimile message may be protected by the Attorney-Client and/or the Attorney-Work Product privileges.  It is intended only for the use of the individual named above.  The privileges are not waived by virtue of this having been sent by facsimile.  If the person actually receiving this facsimile is not the named recipient or the employee or agent responsible to deliver to the named recipient, any use, dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the address above via U.S. Postal Service.  We will reimburse you for any postage and telephone expenses incurred. Thank you.

Sent:     _9/28/99_     _8:45pm_     _dm_
           Date             Time           Operator

EXHIBIT L - LIST OF EXCLUSIVES
IINOLE SQUARE SHOPPING CEN_
CHARLOTTESVILLE, VIRGINIA

| LEASE DATE | TENANT | EXCLUSIVE PROVISION |
|---|---|---|
| 10/9/85 | Giant | General - Landlord shall not use or permit or suffer the use of any other part of the Property (or any extension) for a supermarket; supermarket-drugstore; store similar to Tenant's store; drugstore; store that sells drugs which require prescriptions or the presence of a pharmacist; health and beauty aids store; store with more than 10% of its selling space for retail sale for off-premises consumption of the following items (individually or in any combination): groceries, meat, seafood, poultry, dairy products, produce, flowers, bakery products, health and beauty aids (except that up to 500 sq. ft. of other premises may be used to sell health and beauty aids if that use is incidental to another use, such as an exercise facility or a beauty parlor).

Exceptions - Notwithstanding the restrictions in Section 9(g)(1), certain uses are permitted on Block C as set forth in Section 3 of the Declaration, and certain uses are permitted in the 83,000 sq. ft. space on Block D-1 labeled "Bradlee's" on Exhibit A as set forth in Sections 2.4 and 2.5 of the Declaration.

Parking Problem Uses - Landlord also shall not use, permit or suffer the use of the Protected Area for carnivals, flea markets or other sales of goods or services, and of any other part of the Property (or any extension) for a restaurant, theatre or bowling alley within 300 feet of any part of the Premises (except that a restaurant may be operated on Block F shown on Exhibit A), or an amusement center containing coin-operated games, pinball machines or similar devices (except that up to 12 video games may be operated in the 83,000 sq. ft. space labeled "Bradlee's" on Exhibit A). |
| 7/9/92 | Great Wall | As long as Tenant is not in default of this Lease, Landlord agrees not to lease space in the Shopping Center to another full-service or take-out Chinese, Korean, Thai, Hawaiian or Vietnamese restaurant. |
| 7/9/93 | Marshalls | As a material part of the consideration inducing Subtenant to execute this Sublease and make the necessary expenditures to perform its obligations hereunder, Sublandlord covenants and agrees that notwithstanding anything in this Sublease to the contrary, throughout the term of this Sublease, for so long as Subtenant is open regularly for business utilizing all of the Premises as a "Marshall's Store" that is, a store for the sale and display of off-price brand name clothing and apparel for the entire family, Sublandlord shall not permit any other portion of the Other Premises in excess of fifteen thousand (15,000) square feet of gross leasable area to be used principally as a store for the sale and display of off-price brand name clothing and apparel for the entire family. |
| 8/27/93 | Office Depot | Sublandlord agrees, that so long as the Initial Use has not ceased to be operating in the Subleased Premises for a continuous period in excess of six (6) months, Sublandlord shall not lease to or allow any tenant or other occupant of any portion of the Demised Premises to be used for an office supply or products store or any business having as its primary purpose the sale of office equipment, office furniture, office supplies, art and engineering supplies, and/or computers and related equipment, or any business selling any photocopying, facsimile or printing services. |
| 12/10/93 | Victory Lane | So long as Tenant is not and has not been in default under the terms of this Lease, nor with the passage of time or giving of notice would be in default, Landlord agrees not to lease space in the Shopping Center to another tenant whose primary business is the sale of automobile racing memorabilia. |
| 2/26/99 | Sprint | Landlord agrees not to lease space in the Shopping Center to any business whose primary business is the sale of telephone equipment or services. This exclusive shall not apply to any of the present tenants of the Shopping Center or any replacements thereof. This exclusive shall not preclude the leasing of space in the Shopping Center to Radio Shack or a similar store. |

\DOCS\WP\SEQUEL\BIGLOTS\EXHIBITL



Ex B-1



LEGAL
Department 10061
300 Phillipi Road
Columbus, Ohio 43228-5311
Phone (614) 278 6800
Fax (614) 278-6763
Writer's Direct Dial Number (614) 278-3652
email: charden@biglots.com

**October 21, 2003**

**Dear Landlord:**

**EFFECTIVE OCTOBER 21, 2003** - We will have made some recent changes in our Lease Administration department. This letter is to notify you of the appropriate Lease Coordinator to contact with questions or concerns regarding our obligation for rent payments, utility payments, etc.

Each Lease Coordinator has been assigned a specific region of the United States.  Please contact the individual who handles the account for the Big Lots Store in your state.  They are as follows:

### FOR CAM & INSURANCE INVOICES ONLY:

**Jan Burns**
Phone #: 614-278-3351
E-mail: jburns@biglots.com
**States:** ALABAMA, ILLINOIS, INDIANA, KENTUCKY, LOUISIANA, MICHIGAN, MISSISSIPPI, OHIO, TENNESSEE AND WISCONSIN

**Michael Juarez**
Phone #: 614-278-3492
E-mail: mjuarez@biglots.com
**States:** CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, MAINE, MARYLAND, MASSACHUSETTS, NEW HAMPSHIRE, NEW JERSEY, NEW YORK, NORTH CAROLINA, PENNSYLVANIA, RHODE ISLAND, SOUTH CAROLINA, VERMONT, VIRGINIA AND WEST VIRGINIA

**Scott Vetter**
Phone #: 614-278-3352
E-mail: svetter@biglots.com
**States:**  ARIZONA, ARKANSAS, CALIFORNIA, COLORADO, IDAHO, IOWA, KANSAS, MINNESOTA, MISSOURI, MONTANA, NEBRASKA, NEVADA, NEW MEXICO, NORTH DAKOTA, OKLAHOMA, OREGON, TEXAS, UTAH, WASHINGTON AND WYOMING

### FOR REAL ESTATE TAXES ONLY:

**Frank Daniels**
Phone #: 614-278-3353
E-mail: fdaniels@biglots.com
**States:** ALL STATES

### FOR UTILITY PAYMENTS ONLY:

**Katie Schmelmer**
Phone #: 614-278-6625
E-mail: kschmelmer@biglots.com
**States:** ALL STATES

Any written correspondence for these individuals can be mailed to the address listed above, sent via e-mail, or sent via facsimile to the fax number listed above.

If you should have any additional questions or concerns, please feel free to contact me at my phone number listed above or via e-mail at: cirwin@biglots.com.

Thank you in advance for your support and cooperation!

Yours Truly,

Candace L Irwin – Lease Administration Supervisor

NOV 1 1 2003



Exhibit A-1

## FIRST ADDENDUM TO LEASE AGREEMENT

This document dated as of May 3, 2016, evidences a First Addendum ("First Addendum") to Lease Agreement dated October 25, 1999 by and between Sequel Investors Limited Partnership, a Virginia limited partnership, having its principal office at c/o Great Eastern Management Company, P.O. Box 5526 (2619 Hydraulic Road), Charlottesville, VA 22905-5526 (22901) ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, successor in interest to Consolidated Stores Corporation, an Ohio corporation, d/b/a Big Lots, having offices at 300 Phillipi Road, Department 10051, Columbus, Ohio 43228 ("Tenant") as modified on December 4, 2007 by a Letter Agreement re Pylon Signage for the Premises located in the Seminole Square Shopping Center in Charlottesville, Virginia (which, together shall hereafter collectively be referred to as the "Lease").

Landlord and Tenant agree to extend the Term of the Lease for an additional twelve (12) months to expire on January 31, 2017 ("Renewal Term"), subject to provisions herein.

(1)     Minimum Rent during the Renewal Term shall be as follows:

       February 1, 2016 – January 31, 2017 . . . . . . . . . . . . . . . . . . $15,821.20 per month

(2)     Landlord and Tenant agree that sentence one of Article II, Section 5, Taxes, (b) shall be deleted and replaced with the following:

       Tenant shall pay to Landlord, as provided in the Lease and as Additional Rent, Tenant's "Pro Rata Share" (as defined in Item 8 of Article I hereof) of the total general and special real estate taxes, stormwater and other fees and assessments which are levied and assessed on the Shopping Center, including the Premises and all buildings and common areas therein.

(3)     All notices, demands, requests, consents, approvals and other instruments required or permitted to be given pursuant to the terms of the Lease shall be deemed sufficiently given or rendered if in writing and hand delivered, sent by registered or certified mail, postage prepaid, return receipt required, or deposited with a recognized overnight courier (such as United Parcel Service or Federal Express, e.g.), addressed to Tenant at Tenant's address or Landlord at Landlord's address, as the case may be, and any such notice shall be deemed to have been delivered on the date received, refused or returned for insufficient address. Landlord and Tenant shall each have the right from time to time to specify as its address for the purposes of the Lease any other addresses in the United States of America upon three days' notice thereof, similarly given, to the other party.

| Landlord's Address: | c/o Great Eastern Management Company, P.O. Box 5526, Charlottesville, VA 22905-5526 (Physical Address: 2619 Hydraulic Road, Charlottesville, VA 22901) |
|---|---|
| Tenant's Address: | 300 Phillipi Road, Columbus, Ohio 43228 |
| Contact Name: | Lease Administration Manager |
| Contact Telephone Number: | 614-278-6800 |
| I.R.S. Tax I.D. Number: | 31-1186811 |
| Social Security Number: | N/A |
| Organizational Number (VA): | F050441-7 |
| Registered Agent In Virginia: | Corporation Service Company |
| Address: | Bank of America Center, 16th Floor, 1111 East Main Street, Richmond, VA 23219 |
| Telephone: | |
| Organizational Number (Other State): | |
| Registered Agent (Other State): | Corporation Service Company |
| Address: | 2711 Centreville Rd., Wilmington, DE 19808 |
| Phone: | 888-690-2822 |

(4)     A violation of any of the provisions in this First Addendum shall constitute a Default under the terms of the Lease.

(5)     Unless otherwise defined herein, all capitalized terms shall have the meaning set forth in the Lease.

(6)     In the event of a conflict between the terms of this First Addendum and any other provisions of the Lease, the terms of this Addendum shall prevail.

(7)     Except as amended by this First Addendum, the provisions of the Lease shall remain in full force and effect.

(8)     C B Richard Ellis, Charlottesville, LLC ("CBRE") represents the Landlord in this transaction. The General Partner of the Landlord, Great Eastern Management Company ("Great Eastern"), is a licensed real estate brokerage firm. Mrs. Dotty N. Hopkins, who is employed by Great Eastern and holds an active real estate license, is a limited partner in a partnership which owns a limited partnership interest in Landlord.

(9)   This First Addendum may be signed via facsimile, email and/or in counterparts with the same full force and effect as if all signatures were original and on one document. Landlord and Tenant agree that any electronic or facsimile signature executed in conjunction with the electronic submission of Lease documents shall be legally binding and such transaction shall be considered authorized by the signatory. Further, Landlord and Tenant agree that no certification authority or other third party verification is necessary to validate electronic signatures; and that the lack of such certification or third party verification will not in any way affect the enforceability of signatures or resulting agreement, addenda, contract and/or other Lease between Landlord and Tenant.

Initials: Landlord _____ Tenant _____

WITNESS, the following signatures:

LANDLORD:

Sequel Investors Limited Partnership, a Virginia limited partnership

By: Great Eastern Management Company, Agent

Date: 5/31/16

By: _____
its: Controller / Corp. Secretary

TENANT:

Big Lots Stores, Inc., an Ohio corporation

Date: May 13, 2016

By: _____
Timothy A. Johnson
its:   Executive Vice President
Chief Administrative Officer &
Chief Financial Officer

BL #1499

## SECOND ADDENDUM TO LEASE AGREEMENT

This document dated as of the 29th of October, 2016, evidences a Second Addendum ("Second Addendum") to Lease Agreement dated October 25, 1999 by and between Sequel Investors Limited Partnership, a Virginia limited partnership, having its principal office at c/o Great Eastern Management Company, P.O. Box 5526 (2619 Hydraulic Road), Charlottesville, VA 22905-5526 (22901) ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, successor in interest to Consolidated Stores Corporation, an Ohio corporation, d/b/a Big Lots, having offices at 300 Phillipi Road, Department 10051, Columbus, Ohio 43228 ("Tenant") as modified on December 4, 2007 by a Letter Agreement re Pylon Signage and on May 3, 2016 by a First Addendum to Lease Agreement for the Premises located in the Seminole Square Shopping Center in Charlottesville, Virginia (which, together shall hereafter collectively be referred to as the "Lease").

Landlord and Tenant agree to extend the Term of the Lease for an additional twelve (12) months to expire on January 31, 2018 ("Second Renewal Term"), subject to provisions herein.

(1)     Minimum Rent during the Second Renewal Term shall be as follows:

February 1, 2017 – January 31, 2018 . . . . . . . . . . . . . . . . . . . $15,821.20 per month

(2)     Article II, Section 6(g) of the Lease is hereby deleted in its entirety and replaced with the following:

"(g) Notwithstanding anything to the contrary contained in the Lease, Tenant's Pro Rata share of Common Area Charges during the Renewal Term or any extensions thereof shall not exceed an agreed upon 2015 cap of $14,360.14, exclusive of expenses relating to snow removal and the resurfacing of parking lots and roadways, such cap to increase by three percent 3% for each year thereafter.

(3)     All notices, demands, requests, consents, approvals and other instruments required or permitted to be given pursuant to the terms of the Lease shall be deemed sufficiently given or rendered if in writing and hand delivered, sent by registered or certified mail, postage prepaid, return receipt required, or deposited with a recognized overnight courier (such as United Parcel Service or Federal Express, e.g.), addressed to Tenant at Tenant's address or Landlord at Landlord's address, as the case may be, and any such notice shall be deemed to have been delivered on the date received, refused or returned for insufficient address. Landlord and Tenant shall each have the right from time to time to specify as its address for the purposes of the Lease any other addresses in the United States of America upon three days' notice thereof, similarly given, to the other party.

| | |
|---|---|
| Landlord's Address: | c/o Great Eastern Management Company, P.O. Box 5526, Charlottesville, VA 22905-5526 (Physical Address: 2619 Hydraulic Road, Charlottesville, VA 22901) |
| Tenant's Address: | 300 Phillipi Road, Columbus, Ohio 43228 |
| Contact Name: | Lease Administration Manager |
| Contact Telephone Number: | 614-278-6800 |
| I.R.S. Tax I.D. Number: | 31-1186811 |
| Social Security Number: | N/A |
| Organizational Number (VA): | F050441-7 |
| Registered Agent In Virginia: | Corporation Service Company |
| Address: | Bank of America Center, 16th Floor, 1111 East Main Street, Richmond, VA 23219 |
| Telephone: | |
| Organizational Number (Other State): | |
| Registered Agent (Other State): | Corporation Service Company |
| Address: | 2711 Centreville Rd., Wilmington, DE 19808 |
| Phone: | 888-690-2822 |

g:\leases\in progress\seminole square\big lots\2ndaddendum(g) #1499 charlottesville, va final.doc

BL #1499

(4)   A violation of any of the provisions in this Second Addendum shall constitute a Default under the terms of the Lease.

(5)   Unless otherwise defined herein, all capitalized terms shall have the meaning set forth in the Lease.

(6)   In the event of a conflict between the terms of this Second Addendum and any other provisions of the Lease, the terms of this Addendum shall prevail.

(7)   Except as amended by this Second Addendum, the provisions of the Lease shall remain in full force and effect.

(8)   In the event the Tenant hereunder is a corporation, partnership, or limited liability company (individually, an "entity"), the person(s) executing this Lease on behalf of such entity, if any, hereby covenant(s) and warrant(s) that: (i) the entity is a duly constituted entity currently qualified to do business in the state in which the Shopping Center is located; (ii) all the entity's franchise and corporate or other taxes have been paid to date; (iii) all future forms, reports, fees and other documents necessary for the entity to comply with applicable laws will be filed by the entity when due; and such persons are duly authorized by the governing body of such entity to execute and deliver this on behalf of the entity.

(9)   C B Richard Ellis, Charlottesville, LLC ("CBRE") represents the Landlord in this transaction. The General Partner of the Landlord, Great Eastern Management Company ("Great Eastern"), is a licensed real estate brokerage firm. Mrs. Dotty N. Hopkins, who is employed by Great Eastern and holds an active real estate license, is a limited partner in a partnership which owns a limited partnership interest in Landlord.

WITNESS, the following signatures:

LANDLORD:

Sequel Investors Limited Partnership, a Virginia limited partnership

By: Great Eastern Management Company, Agent

Date: 10/24/2016

By: _____

its: Assistant Controller

TENANT:

Big Lots Stores, Inc., an Ohio corporation

Date: _____

By: _____

Timothy A. Johnson

its:   Executive Vice President
      Chief Administrative Officer &
      Chief Financial Officer

BL#1499

### THIRD ADDENDUM TO LEASE AGREEMENT

This document dated as of September 14, 2017, evidences a Third Addendum ("Third Addendum") to Lease Agreement dated October 25, 1999 by and between Sequel Investors Limited Partnership, a Virginia limited partnership, having its principal office at c/o Great Eastern Management Company, P.O. Box 5526 (2619 Hydraulic Road), Charlottesville, VA 22905-5526 (22901) ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, successor in interest to Consolidated Stores Corporation, an Ohio corporation, d/b/a Big Lots, having offices at 300 Phillipi Road, Department 10051, Columbus, Ohio 43228 ("Tenant") as modified on December 4, 2007 by a Letter Agreement re Pylon Signage, on May 3, 2016 by a First Addendum to Lease Agreement and on October 24, 2016 by a Second Addendum to Lease Agreement for the Premises located in the Seminole Square Shopping Center in Charlottesville, Virginia (which, together shall hereafter collectively be referred to as the "Lease").

Landlord and Tenant agree to extend the Term of the Lease for an additional twelve (12) months to expire on January 31, 2019 ("Renewal Term"), subject to provisions herein.

(1)     Minimum Rent during the Renewal Term shall be as follows:

February 1, 2018 – January 31, 2019 . . . . . . . . . . . . . . . . . . $15,821.20 per month

(2)     Unless otherwise defined herein, all capitalized terms shall have the meaning set forth in the Lease.

(3)     In the event of a conflict between the terms of this Third Addendum and any other provisions of the Lease, the terms of this Third Addendum shall prevail.

(4)     Except as amended by this Third Addendum, the provisions of the Lease shall remain in full force and effect.

(5)     In the event the Tenant and/or any Guarantor hereunder is a corporation, partnership, or limited liability company (individually, an "entity"), the person (s) executing this Third Addendum on behalf of such entity, as well as any individual Guarantor(s), if any, hereby covenant(s) and warrant(s) that: (i) the entity is a duly constituted entity currently qualified to do business in the state in which the Office Building is located; (ii) all the entity's franchise and corporate or other taxes have been paid to date; (iii) all future forms, reports, fees and other documents necessary for the entity to comply with applicable laws will be filed by the entity when due and such persons are duly authorized by the governing body of such entity to execute and deliver this Third Addendum on behalf of the entity.

(6)     C B Richard Ellis, Charlottesville, LLC ("CBRE") represents the Landlord in this transaction. The General Partner of the Landlord, Great Eastern Management Company ("Great Eastern"), is a licensed real estate brokerage firm. Mrs. Dotty N. Hopkins, who is employed by Great Eastern and holds an active real estate license, is a limited partner in a partnership which owns a limited partnership interest in Landlord.

WITNESS, the following signatures:

LANDLORD:

Sequel Investors Limited Partnership, a Virginia limited partnership

By: Great Eastern Management Company, Agent

Date: 9/14/2017

J E Bayes

By: _____
its: _____ Controller

TENANT:

Big Lots Stores, Inc., an Ohio corporation

Date: 9-11-17

Stacy McDonald

By: _____
its: Timothy A. Johnson
Executive Vice President
Chief Administrative Officer &
Chief Financial Officer

BL#1499

## FOURTH ADDENDUM TO LEASE AGREEMENT

This document dated as of May 31, 2018, evidences a Fourth Addendum ("Fourth Addendum") to Lease Agreement dated October 25, 1999 by and between Sequel Investors Limited Partnership, a Virginia limited partnership, having its principal office at c/o Great Eastern Management Company, P.O. Box 5526 (2619 Hydraulic Road), Charlottesville, VA 22905-5526 (22901) ("Landlord"), and Big Lots Stores, Inc., an Ohio corporation, successor in interest to Consolidated Stores Corporation, an Ohio corporation, d/b/a Big Lots, having offices at 4900 East Dublin Granville Road, Columbus, Ohio 43081-7651 ("Tenant") as modified on December 4, 2007 by a Letter Agreement re Pylon Signage, on May 3, 2016 by a First Addendum to Lease Agreement and on October 24, 2016 by a Second Addendum to Lease Agreement dated October 24, 2016, and by a Third Addendum to Lease Agreement dated September 14, 2017 for the Premises located in the Seminole Square Shopping Center in Charlottesville, Virginia (which, together shall hereafter collectively be referred to as the "Lease").

Landlord and Tenant agree to extend the Term of the Lease for an additional twelve (12) months to expire on January 31, 2020 ("Renewal Term"), subject to provisions herein.

(1)   Minimum Rent during the Renewal Term shall be as follows:

February 1, 2019 – January 31, 2020 . . . . . . . . . . . . . . . $15,821.20 per month

(2)   Unless otherwise defined herein, all capitalized terms shall have the meaning set forth in the Lease.

(3)   In the event of a conflict between the terms of this Fourth Addendum and any other provisions of the Lease, the terms of this Fourth Addendum shall prevail.

(4)   Except as amended by this Fourth Addendum, the provisions of the Lease shall remain in full force and effect.

(5)   In the event the Tenant and/or any Guarantor hereunder is a corporation, partnership, or limited liability company (individually, an "entity"), the person (s) executing this Fourth Addendum on behalf of such entity, as well as any individual Guarantor(s), if any, hereby covenant(s) and warrant(s) that: (i) the entity is a duly constituted entity currently qualified to do business in the state in which the Premises is located; (ii) all the entity's franchise and corporate or other taxes have been paid to date; (iii) all future forms, reports, fees and other documents necessary for the entity to comply with applicable laws will be filed by the entity when due and such persons are duly authorized by the governing body of such entity to execute and deliver this Third Addendum on behalf of the entity.

(6)   C B Richard Ellis, Charlottesville, LLC ("CBRE") represents the Landlord in this transaction. The General Partner of the Landlord, Great Eastern Management Company ("Great Eastern"), is a licensed real estate brokerage firm. Mrs. Dotty N. Hopkins, who is employed by Great Eastern and holds an active real estate license, is a limited partner in a partnership which owns a limited partnership interest in Landlord.

WITNESS, the following signatures:

**LANDLORD:**

Sequel Investors Limited Partnership, a Virginia limited partnership

By: Great Eastern Management Company, Agent

Date: 7/31/2018

By: _____

its: Controller

**TENANT:**

Big Lots Stores, Inc., an Ohio corporation

Date: July 25, 2018

By: _____

its: Timothy A. Johnson
     Executive Vice-President
     Chief Administrative Officer &
     Chief Financial Officer

**EXHIBIT B**



VIA CERTIFIED MAIL:  7018 0680 0001 4313 5711
and email: mhauenst@biglots.com
February 17, 2020

Big Lots, Inc.
Attn: Mary Hauenstein, Facilities Specialist
4900 East Dublin Granville Road
Columbus, OH 43081-7651

RE:    Big Lots Store #01499B – Premises Inspection
       -  Seminole Square Shopping Center, Charlottesville, Virginia

Dear Ms. Hauenstein:

This letter is to address issues the Landlord (John Neal, Director of Property Operations, and Ron Smith, Facilities Manager of Great Eastern Management Company, representing Landlord) found during the walkthrough inspection of store #10499B on January 24, 2020 with Mr. Edgerton.  Based on this walkthrough, the Premises are not in an acceptable condition to Landlord and do not meet the requirements outlined in Section 26, Surrender of Premises, of the Big Lots Lease. Section 26 of the Lease states "Tenant will surrender the Premises broom-clean and in good condition and repair and that Tenant's obligations under this section of the Lease survive the expiration of the Lease."

Mr. Neal emailed you on January 24 a sampling of photos taken during the walkthrough that clearly evidence the Premises are not broom-clean or in good condition and repair. I have enclosed and will share with you via Dropbox the balance of the photos taken during the walkthrough that provide justification for Landlord's unwillingness to accept the Premises in its current condition.  Specifically:

1.  There is loose trash as well as residual filth throughout much of the sales floor, stockroom, stairs to the front offices, bathrooms and all offices.

2.  There is a significant presence of mold in the janitor's closet off the sales floor.  This is an immediate health and safety concern and will need to be immediately addressed by a certified mold remediator at Tenant's expense.  The cause of the mold was a massive water drip in a sink in the janitor's closet dripping.  Landlord has cut the water off to this area.

3.  There is ceramic tile damage under the urinal in the men's bathroom.  In addition, the bathrooms are not clean, and there is debris on the floor as shown in the enclosed photos.

4.  There is severe drywall damage throughout the stockroom areas.

CORPORATE OFFICE (434) 296-414|    PROPERTY MANAGEMENT (434) 296-4100    WWW.GEMC.COM  ·  P.O. BOX 5526, CHARLOTTESVILLE, VIRGINIA 22905-5526

DEVELOPMENT   ·   CONSTRUCTION     FINANCE    ·    MANAGEMENT

Mary Hauenstein, Facilities Specialist
February 17, 2020
Page 2

5. The floor tiles in the upstairs front office hallway are no longer adhered to the floor and there is carpet damage in the offices. In addition, there are several missing or damaged ceiling tiles and missing rubber baseboards throughout the entire space.

6. The lights in the sales floor area cannot be turned on. Neither Mr. Edgerton, Smith nor Neal could turn them on during the walkthrough. There appears to be some sort of override or control mechanism that will require attention so the lights can be turned on.

7. Neither Mr. Edgerton, Smith nor Neal could find the switch that operates the conveyor belt. It could not be determined whether the conveyor belt is operational and in good working condition.

We ask that Big Lots address these items immediately to avoid possible legal action by Landlord and additional expenses. Please respond to this letter with Big Lots' plan of action to remedy these issues.

Sincerely,

Jamie E. Boyers
Commercial Administrator
jboyers@gemc.com

Enclosures (larger files to be sent via Dropbox)

cc:   Eddie Edgerton, Big Lots Regional Manager (via email: EEgerton@biglots.com)
      Ronald B. Smith, Facilities Manager (via email: rsmith@gemc.com)
      John E. Neal, Director of Property Operations (via email: jneal@gemc.com)
      John R. Walenten, Esq. (via email: jrwalenten@embarqmail.com)

it:\commercialadministration\letters\consolidated stores (big lots) seminole\moveoutinspectionletter.02.17.2020.docx

**EXHIBIT C**


GREAT EASTERN
MANAGEMENT COMPANY

VIA CERTIFIED MAIL: 7018 0680 0001 4313 5803
   and email: mhauenst@biglots.com
August 13, 2020

Big Lots, Inc.
Attn: Mary Hauenstein, Facilities Specialist
4900 East Dublin Granville Road
Columbus, OH 43081-7651

RE:   Big Lots Store #01499B – Premises Inspection Follow Up and HVAC RTU Issues
      Seminole Square Shopping Center, Charlottesville, Virginia

Dear Ms. Hauenstein:

This letter is in follow up to my February 17, 2020 letter sent to you regarding issues the Landlord found during the walkthrough inspection of store #10499B on January 24, 2020 with Eddie Edgerton of Big Lots. A copy of my February 17 letter, along with the photos that accompanied that letter, is enclosed for your reference.

Based on this walkthrough, the Premises are not in an acceptable condition to Landlord and do not meet the requirements outlined in Section 26, Surrender of Premises, of the Big Lots Lease. Section 26 of the Lease states "Tenant will surrender the Premises broom-clean and in good condition and repair and that Tenant's obligations under this section of the Lease survive the expiration of the Lease."

We are willing to allow the benefit of the doubt that, perhaps, Big Lots' lack of response to address these issues may be a result of the unfortunate COVID-19 pandemic. However, we can no longer let this languish, and Big Lots must address these issues swiftly.

In addition to these issues, an inspection of the five rooftop HVAC units servicing the Premises revealed a severe lack of preventative maintenance by Big Lots during its tenure at Seminole Square, irrespective of normal wear and tear. The Landlord had two well-respected HVAC contractors, CII Service (CII) and Riddleberger Brothers, Inc. (RBI) inspect these units, and enclosed are their reports for your review. We acknowledge that unit #2 is at the end of its useful life and the Landlord is not holding Big Lots responsible for its condition. However, Big Lots did not leave the four other units in good working order, and evaluation and repairs in the amount of $8,309.60 were made to return these units to good operating condition. A copy of invoices from CII and RBI are also enclosed for your review.

CORPORATE OFFICE (434) 296-4141   •   PROPERTY MANAGEMENT (434) 296-4100   •   WWW.GEMC.COM   •   P.O. BOX 5526, CHARLOTTESVILLE, VIRGINIA 22905-5526

D E V E L O P M E N T   •   C O N S T R U C T I O N   •   F I N A N C E   •   M A N A G E M E N T

Mary Hauenstein, Facilities Specialist
August 13, 2020
Page 2

We ask that Big Lots respond to this letter on or before August 21, 2020 with a detailed schedule of plans to address the issues outlined in my February letter.  In addition, Big Lots needs to promptly reimburse the Landlord for the CII and RBI invoices.

If we have not heard from Big Lots by the above-referenced date, the Landlord intends to have its outside counsel initiate legal action to assure the Premises is brought to a broom clean condition as required by the lease and that the referenced RBI invoice has been paid.  If Big Lots would like us to have one of our construction contractors provide cost estimates for the needed work, we are happy to do that.  We trust that this matter will be given the prompt attention it deserves so it will not further escalate.

Sincerely,

Jamie E. Boyers
Commercial Administrator
jboyers@gemc.com

Enclosures (larger files to be sent via Dropbox)

cc:     Eddie Edgerton, Big Lots Regional Manager (via email: EEgerton@biglots.com)
        Ronald B. Smith, Facilities Manager (via email: rsmith@gemc.com)
        John E. Neal, Director of Property Operations (via email: jneal@gemc.com)
        John R. Walenten, Esq. (via email: jrwalenten@embarqmail.com)
        Brian A. Glasser, Esq. (via email: bglasser@baileyglasser.com)

g:\commercial leases - originals\2 section\1.former leases.prospects\consolidated stores (big lots) seminole\drafts\correspondence\non-routine\non routine inspection follow up 08.12.2020.docx



VIA CERTIFIED MAIL:  7018 0680 0001 4313 5711
and email: mhauenst@biglots.com
February 17, 2020

Big Lots, Inc.
Attn: Mary Hauenstein, Facilities Specialist
4900 East Dublin Granville Road
Columbus, OH 43081-7651

RE:    Big Lots Store #01499B – Premises Inspection
          Seminole Square Shopping Center, Charlottesville, Virginia

Dear Ms. Hauenstein:

This letter is to address issues the Landlord (John Neal, Director of Property Operations, and Ron Smith, Facilities Manager of Great Eastern Management Company, representing Landlord) found during the walkthrough inspection of store #10499B on January 24, 2020 with Mr. Edgerton.  Based on this walkthrough, the Premises are not in an acceptable condition to Landlord and do not meet the requirements outlined in Section 26, Surrender of Premises, of the Big Lots Lease. Section 26 of the Lease states "Tenant will surrender the Premises broom-clean and in good condition and repair and that Tenant's obligations under this section of the Lease survive the expiration of the Lease."

Mr. Neal emailed you on January 24 a sampling of photos taken during the walkthrough that clearly evidence the Premises are not broom-clean or in good condition and repair. I have enclosed and will share with you via Dropbox the balance of the photos taken during the walkthrough that provide justification for Landlord's unwillingness to accept the Premises in its current condition.  Specifically:

1.  There is loose trash as well as residual filth throughout much of the sales floor, stockroom, stairs to the front offices, bathrooms and all offices.

2.  There is a significant presence of mold in the janitor's closet off the sales floor.  This is an immediate health and safety concern and will need to be immediately addressed by a certified mold remediator at Tenant's expense. The cause of the mold was a massive water drip in a sink in the janitor's closet dripping.  Landlord has cut the water off to this area.

3.  There is ceramic tile damage under the urinal in the men's bathroom.  In addition, the bathrooms are not clean, and there is debris on the floor as shown in the enclosed photos.

4.  There is severe drywall damage throughout the stockroom areas.

CORPORATE OFFICE (434) 296-4141     PROPERTY MANAGEMENT (434) 296-4100     WWW.GEMC.COM   ·  P.O. BOX 5526, CHARLOTTESVILLE, VIRGINIA 22905-5526

DEVELOPMENT   ·   CONSTRUCTION     FINANCE     MANAGEMENT

Mary Hauenstein, Facilities Specialist
February 17, 2020
Page 2

5. The floor tiles in the upstairs front office hallway are no longer adhered to the floor and there is carpet damage in the offices. In addition, there are several missing or damaged ceiling tiles and missing rubber baseboards throughout the entire space.

6. The lights in the sales floor area cannot be turned on. Neither Mr. Edgerton, Smith nor Neal could turn them on during the walkthrough. There appears to be some sort of override or control mechanism that will require attention so the lights can be turned on.

7. Neither Mr. Edgerton, Smith nor Neal could find the switch that operates the conveyor belt. It could not be determined whether the conveyor belt is operational and in good working condition.

We ask that Big Lots address these items immediately to avoid possible legal action by Landlord and additional expenses. Please respond to this letter with Big Lots' plan of action to remedy these issues.

Sincerely,

Jamie E. Boyers
Commercial Administrator
jboyers@gemc.com

Enclosures (larger files to be sent via Dropbox)

cc:   Eddie Edgerton, Big Lots Regional Manager (via email: EEgerton@biglots.com)
      Ronald B. Smith, Facilities Manager (via email: rsmith@gemc.com)
      John E. Neal, Director of Property Operations (via email: jneal@gemc.com)
      John R. Walenten, Esq. (via email: jrwalenten@embarqmail.com)

g:\commercialadministration\letters\consolidated stores (big lots) seminole\moveoutinspectionletter 02.17.2020.docx

# RIDDLEBERGER BROTHERS, INC.

6127 S. Valley Pike
P. O. Box 27
Mt. Crawford, VA  22841
Tel. (540) 434-1731

## INVOICE

| | |
|---|---|
| INVOICE #: | 125720 |
| INVOICE DATE | 7/30/2020 |

Bill To:

Great Eastern Management
Attention: DAVID MITCHELL
P.O. Box 5526
2619 Hydraulic Road
Charlottesville, VA  22905

Re: Service Performed At

Sequel Investors, L.P.
c/o Great Eastern Management
PO Box 5526Charlottesville, VA  22905

Site #        6660002
Account #     6660

| Call Slip Date | Call Slip/Agr # | PO # | Salesman | Terms | Contract # |
|---|---|---|---|---|---|
| 7/13/2020 | 176990 | | | | |

Description of Work:
Big Lots - Units 1A, 1B, 3A, 5A, 5B Check/Verify Refrigerant Charge

| | | | | UNITS | RATE | COST |
|---|---|---|---|---|---|---|
| Labor | | | | | | |
| 7/13/2020 | Kidwell;Lucas J | | REG | 6.00 | 88.00 | $ 528.00 |
| 7/23/2020 | Kidwell;Lucas J | | REG | 3.00 | 88.00 | $ 264.00 |
| | | | | Labor Subtotal | | $792.00 |
| Materials | | | | | | |
| | HC39GE464 Motor | | | 1.00 | | |
| | Freight | | | 1.00 | | |
| | Fuel Surcharge | | | 1.00 | | |
| | Consumables | | | 1.00 | | |
| | | | | Materials Subtotal | | $665.53 |
| Truck/Trip Charge | | | | | | |
| | Truck/Trip/Mileage-C'ville-C | | | 2.00 | 31.25 | $ 62.50 |
| | | | Truck/Trip Charge Subtotal | | | $62.50 |

Property: _Sea En_ Bldg/Apt#: _Big Lots_, _343 Hillsdale_
Purchased By: _PS_
Explanation: _2nd Refrigerant check,_
_Replace additional condenser Fan Mtr._
Approval #1 _PS_
Approval #2 _____ RM Code: _698A_
                        JN                    SQ

_RBI says 4 Chiller units are in_
_"good operating condition"_

RECEIVED

BY: ................................

| | | |
|---|---|---|
| Subtotal: | $ | 1,520.03 |
| Sales Tax: | | 0.00 |
| Payments: | | 0.00 |
| Total Due: | $ | 1,520.03 |



**RIDDLEBERGER**
BROTHERS, INC

**SERVICE REPORT**

| WORK ORDER: |
| --- |
| 176990 |

DATE: 07/23/2020

CUSTOMER:    Sequel Investors, L.P. (AR#:6660)
SITE ALIAS:    GREAT EASTERN MANAGE
STREET:    c/o Great Eastern Management, P.O Box 5526
CITY:    Charlottesville, VA 22905
CONTACT:    Ron Smith x110

DESCRIPTION:    Big Lots - Units 1A, 1B, 3A, 5A, 5B Check/Verify Refrigerant Charge
CALL TYPE:    Service
TROUBLE REPORTED:    Repair
WORK PERFORMED:    I met Ron on site and he opened up the building. I began my task of logging the specified units. When I came to unit 1 I found only one condenser fan running. I found the capacitor was very weak so I replaced the dual capacitor with two single units. I turned the unit on and the motor still would not work. I notified Ron of the bad motor and he told me to get one ordered which I did. I left that unit turned off at the disconnect. I completed the logging on the other units and notified Ron when I was finished.
After ordering and picking up the new motor I met Ron on site and he gave me the keys to the building. I replaced the condenser fan motor on unit 1 and then proceeded to do a refrigerant log on both circuits. I left the disconnects turned on for the all of the units that I worked on and turned them off at the thermostats.
(Kidwell;Lucas J on Jul 23, 2020)

VISUAL CONTENT:    http://vision.xoeye.io/partners/RiddlebergerBrothersInc/activity/b83bc2389001b33abd0

| PARTS | | |
| --- | --- | --- |
| QUANTITY | | DESCRIPTION |
| 1 | | HC39GE464 Motor |
| 1 | | Freight |
| | | |
| | | |
| | | |

| LABOR | | | |
| --- | --- | --- | --- |
| DATE | | LABOR | TECHNICIAN/DESC. |
| Jul 23, 2020 | 3 (REG) | | Kidwell;Lucas J (Made Necessary Repairs) |
| Jul 13, 2020 | 6 (REG) | | Kidwell;Lucas J (Made Necessary Repairs) |
| | | | |

IS JOB COMPLETE? --

**Customer**
Name:
Date: 07/23/2020 11:46 AM
Comments:

**Email**
facilitiesmgr@gemc.com,

**Employee**
Name: Lucas J Kidwell
Date: 07/23/2020 11:46 AM
Comments:

TERMS AND CONDITIONS

Thank you for the opportunity to serve you.  If you have any questions, please call 866-RBI-SERV (866-724-7378).

# RIDDLEBERGER BROTHERS, INC.

INVOICE

6127 S. Valley Pike
P. O. Box 27
Mt. Crawford, VA  22841
Tel. (540) 434-1731

| INVOICE #: | 125261 |
|---|---|
| INVOICE DATE | 7/14/2020 |

Bill To:

Great Eastern Management
Attention: DAVID MITCHELL
P.O. Box 5526
2619 Hydraulic Road
Charlottesville, VA 22905

Re: Service Performed At

Sequel Investors, L.P.
c/o Great Eastern Management
PO Box 5526 Charlottesville, VA  22905

Site #        6660002
Account #     6660

| Call Slip Date | Call Slip/Agr # | PO # | Salesman | Terms | Contract # |
|---|---|---|---|---|---|
| 6/9/2020 | 175969 | | | | |

Description of Work:
BT-175922  Repair Work form Initial Assessment at former Big Lots, 393 Hillsdale Dr, Charlottesville

| | | | UNITS | RATE | COST |
|---|---|---|---|---|---|
| **Labor** | | | | | |
| 7/7/2020 | Kidwell;Lucas J | REG | 8.00 | 88.00 | $ 704.00 |
| 7/7/2020 | Brown; Samuel M | REG | 6.00 | 88.00 | $ 528.00 |
| 7/8/2020 | Kidwell;Lucas J | REG | 8.00 | 88.00 | $ 704.00 |
| 7/8/2020 | Brown; Samuel M | REG | 4.00 | 88.00 | $ 352.00 |
| | | | Labor Subtotal | | $2,288.00 |
| **Materials** | | | | | |
| | Carrier fan motor | | 2.00 | | |
| | Run capacitor single | | 2.00 | | |
| | Mini pressure control hi | | 1.00 | | |
| | 1/4 valve cores | | 1.00 | | |
| | 1/4 swivel nut tee | | 1.00 | | |
| | 3/4 pipe | | 10.00 | | |
| | 3/4 pvc 90d ell | | 16.00 | | |
| | 3/4 pvc tee | | 4.00 | | |
| | 15x20x2 pl | | 16.00 | | |
| | Nu brite 2.5 gal | | 1.00 | | |
| | Super fin comb set | | 1.00 | | |
| | Mike multi purpose cement | | 1.00 | | |
| | 3/4 slip cap | | 4.00 | | |
| | Freight | | 1.00 | | |
| | Consumables | | 1.00 | | |
| | Fuel Surcharge | | 1.00 | | |
| | | | Materials Subtotal | | $1,855.29 |
| **Truck/Trip Charge** | | | | | |
| | Truck/Trip/Mileage-C'ville-C | | 1.00 | 31.25 | $ 31.25 |
| | | | Truck/Trip Charge Subtotal | | $31.25 |

*Contract Price $ 4,123.00*

| Subtotal: | $  4,174.54 |
|---|---|
| Sales Tax: | 0.00 |
| Payments: | 0.00 |
| Total Due: | $  4,174.54 |



**RIDDLEBERGER**
BROTHERS, INC

**SERVICE REPORT**

WORK ORDER:
**175969**

DATE: 07/14/2020

| | |
|---|---|
| CUSTOMER: | Sequel Investors, L.P. (AR#:6660) |
| SITE ALIAS: | GREAT EASTERN MANAGE |
| STREET: | c/o Great Eastern Management, PO Box 5526 |
| CITY: | Charlottesville, VA 22905 |
| CONTACT: | Ron Smith |

| | |
|---|---|
| DESCRIPTION: | BT-175922 Repair Work form Initial Assessment at former Big Lots, 393 Hillsdale Dr, Charlottesville |
| CALL TYPE: | Service Project - NTE |
| TROUBLE REPORTED: | Repair |
| WORK PERFORMED: | Replaced two condenser fan motors and cleaned the condenser coils. (Kidwell;Lucas J on Jul 8, 2020) |
| | Replace 2 condenser fan motors on unit 6 and 1 cleaned all condenser coils (Brown; Samuel M on Jul 8, 2020) |
| | I did a refrigerant log on each of the circuits in the 4 systems. Replaced all the air filters and aligned the belts on the pulleys. (Kidwell;Lucas J on Jul 8, 2020) |
| | Changed filters on all rooftop units and checked operations (Brown; Samuel M on Jul 8, 2020) |
| VISUAL CONTENT: | http://vision.xoeye.io/partners/RiddlebergerBrothersInc/activity/b9a5e438f024c4489475 |

## PARTS

| QUANTITY | DESCRIPTION |
|---|---|
| 2 | Carrier fan motor |
| 2 | Run capacitor single |
| 1 | Mini pressure control hi |
| 1 | 1/4 valve cores |
| 1 | 1/4 swivel nut tee |
| 10 | 3/4 pipe |
| 16 | 3/4 pvc 90d ell |
| 4 | 3/4 pvc tee |
| 16 | 15x20x2 pl |
| 1 | Nu brite 2.5 gal |
| 1 | Super fin comb set |
| 1 | Mike multi purpose cement |
| 4 | 3/4 slip cap |
| 1 | Freight |
| | |
| | |
| | |

## LABOR

| DATE | LABOR | TECHNICIAN/DESC. |
|---|---|---|
| Jul 8, 2020 | 8 (REG) | Kidwell;Lucas J (Made Necessary Repairs) |
| Jul 8, 2020 | 4 (REG) | Brown; Samuel M (Made Necessary Repairs) |
| Jul 7, 2020 | 8 (REG) | Kidwell;Lucas J (Made Necessary Repairs) |
| Jul 7, 2020 | 6 (REG) | Brown; Samuel M (Made Necessary Repairs) |
| | | |

IS JOB COMPLETE? Yes

Customer                                      Employee
Name:                                         Name: Luke Kidwell
Date:                                         Date: 07/08/2020
Comments:                                     Comments:

**Email**

TERMS AND CONDITIONS

Thank you for the opportunity to serve you.  If you have any questions, please call 866-RBI-SERV (866-724-7378).

Cii Service of Central VA
6767 Forest Hill Ave, Ste 100
Richmond, VA 23225
434 977-5626



**SERVICE**

COMMERCIAL AIR CONDITIONING & HEATING SERVICE

## Credit Memo 46492

Date: 06/24/20

| Bill to: | Job Address: |
|---|---|
| Great Eastern Management<br>PO BOX 5526<br>Charlottesville, VA 22905 | |

| Customer Code | Payment Terms | Customer PO Number | Quote | Type | Page |
|---|---|---|---|---|---|
| 16115 | Net 30 | | | | 1 |
| Remarks: | Credit customer per Curtis Edwards | | | | |

**Other**

-902.72

| Invoice Totals: | Labor | Material | Other | |
|---|---|---|---|---|
| | 0.00 | 0.00 | -902.72 | -902.72 |

Invoice Total:    -902.72

Property: _Sea Sy_ Bldg/Apt#: _393 Hillsdale, former Big Lots_
Purchased By: _____
Explanation: _CREDIT MEMO_
_(from invoice #46492)_
Approval #1 _RE_
Approval #2 _____ RM Code: _6984 SQ_

JN

Print Date: 06/24/20

# RIDDLEBERGER BROTHERS, INC.

6127 S. Valley Pike
P. O. Box 27
Mt. Crawford, VA 22841
Tel. (540) 434-1731

## INVOICE

INVOICE #:  124461

INVOICE DATE  6/5/2020

Bill To:

Great Eastern Management
Attention: DAVID MITCHELL
P.O. Box 5526
2619 Hydraulic Road
Charlottesville VA 22905

BIG LOTS

Re: Service Performed At

~~COURT SQUARE CHARLOTTESVILLE~~
~~310 4TH STREET, N.E.~~
CHARLOTTESVILLE, VA ~~22905~~

Site #  6660001
Account #  6660

| Call Slip Date | Call Slip/Agr # | PO # | Salesman | Terms | Contract # |
|---|---|---|---|---|---|
| 5/28/2020 | 175444 | | | | |

Description of Work:

Big Lots - Evaluate 2 RTUs

| | | | UNITS | RATE | COST |
|---|---|---|---|---|---|
| **Labor** | | | | | |
| 5/29/2020 | Kidwell;Lucas J | REG | 3.50 | 85.00 $ | 297.50 |
| | | Labor Subtotal) | | | $297.50 |
| **Materials** | | | | | |
| | Fuel Surcharge | | 1.00 | | |
| | | Materials Subtotal | | | $15.00 |
| **Truck/Trip Charge** | | | | | |
| | Truck/Trip/Mileage-C'ville-C | | 1.00 | 31.25 $ | 31.25 |
| | | Truck/Trip Charge Subtotal | | | $31.25 |



Property: Semly, Bldg/Apt#: 393 Hillsdale  former Big Lots
Purchased By: RB
Explanation: check office units that
cu condemned ( bad compressors + evap. Pan mtrs.)
Approval #1 RB
Approval #2 _____ RM Code: 6982 5Q

JN

PAID

BY: 192735

RECEIVED

JUN 11 · 2020

BY: _____

| Subtotal: | $ | 343.75 |
|---|---|---|
| Sales Tax: | | 0.00 |
| Payments: | | 0.00 |
| Total Due: | $ | 343.75 |



**RIDDLEBERGER**
BROTHERS, INC

SERVICE REPORT

WORK ORDER:
175444

DATE: 06/01/2020

CUSTOMER:     X̶X̶X̶X̶ X̶X̶X̶X̶X̶X̶X̶ X̶X̶X̶X̶X̶X̶X̶X̶X̶X̶
              (AR#:6660)

SITE ALIAS:   X̶X̶X̶X̶ X̶X̶X̶X̶X̶X̶X̶   BIG LOTS
STREET:       X̶X̶X̶X̶X̶X̶ X̶X̶X̶X̶X̶X̶X̶X̶X̶X̶
CITY:         CHARLOTTESVILLE, VA 22905
CONTACT:      Ron Smith x110

DESCRIPTION:        Big Lots - Evaluate 2 RTUs
CALL TYPE:          Service
TROUBLE REPORTED:   Repair
WORK PERFORMED:     When I arrived I met Ron and together we went through the rooftop carrier units.
                    Using my megohmmeter I checked the compressors in the units and all the readings
                    came back in the range of 100 to 250 showing good. I inspected the heat exchangers
                    and blower wheels. A couple of the units have a condenser fan motor that is bad. The
                    units also do not have condensate traps in the drains. The belts for the evaporator
                    motors need to be aligned. Ron and I made a list of work to be priced up. That quote
                    will come along over the next few days once I get some prices for parts. We left the
                    units turned off. (Kidwell;Lucas ) on May 29, 2020)

| PARTS | | |
|---|---|---|
| QUANTITY | | DESCRIPTION |
| | | |
| | | |
| | | |

| LABOR | | |
|---|---|---|
| DATE | LABOR | TECHNICIAN/DESC |
| May 29, 2020 | 3.5 (REG) | Kidwell;Lucas J (Made Necessary Repairs) |
| | | |

IS JOB COMPLETE? --
**Customer**
Name:
Date: 06/01/2020 08:14 AM
Comments:

**Employee**
Name: Lucas J Kidwell
Date: 06/01/2020 08:14 AM
Comments:

**Email**
facilitiesmgr@gemc.com,

TERMS AND CONDITIONS

Thank you for the opportunity to serve you.  If you have any questions, please call 866-RBI-SERV (866-724-7378).

Cii Service of Central VA
6767 Forest Hill Ave, Ste 100
Richmond, VA 23225
434 977-5626



**SERVICE**
COMMERCIAL AIR CONDITIONING & HEATING SERVICE

## Invoice 46492

Date: 03/31/20

| Bill to: | Job Address: |
|---|---|
| Great Eastern Management<br>PO BOX 5526<br>Charlottesville, VA 22905 | Great Eastern Management |

| Customer Code | Payment Terms | Customer PO Number | Quote | Type | Page |
|---|---|---|---|---|---|
| 18115 | Net 30 | | | T | 1 |
| Remarks: | Great Eastern Management WO# 5138-1 | | | | |

### Description of Work Completed

5138 Big Lots RTU #1-5 Unit assessment

Please see service reports for details.

** Price reflects 20% labor discount. **

| Service | | | | | 2,963.00 |
|---|---|---|---|---|---|

| Material | Quantity | Description | Unit of Measure | Unit Price | Extension |
|---|---|---|---|---|---|
| | 1.00 | Misc. Materials | EA | 64.00 | 64.00 |
| | 2.00 | Acid Test | EA | 53.27 | 106.54 |

| | Service Call Charge | | | | 24.00 |
|---|---|---|---|---|---|
| | Truck Mileage Expense | | | | 68.00 |

| Invoice Totals: | Labor | Material | Other | | 3,225.54 |
|---|---|---|---|---|---|
| | 2,963.00 | 170.54 | 92.00 | | |

Invoice Total: 3,225.54

RECEIVED
APR 1 4 2020
BY:.....................



Property: San Se Bldg/Apt#: Big Lots
Purchased By: PS
Explanation: evaluate 5 RTU's + $ units hters

Approval #1 PS
Approval #2 _____ RM Code: 6982 SQ

JN

Print Date 04/09/20    Evaluations + repair/replace pricing reed 5/11/20

PAID
JUN 0 1 2020
BY: 192449



## SERVICE OF CENTRAL VIRGINIA, INC.

1062A CHICAGO AVE • HARRISONBURG VA 22802 • (540) 434-8368 • FAX (540) 433-9972

May 11, 2020

Mr. Ron Smith
Great Eastern Management
PO Box 5526
Charlottesville, Virginia 22905

RE: Big Lots

Mr. Ron Smith
Cii Service is pleased to give you the report and suggestion of repairs needed on the RTU's at the old Big Lots location

RTU #1 8 Ton-Age 8yrs
- Bad condenser fan motor
- Bad evaporator fan motor
- Both compressors Megged out bad
- Wrong filters

Cii Service recommends that the Roof Top Unit be replaced.

Total Labor and Materials $11,822.00

RTU #2 40 Ton-Age 24yrs
- Evaporator fan motor jumped out
- No refrigerant in both systems
- Condenser coils have major leaks
- Both compressors Megged out bad

Cii service recommends that the Roof Top unit be replaced

Total Labor and Materials $60,354.00

RTU #3 8 Ton-Age 10yrs
- Bad head pressure control
- Wrong filters

Cii Service recommends replacing head pressure control on Roof Top unit

Total Labor and repairs $992.00

www.ciiservice.com

RTU #4 8 Ton-Age 8yrs
- Bad Vibration on Blower wheel
- Wrong filters
- Hail damage to condenser coils

Cii Service recommends replacing blower wheel, bearings, and shaft, attempt to straighten out fins on condenser coils.

Total Labor and materials **$1,883.00**

RTU #5 8 Ton-Age 8yrs
- Blown fuses caused single phase
- Both compressors Megged Bad
- Evaporator fan motor Megged bad
- Wrong filters

Cii Service recommends that the Roof Top unit be replaced

Total Labor and Materials **$11,822.00**

These quotes are good for thirty days or subject to revision.

We look forward to working with you in the future.  Please contact me if you have any questions at
434-977-5626 or 800-553-8569 and E-mail me at bcote@cliservice.com
Please visit us for news and information at our web site www.ciiservice.com

Sincerely,
Cii Service of Central Virginia, Inc.

*Bob Cote*

Bob Cote
Branch Manager



The above process, specifications, and conditions are satisfactory and are hereby accepted. I understand payment terms to be net 30 days upon completion of this project.

Accepted by: _____        Date: _____



**CII SERVICE**   **SERVICE REPORT**

CII SERVICE

No. 40 20 2472
5138

X BILL CUSTOMER   CHARGE TO AGREEMENT
X PRELIMINARY   Timothy Cote
FINAL   3-13-20

GEM
Ron Smith

MATERIAL: (DEVICES AND EQUIPMENT USED)

EXECUTIVE OFFICES:

www.cii-service.com

SERVICE AREAS

MISC. CASH PURCHASES  X NONE   YES

**LABOR HOURS**

DATE → 3-12

| DAY | SAT | SUN | MON | TUES | WED | THURS | FRI |
|-----|-----|-----|-----|------|-----|-------|-----|
| STRAIGHT TIME | | | | | 8 | | |
| PREMIUM TIME | | | | | | | |
| ONE P TIME | | | | | | | |
| DOUBLE TIME | | | | | | | |
| SERVICE INDUCEMENT | | | | | | | |
| EXCESS TRAVEL | | | | | | | |
| TRAINING | | | | | | | |

ABOVE ENTRIES X DO   DO NOT INCLUDE TRAVEL TIME  THEY DO NOT INCLUDE
TRUCK EXPENSE OR MILEAGE CHARGE MISC EXPENSE OR SERVICE CALL CHARGE

EXPENSES: X NONE  O NITE #$_____ DIEM  OTHER (EXPLAIN BELOW)

FINDINGS AND/OR ACTION TAKEN: Unit ID → RTU 1 thru 5 Here
unit Heaters 1 thru 4 / Inspected All Rooftop
unit as required Found #1 RTU to be
Tripping main Breaker and when put into
A/C mode Deals further Trouble shooting
Found RTU 4 Deals Blower wheel shaft
and Bearings and New fully Also wiring
See Filters in it. RTU 2 This unit is in
Rough Condition Insulation Falling off
Unit # 2 Does not Come on Share a fully
Deals Replacing economizer is Broken unit
is Dirty Front to Back outside Panels in Bad
Shape Checked All unit Heaters the proper
operation GUH-10. Needs a Flame Sensor.

EMERGENCY CALL
CONTRACT INSP.
X PLANNED REPAIRS

LEAK CHECK
LEAK REPAIR
CHARGE R-
CHANGE FILTERS
ADJUST BELT
REPLACE BELT
CLEAN DRAIN
CLEAN CONDENSER
CLEAN EVAPORATOR
REPLACE OFM
REPLACE IFM
REPLACE COMPRESSOR

MATERIALS FURNISHED BY CUSTOMER
NO MATERIALS USED

HAZARDOUS MATERIALS DISPOSAL _____ gal./lbs   RECOVERY CHARGE _____ lbs
CUSTOMER'S SIGNATURE
SERVICE TECHNICIAN'S SIGNATURE

INVOICE COPY

**EXHIBIT D**



GREAT EASTERN
M A N A G E M E N T   C O M P A N Y

VIA CERTIFIED MAIL:  7018 0680 0001 4313 5827
   and email: mhauenst@biglots.com
September 25, 2020

Big Lots, Inc.
Attn:  Mary Hauenstein, Facilities Specialist
4900 East Dublin Granville Road
Columbus, OH 43081-7651

RE:     Big Lots Store #01499B – Quotes to Repair Damages
        Seminole Square Shopping Center, Charlottesville, Virginia

Dear Ms. Hauenstein:

This letter is in follow up to my February 17 and August 13, 2020 letters regarding issues the Landlord found during the walkthrough inspection and subsequent issues with the rooftop HVAC units ("RTUs") servicing the former Big Lots Premises in the Seminole Square Shopping Center.

As stated in both of the above referenced letters, based on this walkthrough and HVAC inspections, the Premises and the RTUs are not in an acceptable condition to Landlord and do not meet the requirements outlined in Section 26, Surrender of Premises, of the Big Lots Lease. Section 26 of the Lease states "Tenant will surrender the Premises broom-clean and in good condition and repair and that Tenant's obligations under this section of the Lease survive the expiration of the Lease."

As of the date of this letter, we have not heard back from Big Lots regarding a plan of action to remedy these issues, nor have we received reimbursement for the repairs of the RTUs to bring them into good working order as outlined in the August 13, 2020 letter.  As a result, and in light of the fact that the August 21, 2020 deadline for a response has passed, we have retained outside counsel to assist in resolving this matter, and have been advised to gather quotes necessary to bring the Premises to broom clean condition as defined in the Lease.  The quotes for this work based on pricing from subcontractors (and with an allowance for Profit & Overhead to oversee this work) are as follows:

| DESCRIPTION OF REPAIRS | COST |
|---|---|
| **Floor and Ceiling** | |
| Demolition, including all drywall in janitor's closet for mold remediation, carpentry, drywall, VCT flooring, ceramic tile, acoustic ceiling | $55,435.00 |
| **Cleaning** | |
| Clean, strip, seal and wax all VCT, clean ceramic and carpeted surfaces and all bathrooms/janitor's closet; mold remediation in janitor's closet | 13,200.00 |
| **Electrical** | |
| Electrical repair, lighting, exit/emergency, heaters, hand dryers, occupancy sensors, wiring repair, communication cables | 12,300.00 |
| **Plumbing** | |
| Replace broken toilets, faucets, flush valves and water fountain | 3,600.00 |
| **Subtotal** | 84,535.00 |
| **Profit & Overhead (10%)** | 8,453.50 |
| **Total Cost of Repairs** | $92,988.50 |

CORPORATE OFFICE (434) 296-4141  •  PROPERTY MANAGEMENT (434) 296-4100  •  WWW.GEMC.COM  •  P.O. BOX 5526, CHARLOTTESVILLE, VIRGINIA 22905-5526

D E V E L O P M E N T   •   C O N S T R U C T I O N   •   F I N A N C E   •   M A N A G E M E N T

Mary Hauenstein, Facilities Specialist
September 25, 2020
Page 2

In order to prevent further legal action and the addition of interest and legal fees, Big Lots either needs to issue a check in the amount of $101,298.10, representing the costs for the outlined repairs above and reimbursement for the repairs to the RTUs ($8,309.60), or provide a proposal that is acceptable to the Landlord for Big Lots to undertake the work necessary to resolve this matter.

Sincerely,

Jamie E. Boyers
Commercial Administrator
jboyers@gemc.com

cc:     Eddie Edgerton, Big Lots Regional Manager (via email: EEgerton@biglots.com)
        Ronald B. Smith, Facilities Manager (via email: rsmith@gemc.com)
        John E. Neal, Director of Property Operations (via email: jneal@gemc.com)
        John R. Walenten, Esq. (via email: jrwalenten@embarqmail.com)
        Brian A. Glasser, Esq. (via email: bglasser@baileyglasser.com)

g:\commercial leases - originals\2 sequal\1 formerleases prospects\consolidated stores (big lots) seminole\drafts\correspondence\noureoutinspectionfollowup.09.25.20.docx